UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, | C.A. No. _____ |

Plaintiffs,

vs.

JEFFREY S. RAUCH, D.C. d/b/a
REGO PARK HEALTHCARE ALLIANCE,
JACQUELINE M. LEWIS, M.D.,
RICHARD C. KOFFLER, M.D., SARI R.
RAUCH, FRED J. JONES, JR., D.C., JOHN J.
MCGEE, M.D., TODD R. GOLDMAN, D.C., BI
COUNTY MEDICAL DIAGNOSTICS P.C.,
APOLLO MEDICAL DIAGNOSTICS PLLC,
ISLAND MEDICAL DIAGNOSTICS PLLC,
MOTION MEDICAL DIAGNOSTICS P.C.,
FRED JONES CHIROPRACTOR P.C. d/b/a
SUNRISE CHIROPRACTIC, YELLOWSTONE
MEDICAL REHABILITATION P.C., AND DR.
TODD GOLDMAN, CHIROPRACTOR, P.C.,

Defendants.

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and

Casualty Insurance Company, and Allstate Property and Casualty Insurance Company (hereinafter

collectively, "Allstate" and/or "Plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink,

P.C., allege as follows:

## I.    INTRODUCTION

1.      This case involves a group of businesses and individuals who conspired together to

fraudulently procure No-Fault automobile insurance payments from Allstate.

1

2.      Jeffrey S. Rauch, D.C. (hereinafter, "Rauch") recruited, incentivized and conspired with medical doctors/physicians, Jacqueline M. Lewis, M.D. (hereinafter, "Lewis"), and Richard C. Koffler, M.D. (hereinafter, "Koffler"), (hereinafter collectively, "Nominal Owners") to operate certain medical facilities, which he was not otherwise permitted to control under New York law.

3.      These medical facilities included: Bi County Medical Diagnostics P.C. (hereinafter, "Bi County Medical"), Apollo Medical Diagnostics PLLC (hereinafter, "Apollo Medical"), Island Medical Diagnostics PLLC (hereinafter, "Island Medical"), and Motion Medical Diagnostics P.C. (hereinafter, "Motion Medical") (hereinafter collectively, "PC Defendants").

4.      While the PC Defendants appeared to be lawfully owned on paper by physicians, Rauch actually retained control of the operation, finances and medical decision making at the PC Defendants in violation of New York law.

5.      In connection with Rauch's control of the Defendants' scheme, Rauch's wife, Sari R. Rauch (hereinafter, "Sari Rauch"), acted as the office manager for the PC Defendants, and played a specific role in the Defendants' submission of claims and bills to insurers, like Allstate.

6.      At no point in time did any of the Defendants indicate or disclose that Rauch was actually the true owner/proprietor of the PC Defendants.

7.      The Nominal Owners who ceded actual control of the medical facilities, split fees with Rauch in violation of New York law.

8.      Given the fraudulent ownership and control of these medical facilities none of the bills submitted to Allstate by the PC Defendants were/are eligible for reimbursement under New York law.

9.      After establishing the PC Defendants, Rauch and the Nominal Owners created and implemented a fraudulent treatment/billing protocol to be used by the PC Defendants, which was

designed to maximize billing, as opposed to treating the individual needs of the patients at issue in this case (hereinafter, "Allstate Claimants").

10.     Essentially, the PC Defendants billed Allstate for the same treatment and testing regardless of a patients' claimed injuries or individual considerations.

11.     Specifically, Defendants engaged in the practice of billing for unnecessary services; namely, unnecessary computerized range of motion (hereinafter, "ROM") and muscle testing (hereinafter, "MT") (hereinafter collectively, "ROM/MT testing").

12.     Defendants also engaged in "unbundling" certain billing codes for unnecessary services to inflate the charges submitted to Allstate and bill in excess of amounts permitted under the New York Worker's Compensation Fee Schedule (hereinafter, "Fee Schedule").

13.     Rauch, the Nominal Owners and the PC Defendants also relied upon Defendants, Fred J. Jones, Jr., D.C., (hereinafter, "Jones"),  John J. McGee, M.D., (hereinafter, "McGee"), Todd R. Goldman, D.C. (hereinafter, "Goldman"), Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, (hereinafter, "Sunrise") Yellowstone Medical Rehabilitation P.C., (hereinafter, "Yellowstone"), and Dr. Todd Goldman, Chiropractor, P.C. (hereinafter, "Goldman PC") (hereinafter collectively, "Referring Providers") for bogus referrals of Allstate Claimants to the PC Defendants.

14.     In furtherance of the conspiracy to defraud Allstate, the Referring Providers intentionally sent Allstate Claimants to the PC Defendants to inflate the overall payment of No-Fault benefits in exchange for a kickback/portion of the fraudulent proceeds.

15.     Indeed, the unnecessary nature of these referrals for computerized ROM/MT testing is evidenced by the fact that the testing, allegedly performed by the PC Defendants, had already been manually performed by the Referring Providers.

16.     Moreover, the computerized ROM/MT testing, purportedly rendered by the PC Defendants, was rarely if ever factored into the Referring Providers' treatment plans for Allstate Claimants.

17.     Ultimately, the Defendants never had any right to be compensated for claims made to Allstate and were completely ineligible for reimbursement under New York law because: (a) the PC Defendants were operated, managed and/or controlled by one or more, undisclosed, non-physician(s); (b) the Defendants knowingly and purposely engage in the unlawful splitting of the PC Defendants professional fees and profits; (c) the Defendants billed Allstate for medically unnecessary and excessive healthcare referrals/services and, (d) the Defendants engaged in a system of payments designed to increase the amount of referrals to perpetuate their unlawful scheme.

18.     As a direct and proximate result of the Defendants' unlawful conduct between 2015 and the Present (hereinafter, "The Relevant Time Period"), Allstate was wrongfully induced to make No-Fault insurance payments totaling over $794,346.26 to Defendants.

19.     Allstate's claim for compensatory damages includes: (a) payments made by Allstate to Bi County Medical Apollo Medical, Island Medical, Motion Medical, Yellowstone, Sunrise, and Goldman PC in reliance upon the false representations made by the Defendants that Bi County Medical, Apollo Medical, Island Medical, Motion Medical, Yellowstone, Sunrise, and Goldman PC were eligible to receive reimbursement under New York's No-Fault laws; (b) payments made by Allstate to Bi County Medical, Apollo Medical, Island Medical, Motion Medical, Yellowstone, Sunrise, and Goldman PC in reliance upon the false documentation submitted, or caused to be submitted, by the Defendants; (c) treble damages; (d) interest; (e) costs; and (f) attorney's fees.

20.     In addition to compensatory damages, Allstate also seeks a declaration that it has no legal obligation to make any payments on any and all claims at issue in this lawsuit and/or previously denied and/or currently unpaid claims submitted by (or on behalf of) Bi County Medical, Apollo Medical, Island Medical, Motion Medical, Yellowstone, Sunrise, and Goldman PC, because the tests and treatments purportedly administered to Allstate Claimants were rendered in direct violation of one or more No-Fault regulations and/or licensing requirements necessary to provide such tests and treatments, thus rendering Bi County Medical, Apollo Medical, Island Medical, Motion Medical, Yellowstone, Sunrise and Goldman PC, completely ineligible to seek No-Fault reimbursement under prevailing New York law.

21.     All of the acts and omissions by the Defendants, described throughout the balance of this Complaint, were undertaken purposely, knowingly, and intentionally.

22.     Each Defendant named herein conspired with at least one other Defendant to accomplish and to further the objectives of their scheme to defraud.

23.     The Defendants purposely designed and executed this scheme with the express aim of eliciting payment of automobile insurance proceeds from Allstate to Bi County Medical, Apollo Medical, Island Medical, Motion Medical, Yellowstone, Sunrise, and/or Goldman PC, for the benefit of each and all of the Defendants named herein.

24.     The Defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

25.     Allstate estimates that the Defendants, in furtherance of this scheme, purposely and knowingly submitted hundreds of bills for tests and services purportedly rendered to persons eligible for insurance coverage under Allstate insurance policies.

26. By and through this Complaint, and as detailed in each count set out below, Allstate asserts claims against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §§ 1961, *et seq.*; (b) common-law fraud; (c) unjust enrichment; and, (d) declaratory relief.

27. The particulars of the Defendants' scheme, each Defendant's role(s), and the damage(s) caused to Allstate as a direct and proximate result of the Defendants' fraudulent conduct are further enumerated throughout the balance of Allstate's Complaint and the exhibits attached hereto.

## II.    THE PARTIES

### A.    PLAINTIFFS

28. Allstate Insurance Company, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

29. Allstate Insurance Company, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company each have their principal place of business in Northbrook, Illinois.

30. At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company were each authorized to conduct business in New York.

B.    DEFENDANTS

1.    Jeffrey S. Rauch, D.C.

31.    Rauch resides in and is a citizen of the State of New York.

32.    At all relevant times, Rauch has been licensed to provide chiropractic services in the State of New York.

33.    At no time has Rauch been licensed to provide physician services in the State of New York or elsewhere.

34.    Rauch has established various businesses that purportedly provide medical services to patients.

35.    In spite of his clandestine and improper control of the PC Defendants, Rauch utilized his businesses to generate billing and referrals to the PC Defendants, and otherwise improperly bill automobile insurers, like Allstate.

36.    Indeed, Rauch has personally referred Allstate Claimants to receive computerized ROM/MT testing at Bi County Medical, Apollo Medical, and Island Medical.

37.    Rauch participated in the operation and management of Bi County Medical, Apollo Medical, Island Medical and Motion Medical and knowingly engaged in a pattern of mail fraud activity with Bi County Medical, Apollo Medical, Island Medical and Motion Medical.

38.    Rauch furthered the objectives of this scheme by: (a) recruiting the Nominal Owners to serve as fraudulent figureheads of the PC Defendants when, in fact, Rauch was in control at all times; (b) implementing a pre-determined treatment protocol consisting of, among other things, fraudulent, unwarranted, and medically unnecessary treatment/testing, the purpose of which was solely monetary gain; (c) establishing a referral network among the PC Defendants and Referring Providers in order to improperly inflate No-Fault claims; (d) billing Allstate for

unwarranted and medically unnecessary tests and services; (e) demanding and collecting payment for these unnecessary tests and services; and, (f) illegally splitting fees with the Nominal Owners.

39.     Because he directly participated in the operation and management of the Bi County Medical, Apollo Medical, Island Medical and Motion Medical enterprises, Rauch is responsible for the fraudulent and non-compensable tests and services rendered to patients of the PC Defendants at issue in this Complaint.

### 2.     Jacqueline M. Lewis, M.D.

40.     Lewis resides in and is a citizen of the State of New York.

41.     At all relevant times, Lewis has been licensed to provide physician services in the State of New York.

42.     Lewis participated in this scheme by serving as the owner, in name only, of Bi County Medical and Apollo Medical when, in fact, Rauch was the person in control of Bi County Medical and Apollo Medical.

43.     While Lewis did not actually have control of Bi County Medical and Apollo Medical, she participated in the operation and management of these PC Defendants and the Defendants' overall scheme to defraud Allstate by accepting improper referrals from certain Referring Providers, and executing the Defendants' pre-determined treatment protocol along with Rauch and Koffler, as she purportedly administered medical tests and services that were unwarranted and medically unnecessary.

44.     As such, Lewis is responsible for the fraudulent and non-compensable tests and services that were provided to patients of Bi County Medical and Apollo Medical.

### 3.     Richard C. Koffler, M.D.

45.     Koffler resides in and is a citizen of the State of Florida.

46. At all relevant times, Koffler has been licensed to provide physician services in the State of New York.

47. Koffler participated in this scheme by serving as the owner, in name only, of Apollo Medical (as a successor to Lewis), Island Medical and Motion Medical when, in fact, Rauch was the person in control of Apollo Medical, Island Medical and Motion Medical.

48. While Koffler did not actually have control of Apollo Medical, Island Medical and Motion Medical, he participated in the operation and management of these PC Defendants and the Defendants' overall scheme to defraud Allstate by accepting improper referrals from certain Referring Providers, and executing the Defendants' pre-determined treatment protocol along with Lewis and Koffler, as he purportedly administered medical tests and services that were unwarranted and medically unnecessary.

49. As such, Koffler is responsible for the fraudulent and non-compensable tests and services that were provided to patients of Apollo Medical, Island Medical and Motion Medical.

### 4. **Sari R. Rauch**

50. Sari Rauch resides in and is a citizen of the State of New York.

51. At no time has Sari Rauch been licensed to provide any medical services in the State of New York or elsewhere.

52. Sari Rauch participated in the operation and management of Bi County Medical, Apollo Medical, Island Medical and Motion Medical and knowingly engaged in a pattern of mail fraud activity with Bi County Medical, Apollo Medical, Island Medical and Motion Medical.

53. More specifically, Sari Rauch acted as the office manager for the PC Defendants and had/has direct knowledge of, and participation in, the submission of medical records and bills from the PC Defendants to Allstate for payment.

54.     Sari Rauch admitted to her participation in the operation of the PC Defendants in sworn affidavits related to the PC Defendants' use of the U.S. Mails when submitting claims to Allstate during the relevant time period.

55.     Sari Rauch furthered the objectives of this scheme by: (a) being directly involved in the submission of medical records and bills through the U.S. Mails and Wires from the PC Defendants; and (b) demanding and collecting payment for unnecessary tests and services.

56.     Because she directly participated in the operation and management of the PC Defendant Enterprises, Sari Rauch is responsible for the fraudulent and non-compensable tests and services rendered to patients of the PC Defendants at issue in this Complaint.

### 5.     Fred J. Jones, Jr., D.C.

57.     Jones resides in and is a citizen of the State of New York.

58.     At all relevant times, Jones has been licensed to provide chiropractic services in the State of New York.

59.     Jones participated in the operation and management of Sunrise, Island Medical, and Motion Medical and knowingly engaged in the scheme to defraud Allstate with these PC Defendants.

60.     Jones participated in this scheme by administering unnecessary treatment and improperly referring Allstate Claimants to Island Medical and Motion Medical through his entity, Sunrise, for medically unnecessary testing that was performed pursuant to the Defendants' pre-determined treatment protocol.

61.     As such, Jones is responsible for the unlawful billing submitted by Sunrise and the PC Defendants related to Allstate Claimants.

### 6. **John J. McGee, M.D.**

62. McGee resides in and is a citizen of the State of New York.

63. At all relevant times, McGee has been licensed to provide physician services in the State of New York.

64. McGee participated in the operation and management of Yellowstone, Island Medical, and Motion Medical and knowingly engaged in the scheme to defraud Allstate with these PC Defendants.

65. McGee participated in this scheme by administering unnecessary treatment and improperly referring Allstate Claimants to Island Medical and Motion Medical through his entity, Yellowstone, for medically unnecessary testing and treatment that was performed pursuant to the Defendants' pre-determined treatment protocol.

66. As such, McGee is directly responsible for the unlawful billing submitted by Yellowstone and the PC Defendants related to Allstate Claimants.

### 7. **Todd R. Goldman, D.C.**

67. Goldman resides in and is a citizen of the State of New York.

68. At all relevant times, Goldman has been licensed to provide chiropractic services in the State of New York.

69. Goldman participated in the operation and management of Goldman PC, Motion Medical and knowingly engaged in the scheme to defraud Allstate with Motion Medical.

70. Goldman participated in this scheme by administering unnecessary treatment and improperly referring Allstate Claimants to Motion Medical through his entity, Goldman PC, for medically unnecessary testing and treatment that was performed pursuant to the Defendants' pre-determined treatment protocol.

71.     Amongst other things, Goldman furthered the objectives of this scheme by directly and indirectly: (a) entering into a lease agreement to conceal improper payments; (b) implementing a pre-determined treatment protocol consisting of, among other things, fraudulent, unwarranted, and medically unnecessary treatment, the purpose of which was solely monetary gain; (c) billing Allstate for medically unnecessary tests and services; and, (d) demanding and collecting payment for these unnecessary tests and services.

72.     As such, Goldman is responsible for the unlawful billing submitted by Goldman PC and Motion Medical related to Allstate Claimants.

### 8.      Bi County Medical Diagnostics P.C.

73.     Bi County Medical Diagnostics P.C. is organized under New York law as a professional service corporation.

74.     Bi County Medical maintains its principal place of business at 338 Jericho Turnpike, Syosset, NY 11791.

75.     Bi County Medical was formed in 2015 to allegedly provide medical services to patients.

76.     Lewis was/is listed as the sole shareholder, director and/or officer of Bi County Medical.

77.     At all relevant times, Rauch and Lewis directed the medical tests and services to patients of Bi County Medical, or caused their names to appear on the medical records/bills from this facility.

78.     Indeed, Rauch himself has personally referred Allstate Claimants to receive computerized ROM/MT testing at Bi County Medical.

79.     During the Relevant Time Period, in line with the Defendants' common scheme and plan, patients were referred to Bi County Medical by various Referring Providers for unnecessary computerized tests that were never used in the underlying treatment of Allstate Claimants.

80.     As an assignee of its patients' benefits, Bi County Medical sought and collected No-Fault benefit payments directly from insurers, including Allstate.

81.     As detailed herein, the Defendants purposely sought No-Fault benefits from Allstate knowing that Bi County Medical was not lawfully eligible to seek or collect such payments.

**9.     Apollo Medical Diagnostics PLLC**

82.     Apollo Medical Diagnostics PLLC is organized under New York law as a professional service limited liability company.

83.     Apollo Medical maintains its principal place of business at 6800 Jericho Turnpike, Suite 120W, Syosset, NY 11791.

84.     Subsequently, Apollo Medical listed its address for service at 31 Woodmill Road Chappaqua, NY 10514. This address is associated with Defendant, Koffler.

85.     Apollo Medical was formed in 2017 to allegedly provide medical services to patients.

86.     According to records on file with the New York Department of State, Lewis was listed as a founding member of Apollo Medical.

87.     On or about April 2017, Lewis purportedly resigned as a member and/or manager of Apollo Medical, and Koffler was listed as a member and/or manager.

88.     During the Relevant Time Period, Rauch, Lewis and Koffler directed the medical tests and services to patients of Apollo Medical, or caused their names to appear on the medical records/bills from this facility.

89.     Indeed, Rauch himself has personally referred Allstate Claimants to receive computerized ROM/MT testing at Apollo Medical.

90.     During the Relevant Time Period, in line with the Defendants' common scheme and plan, patients were referred to Apollo Medical by various Referring Providers for unnecessary computerized tests that were never used in the underlying treatment of Allstate Claimants.

91.     As an assignee of its patients' benefits, Apollo Medical sought and collected No-Fault benefit payments directly from insurers, including Allstate.

92.     As detailed herein, the Defendants purposely sought No-Fault benefits from Allstate knowing that Apollo Medical was not lawfully eligible to seek or collect such payments.

**10.     Island Medical Diagnostics PLLC**

93.     Island Medical Diagnostics PLLC is organized under New York law as a professional service limited liability company.

94.     Island Medical maintains its principal place of business at 6800 Jericho Turnpike, Suite 120W, Syosset, NY 11791.

95.     Island Medical was formed in 2017 to allegedly provide medical physician services to patients.

96.     Koffler is listed as the sole member and/or manager of Island Medical.

97.     At all relevant times, Rauch and Koffler directed the medical tests and services to patients of Island Medical, or caused their names to appear on the medical records/bills from this facility.

14

98.     Indeed, Rauch himself has personally referred Allstate Claimants to receive computerized ROM/MT testing at Motion Medical.

99.     During the Relevant Time Period, Jones, McGee and various other Referring Providers referred patients to Island Medical for unnecessary computerized tests that were never used in the underlying treatment of Allstate Claimants at their respective facilities.

100.    As an assignee of its patients' benefits, Island Medical sought and collected No-Fault benefit payments directly from insurers, including Allstate.

101.    As detailed herein, the Defendants purposely sought No-Fault benefits from Allstate knowing that Island Medical was not lawfully eligible to seek or collect such payments.

**11.    Motion Medical Diagnostics P.C.**

102.    Motion Medical Diagnostics P.C. is organized under New York law as a professional service corporation.

103.    Motion Medical originally maintained its principal place of business at 6800 Jericho Turnpike, Suite 120W, Syosset, NY 11791.

104.    On or around June 2021, Motion Medical's principal place of business was changed to 44 Bethpage Road, Suite 3, Hicksville, NY 11801.

105.    Upon information and belief, Motion Medical changed its principal place of business to avoid any further detection of the ongoing scheme by Defendants to defraud Allstate.

106.    Motion Medical was allegedly formed to provide medical physician services to patients.

107.    Koffler is listed as the sole shareholder, director and/or officer of Motion Medical.

108.    At all relevant times, Rauch and Koffler directed the medical tests and services to patients of Motion Medical, or caused their names to appear on the medical records/bills from this facility.

109.    During the Relevant Time Period, Jones, McGee, Goldman and various other providers referred patients to Motion Medical for unnecessary computerized tests that were never used in the underlying treatment of Allstate Claimants at their respective facilities.

110.    As an assignee of its patients' benefits, Motion Medical sought and collected No-Fault benefit payments directly from insurers, including Allstate.

111.    As detailed herein, the Defendants purposely sought No-Fault benefit payments from Allstate knowing that Motion Medical was not lawfully eligible to seek or collect such payments.

## 12.    Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic

112.    Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic is organized under New York law as a professional service corporation.

113.    Sunrise maintains its principal place of business at 2260 Hewlett Avenue, Merrick, NY 11566.

114.    Sunrise was formed in 2005 to provide medical services to patients.

115.    During the Relevant Time Period, Sunrise improperly directed the referral of Allstate Claimants to Island Medical and Motion Medical for unnecessary testing in exchange for a portion of the ill-gotten gains.

116.    As an assignee of its patients' benefits, Sunrise sought and collected No-Fault benefit payments directly from insurers, including Allstate.

117.    As detailed herein, Sunrise purposely sought No-Fault benefit payments from Allstate knowing that referrals from Sunrise to the PC Defendants were not lawful and that the PC Defendants were not lawfully eligible to seek or collect such payments.

**13.    Yellowstone Medical Rehabilitation P.C.**

118.    Yellowstone Medical Rehabilitation P.C. is organized under New York law as a professional service corporation.

119.    Yellowstone maintains its principal place of business at 18 Green Lawn Road, Huntington, NY 11743.

120.    Yellowstone was formed in 2007 to provide medical services to patients.

121.    During the Relevant Time Period, Yellowstone improperly directed the referral of Allstate Claimants to Island Medical and Motion Medical for unnecessary testing in exchange for a portion of the ill-gotten gains.

122.    As an assignee of its patients' benefits, Yellowstone sought and collected No-Fault benefit payments directly from insurers, including Allstate.

123.    As detailed herein, Yellowstone purposely sought No-Fault benefit payments from Allstate knowing that referrals from Yellowstone to the PC Defendants were not lawful and that the PC Defendants were not lawfully eligible to seek or collect such payments.

**14.    Dr. Todd Goldman, Chiropractor, P.C.**

124.    Dr. Todd Goldman, Chiropractor, P.C. is organized under New York law as a professional service corporation.

125.    Goldman PC maintains its principal place of business at 2799 Route 112, Suite 5, Medford, NY 11763.

126.    Goldman PC was formed in 2001 to provide medical services to patients.

127.    During the Relevant Time Period, Goldman PC improperly directed the referral of Allstate Claimants to Motion Medical for unnecessary testing in exchange for a portion of the ill-gotten gains.

128.    As an assignee of its patients' benefits, Goldman PC sought and collected No-Fault benefit payments directly from insurers, including Allstate.

129.    As detailed herein, Goldman PC purposely sought No-Fault benefit payments from Allstate knowing that referrals from Goldman PC to the PC Defendants were not lawful and that the PC Defendants were not lawfully eligible to seek or collect such payments.

III.    **JURISDICTION AND VENUE**

130.    Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

131.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

132.    Venue is proper pursuant to 28 U.S.C. § 1391(a), (b) & (c); particularly, 28 U.S.C. § 1391(b)(2), as the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

133.    At all relevant times, the Defendants have engaged in intentional activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws, as detailed herein.

134.    The Defendants' activities in and contacts with New York were performed intentionally and transacted to take advantage of the benefits available under New York's No-Fault laws.

135.     As the allegations and causes of action in the subject Complaint arise from the Defendants' fraudulent demands for payment under the No-Fault laws of New York, there is no question that there exists a substantial relationship between the transactions at issue and Allstate's causes of action.

## IV.   APPLICABLE LAWS AND REGULATIONS

### A.   NEW YORK NO-FAULT LAWS

136.     Allstate underwrites automobile insurance in the State of New York.

137.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary health care services.

138.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act, (N.Y. INS. LAW § 5101, *et seq.*) and the regulations promulgated thereto (11 N.Y.C.R.R. § 65, *et seq.*) (collectively, the "No-Fault Laws"), motor vehicle insurers, like Allstate, are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to claimants.

139.     Under the New York No-Fault Laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

140.     "Basic economic loss" is defined to include "all necessary expenses" for healthcare services. *See* N.Y. INS. LAW § 5102(a)(1); 11 N.Y.C.R.R. § 65-1-1.

141.     These necessary expenses include physical therapy that is rendered pursuant to a referral from a physician. *See* N.Y. INS. LAW § 5102(a)(1).

142.     These No-Fault benefits include up to $50,000 per claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

143.    A claimant may assign his or her No-Fault Benefits to third parties, such as healthcare service providers.

144.    Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary healthcare services rendered using the claim form required by the New York State Department of Insurance (known by its title "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly known as an "NF-3").

145.    Alternatively, healthcare providers may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

146.    The NF-3 and CMS-1500 forms are important documents in the insurance industry. These documents certify that the provider's request for payment is not materially false, misleading, or fraudulent. *See* 11 N.Y.C.R.R. § 65.3-11(a); N.Y. INS. LAW § 403(d).

**B.    NEW YORK EDUCATION LAW**

147.    New York Education Law § 6522 prohibits anyone from engaging in the practice of medicine except for those licensed to practice medicine. *See* N.Y. EDUC. LAW § 6522.

148.    Pursuant to New York Education Law § 6530(11), licensed physicians are prohibited from "permitting, aiding or abetting an unlicensed person to perform activities requiring a [medical] license."

149.    Under New York Education Law § 6530, it is professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

150.    Under New York Education Law § 6530(19), it is also professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

151.    The sharing or splitting of fees derived from the provision of professional physician services constitutes professional misconduct and subjects a physician to serious penalties, including sanctions against the offending physician's medical license.

152.    New York law prohibits anyone from engaging in the practice of chiropractic services unless they are licensed to practice as a chiropractor. *See* N.Y. EDUC. LAW §§ 6551-52.

153.    Additionally, chiropractors are generally prohibited from dividing or sharing professional fees with non-licensees. *See* N.Y. EDUC. LAW § 6509-a.

C.    **NEW YORK PROFESSIONAL SERVICE ENTITIES**

154.    In New York, professional service corporations are governed by §§ 1501-1516 of the Business Corporation Law.

155.    Under Business Corporation Law § 1504, professional service corporations cannot render professional services except through individuals authorized by law to render such professional services.

156.    Moreover, under Business Corporation Law § 1507, a professional service corporation cannot issue shares to individuals unless they are "engaged in the practice of such profession in such [a] corporation." It also prohibits such shareholder(s) from entering into any agreement, granting proxies, or transferring control to individuals who are not authorized by law to practice the profession for which the professional service corporation is authorized to practice.

21

157.    Pursuant to Business Corporation Law § 1508, each director or officer of a professional service corporation must be authorized by law to practice in New York the profession that such corporation is authorized to practice.

158.    In New York, professional service limited liability companies are governed by §§ 1201-1216 of the Limited Liability Company Law.

159.    A professional service limited liability company in New York can only render professional services through those individuals who are authorized to perform the service that the professional service limited liability company is organized to perform. *See* N.Y. LTD. LIAB. LAW § 1204(a).

160.    With respect to professional service limited liability companies in New York that are formed to provide medical services, each member must be licensed to practice medicine in New York. *See* N.Y. LTD. LIAB. LAW § 1207(b).

161.    Under Limited Liability Company Law § 1207, a person cannot be a member of a professional service limited liability company unless they are authorized by law to render professional services that the professional service limited liability company is authorized to perform. It also prohibits such member(s) from entering into any agreement, granting proxies, or transferring control to individuals who are not authorized by law to practice the profession for which the professional service limited liability company is authorized to practice. *See* N.Y. LTD. LIAB. LAW § 1207(c).

162.    Moreover, under Limited Liability Company Law § 1211, no member of a professional services limited liability company may sell or assign their membership interest in said professional services limited liability company to individuals unless they are "eligible to become a member of such limited liability company."

163.     Taken together, the restrictions set forth under the No-Fault Laws, the Education Law, and the Business Corporation Law are designed to ensure that professional service entities are operated and controlled by individuals that are authorized to practice in the professional discipline(s) offered by the entity.

164.     New York's No-Fault Laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 51029a)(1) of the Insurance Law if the provider fails to meet **_any_** applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

165.     In *State Farm Mut. Auto Ins. Co. v. Mallela*, the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that corporations organized and registered to provide professional healthcare services that are fraudulently incorporated under New York Business Corporation Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional healthcare services that the corporations are organized are registered to provide) are not entitled to No-Fault reimbursement. *State Farm Mut. Auto ins. Co. v. Mallela*, 4 N.Y.3d 313, 320 (N.Y. 2005).

166.     As such, a professional services company is lawfully ineligible to seek or receive No-Fault benefit payments if the entity, or any of its members, fails to meet **_any_** applicable licensing requirement necessary to perform a service. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

167.     Under prevailing law, an insurer may maintain a cause of action to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)) to healthcare providers that are organized, operated, and/or controlled in violation of New York law. *Metroscan Imaging, P.C. v. GEICO Ins. Co.*, 823 N.Y.S.2d 818, 821-22 (N.Y. App. Term, 2d Dep't 2006).

## V.   FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.   RAUCH'S UNLAWFUL OPERATION AND CONTROL OF THE PC DEFENDANTS

168.    At all relevant times, the PC Defendants were falsely held out to the general public as being owned, operated, and/or controlled by medical doctors when, in fact, the PC Defendants were actually owned, operated and/or controlled by Rauch, a non-physician.

169.    In furtherance of the Defendants' scheme, Rauch recruited Lewis, a licensed physician who was willing to sell the use of her medical license to Rauch so the PC Defendants could secretly and unlawfully submit fraudulent No-Fault billing to Allstate and other insurers.

170.    In order to circumvent New York Law and to induce the New York State Education Department to issue a certificate of authority authorizing Bi County Medical and Apollo Medical to operate a medical practice, Rauch entered into a secret scheme with Lewis.

171.    In exchange for a designated salary, and/or other form of compensation from Rauch, Lewis agreed to falsely represent in the certificate of incorporation and related filings with New York State for Bi County Medical and Apollo Medical, that she was the true shareholder, director, and officer of Bi County Medical and Apollo Medical and that she truly owned, controlled, and practiced through these professional corporations.

172.    Lewis did this knowing that Rauch would use these professional corporations to submit fraudulent and non-compensable billing to insurers, like Allstate.

173.    Rauch also recruited Koffler, a licensed physician who was willing to sell the use of his medical license to Rauch so the PC Defendants could secretly and unlawfully submit fraudulent No-Fault billing to Allstate and other insurers.

174.    In order to circumvent New York Law and to induce the New York State Education Department to issue a certificate of authority authorizing Island Medical and Motion Medical to operate a medical practice, Rauch entered into a secret scheme with Koffler.

175.    In exchange for a designated salary and/or other form of compensation from Rauch, Koffler agreed to falsely represent in the certificate of incorporation and related filings with New York State for Island Medical and Motion Medical that he was the true shareholder, director, and officer of Island Medical and Motion Medical and that he truly owned, controlled, and practiced through these professional corporations.

176.    Koffler did this knowing that Rauch would use the professional corporations to submit fraudulent and non-compensable billing to insurers, like Allstate.

**B.   THE OPERATION OF PC DEFENDANTS DEMONSTRATES AN ONGOING CONSPIRACY**

177.    While the Nominal Owners seemingly operated independent of one another at their respective shell businesses, their operation of the PC Defendants did, in fact, overlap.

178.    Specifically, documentation demonstrates Koffler ultimately took over Lewis' interest in Apollo Medical in 2017.

179.    While the Defendants submitted bills from the four different PC Defendants, these businesses actually operated under a common umbrella.

180.    Indeed, these PC Defendants operated in a virtually identical fashion, with all four PC Defendants using similar documentation and the same predetermined testing and billing protocol.

181.    Upon information and belief, the PC Defendants also used the same technicians to render the same pre-determined treatment to Allstate Claimants.

182.     The PC Defendants operated sequentially, and patients were routinely transferred from Bi County to Apollo Medical, Apollo Medical to Island Medical, and Island Medical to Motion Medical.

183.     Indeed, on at least one occasion, the Allstate Claimants' treatment protocol was so prolonged that they were referred for computerized testing at three of the PC Defendants.

### C.  TIMELINE OF PC DEFENDANTS' EFFORTS TO CONCEAL IMPROPER TESTING

184.     Allstate Claimants initially began receiving computerized range of motion tests from Lewis, which was billed for by Bi County Medical.

185.     Thereafter, in or around April of 2017, the Allstate Claimants were "transferred" from Bi County Medical to Apollo Medical, to the extent the Allstate Claimants were still in the Defendants' fraudulent treatment billing cycle.

186.     In or around May 2017, Lewis executed and filed a Certificate of Assumed Name demonstrating that Apollo Medical had an assumed name of "Bicounty Medical Testing."

187.     A true and accurate copy of Apollo Medical's Certificate of Assumed Name is attached hereto as Exhibit 1.

188.     Approximately one month later, in or around June 2017, Koffler signed and filed a Certificate of Amendment of Certificate of Assumed Name to change the assumed name of Apollo Medical from "Bicounty Medical Testing" to "Bicounty Medical Diagnostics."

189.     A true and accurate copy of Apollo Medical's Certificate of Amendment of Certificate of Assumed Name is attached hereto as Exhibit 2.

190.     These certificates demonstrate that Apollo Medical was a continuation/different iteration of Bi County Medical.

191.    Upon information and belief, the Defendants engaged in this practice to limit the duration of time through which any one of the PC Defendants was used to submit billing to insurers, thereby evading detection of their fraudulent scheme; and this continued with the other PC Defendants.

192.    In or about January of 2018, Allstate Claimants were further "transferred" from Apollo Medical to Island Medical, to the extent the Allstate Claimants were still in the Defendants' testing/billing cycle.

193.    In or around October of 2019, Allstate Claimants were further "transferred" from Island Medical to Motion Medical, to the extent the Allstate Claimants were still in the Defendants' testing/billing cycle.

194.    As of the date of this filing, Motion Medical continues to submit billing to Allstate for computerized range of motion testing allegedly administered to Allstate Claimants.

**D. RAUCH'S ROLE IN THE DEFENDANTS' SCHEME & REGO PARK HEALTHCARE ALLIANCE CONNECTIONS TO THE PC DEFENDANTS**

195.    The PC Defendants, four seemingly distinct businesses, apparently "owned" by different individuals, actually operated in near identical fashion because they were/are controlled by a common entity—Rauch.

196.    As noted, Rauch is a licensed chiropractor who maintained/maintains medical businesses in New York State.

197.    Some of Rauch's businesses include Jeffrey S. Rauch, D.C., P.C., A.H.S. Management & Marketing Company Inc., and Supplies Plus Inc; and Rauch was/is the owner and in control of these businesses.

198.    As demonstrated herein, Rauch's above-referenced businesses share contact information with the PC Defendants.

199.     The common ties between Rauch's businesses and the PC Defendants further demonstrate how Rauch played an unlawful and fraudulent role in the operation of the PC Defendants.

200.     Additionally, it should be noted that Rauch previously paid a fine, had his license suspended, and was on probation after admitting to charges of Insurance Fraud in the 5th Degree.

201.     A true and accurate image from the New York State Office of Professions pertaining to Professional Misconduct and Discipline of Defendant, Jeffrey S. Rauch is depicted below:

**Jeffrey Scott Rauch, Syosset, NY**

**Profession:** Chiropractor; Lic. No. 008315; Cal. No. 23342
**Regents Action Date:** December 14, 2007
**Action:** Application for consent order granted; Penalty agreed upon: 1 month actual suspension, 23 month stayed suspension, 2 years probation, $2,500 fine.
**Summary:** Licensee admitted to the charge of having been convicted of Insurance Fraud in the 5th Degree, a class A misdemeanor.

(Highlight Added).

202.     A true and accurate copy of the consent order entered against Rauch is attached hereto as Exhibit 3.

203.     A true and accurate image regarding the specifics of Rauch's professional misconduct is depicted below:

```
New York. Specifically it was alleged that in the
Town of Brookhaven, County of Suffolk, New York,
between June, 2002 and February, 2003 Respondent
submitted billing under no-fault insurance for an
injury that Respondent knew was not related to a
motor    vehicle    accident,    and    billed    for
chiropractic services that were not rendered.
```

204.     The respondent referred to in the image above is Defendant, Rauch.

28

205.   The consent order entered against Rauch related directly to fraudulent No-Fault billing submissions.

206.   Upon information and belief, Rauch utilized the PC Defendants, and other corporate shields, in an effort to otherwise disguise the nature of the Defendants' fraudulent practices from his own disciplinary history.

207.   At the center of the Defendants' current scheme was/is Rauch's multidisciplinary company that Rauch does business as: Rego Park Healthcare Alliance ("RPHA").

208.   RPHA is an unincorporated entity that operates as a direct extension of Jeffery Rauch himself.

209.   Rauch has acknowledged in public filings that he does business as ("d/b/a") Rego Park Healthcare Alliance. *See Cherveny v. Rauch, et al.*, Queens County Index No. 706095/2018, Doc. No. 19, p. 1. *See* Exhibit 4.

210.   On the company website, Rauch's name is listed below the masthead for RPHA.

211.   Specifically, Rauch's name is listed under the RPHA's webpage tabs for "Healthcare Services" and "Insurances".

212.   A true and accurate depiction of RPHA's webpage tabs for "Healthcare Services" and "Insurances" can be found below:





213. The RPHA website confirms the following information:

    a) Dr. Rauch is the sole founding member of Rego Park Healthcare Alliance;

    b) Dr. Rauch created Rego Park Healthcare Alliance; and,

    c) Dr. Rauch put together a Medical Team based on his vision.

214. The "Medical Team" portion of RPHA's website describes Rauch as the "Medical Director, Head of Chiropractic Medicine and Chief Administrator of [Rego Park Healthcare Alliance]."

215. A true and accurate depiction of RPHA's webpage tab for "Medical Team" can be found below:



216.    As depicted above, Dr. Jeffrey Rauch, D.C.[1] is the first medical professional listed under the "Medical Team" webpage tab on RPHA's website.

217.    Various other physician/medical doctors can be found *under* Dr. Jeffrey Rauch DC on the website; including but not limited to Defendant, Jacqueline Lewis, MD.

218.    Specifically, RPHA's website reads, that Defendant, "Dr. Jacqueline Lewis joined Rego Park Healthcare Alliance in early 2014".

219.    This timeline regarding Lewis and RPHA coincides with, and in fact pre-dates her paper ownership of Defendant, Bi County Medical.

220.    A true and accurate copy of RPHA's webpage tab for "Medical Team", listing Lewis as part of RHPA can be found below:



221.    At least one connection between each PC Defendant and Rauch can almost always be traced back to RPHA and/or his other businesses.

222.    Specifically, according to its website, RPHA operates from 64-33 98th Street, Rego Park, NY 11374 ("RPHA Address").

---

[1] The face of Dr. Jeffrey Rauch, D.C. depicted in the above-referenced image has been obscured in the spirit of Fed. R. Civ. P. 5.2.

223.    A true and accurate image from RPHA's website depicting the business' address and telephone number can be found below:



224.    During the Relevant Time Period, Bi County Medical, Apollo Medical, and Island Medical submitted bills to Allstate representing that treatment to Allstate Claimants was rendered at Rauch's RPHA Address.

225.    True and accurate examples of bills submitted to Allstate by Bi County Medical, Apollo Medical, and Island Medical (entities listed as being owned by Lewis and/or Koffler) are attached hereto as Exhibit 5.

226.    The bills attached as Exhibit 5 list (in Box 15) a treatment location at the RPHA Address.

227.    The bills attached as Exhibit 5 provide the treating provider(s) as either Koffler or Lewis.

228.    Nowhere on the PC Defendants' bills, attached as Exhibit 5, is Rauch disclosed as being associated or involved with the PC Defendants.

229.    Under the "Contact Us" portion of its website, Motion Medical refers the public to call: 718-606-6000 or email: docrauch@aol.com.

230.    The telephone number 718-606-6000 is the telephone number listed on the RPHA website.

231.    Upon information and belief, docrauch@aol.com is an email address for Rauch.

232.    A true and accurate depiction of the "Contact Us" webpage tab on the Motion Medical website can be found below:



233.    The telephone number and email address on RPHA's website also appears on Motion Medical's website.

234.    Under the "Frequently Asked Questions" portion of its website, Motion Medical also refers the public to call 516-729-2629—in addition to listing the RPHA phone number 718-606-6000 for a second time.

235.    Based upon an investigation by Allstate, the telephone number 516-729-2629 is the telephone number used by Jeffrey S. Rauch, D.C., P.C.

236.     A true and accurate depiction of the "Frequently Asked Questions" (i.e., "FAQs") webpage tab on the Motion Medical website can be found below:

# FAQs

**What exactly does range-of-motion mean?**

Range of motion, or (ROM), refers to the extent of movement of a specific joint, which is measured in the degrees of a circle. The devices used to measure range of motion include Goniometer and Inclinometer's, Tape measure's can also be used to measure range of motion for some parts of the body. In simpler terms, lets say Joann has torn a ligament in her knee and is now working with a physical therapist in order to regain her full range of motion. When she began treatment, she was rather limited in the movement of her knee, but since preforming stretching exercises on a regular basis, her therapist has confirmed that her range of motion (ROM) is becoming closer to her pre-injury level of functioning. When you give us a call, you will be connected directly to one of our friendly, helpful staff, so you can expect immediate attention to your inquiry.

**What are your prices?**

If you would like to gather a quote, please fill out our form on our web-page for more information about pricing. Or you can call us at 718-606-6000 or 516-729-2629. If you would like to send us an email, you can email us about pricing at docrauch@aol.com. We want to help you recover your range of motion so you can live normally again! Here at Motion Medical Diagnostics, our doctors perform a series of tests to evaluate your range of motion. They'll then work with you to create a treatment plan that will address your range of motion issues to get you healthy as safely and quickly as possible! Our team works to provide you with solutions that will help you achieve mobility and a better quality of life, no matter what it takes! When you give us a call, you will be connected directly to one of our friendly, helpful staff, so you can expect immediate attention to your inquiry.

**Does everyone get the same treatment plan?**

237.     As noted at the outset of this section, information related to Rauch's other medical businesses demonstrate how the PC Defendants were/are actually Rauch's companies.

238.     In a similar fashion to the public facing information for the PC Defendants, the websites for A.H.S. Management & Marketing Company Inc. and Supplies Plus Inc. directed the public to call the telephone number 516-729-2629 (the telephone number for Jeffrey S. Rauch, D.C., P.C.).

239.     In addition, the websites for Rauch's A.H.S. Management & Marketing Company Inc. and Supplies Plus Inc. also directed the public to call 718-606-6000 (the telephone number for RPHA).

240.     Furthermore, the websites for A.H.S. Management & Marketing Company Inc. and Supplies Plus Inc. directed the public to reach these entities by e-mailing 'docrauch@aol.com'.

241.     In short, the telephone numbers and e-mail address Rauch used for businesses registered in his own name were the same used by Motion Medical.

34

242.    During the Relevant Time Period, Motion Medical, (a business purportedly owned by Koffler) responded to Allstate's request for verification via facsimile.

243.    On the top of the faxed verification response submitted to Allstate by Motion Medical was the name, "Sari Rauch".

244.    A true and accurate example of such information on a verification response submitted to Allstate can be found below:

```
20-Aug-2020  16:00    Sari Rauch-1                    5163935914        p.2
```

245.    Another true and accurate example of a verification response submitted to Allstate by Motion Medical is attached hereto as Exhibit 6.

246.    Sari Rauch's involvement with the PC Defendants' verification responses demonstrates her direct participation in the submission of claim documentation to insurers, like Allstate.

247.    Indeed, the facsimile number 516-393-5914, used by Motion Medical to respond to Allstate's request for verification, was/is the same facsimile number listed by Island Medical on its website.

248.    The following image is a true and accurate copy from Island Medical's website:



You're Always
Welcome at Island
Medical Diagnostics

Computerized Range of Motion Testing:
*Quality Care You Can Trust*
(Phone) 516 393-5904
(Fax) 516 393-5914
Islandmeddx@gmail.com

249.    As noted above, Sari Rauch's work with the PC Defendants did not begin with Motion Medical.

250.    Several years before Motion Medical was formed, Sari Rauch was held out as the "office manager" of Bi County Medical.

251.    Sari Rauch submitted an affidavit on behalf of Bi County Medical wherein she acknowledged that she is the company's office manager and that she has personal knowledge regarding Bi County Medical's practice of mailing claim documentation to Allstate.

252.    A true and accurate example of an affidavit of mailing including Sari Rauch's name and role at Bi County Medical can be found below:

### AFFIDAVIT OF MAILING

STATE OF NEW YORK

COUNTY OF NASSAU:

Sari Rauch, being duly sworn, deposes and says:

1) My name is Sari Rauch and I am the office manager at Bi County Medical Diagnostics. I am over 18 years old and am fully familiar with the facts alleged herein. The source of my knowledge being my personal knowledge and the files kept at the Practice in the ordinary course of business.

2) I am fully familiar with the practice's mailing of our claims. I have personal knowledge of our claim's mailings.

3) With regard to patient M█████ A█████ and the responses to Allstate's verification requests,

253.    A true and accurate copy of the affidavit of mailing signed by Sari Rauch is attached hereto as Exhibit 7.

254.    Additionally, in her capacity as "office manager" Sari Rauch was included on a May 5, 2016 e-mail to the American Arbitration Association wherein counsel expressed that their client, Bi County Medical, would like all active cases transferred to their firm.

255.    A true and accurate copy of the above-referenced e-mail can be found below:



256.    A true and accurate copy of the May 5, 2016 e-mail is attached hereto as Exhibit 8.

257.    Upon information and belief, Sari Rauch continued this role as Office Manager at Apollo Medical, Island Medical and Motion Medical.

258.    In addition to being held out as an employee of Bi County Medical, Sari Rauch can be traced to the submission of claims from Apollo Medical, Island Medical and Motion Medical.

259.    Bi County Medical, where Sari Rauch served as office manager, ultimately became Apollo Medical, by and through the above-referenced Certificate of Assumed Name. *See* Exhibit 1.

260.    Island Medical listed the same facsimile number on its website that was listed on other claim submissions (for Motion Medical) bearing the name, "Sari Rauch".

261.    Finally, Sari Rauch directly submitted verification responses to Allstate on behalf of Motion Medical.

262.    This information regarding Sari Rauch's connections to each of the PC Defendants, further points to the fact that the PC Defendants were/are different iterations of one another, and

that upon information and belief they sought to limit the duration of time through which any one of the PC Defendants was used to submit billing to insurers, thereby evading detection of their fraudulent scheme.

263.    The above-referenced information is also evidence that Defendant Rauch was/is the fulcrum between the PC Defendants and that, as his website demonstrates, he had control over these businesses, the employees, and the doctors that owned the PC Defendants on paper.

264.    In spite of their efforts to conceal his involvement, Defendants did ultimately submit documentation to Allstate demonstrating that Rauch was actively involved in the claims submitted to Allstate by the PC Defendants.

265.    Specifically, Rauch's name appears on certain medical records submitted by Island Medical.

266.    A true and accurate copy of a medical report from Island Medical, authored by Rauch, which was billed under the name of Koffler can be found below:



267.     A true and accurate copy of medical records and bills from December 4, 2018 which were submitted to Allstate by Island Medical are attached hereto as Exhibit 9.

268.     Koffler is listed on the medical bills as the treating provider for the services allegedly rendered on December 4, 2018, to this Allstate Claimant. *See* Exhibit 9.

269.     This record attached as Exhibit 9 demonstrates that the PC Defendants misrepresented the name of the treating provider on the medical bills submitted to Allstate.

270.     Upon information and belief, this misrepresentation was made on the bills in order to get paid by Allstate, and otherwise conceal Rauch's involvement with Island Medical and the PC Defendants.

271.     These facts demonstrate how Rauch operated systematically and intentionally within the PC Defendants, even if these businesses, in their submissions to Allstate, attempted to hide his participation and control.

272.     While Koffler and Lewis were held out as the owners and/or treating providers at the PC Defendants, they did not supervise or actively participate in treatment to Allstate Claimants.

273.     Instead, while at times doing little to no work for the PC Defendants and in exchange for monetary gain, Koffler and Lewis allowed Rauch to implement the fraudulent business practices detailed herein.

274.     During the Relevant Time Period, Koffler spent a substantial period of time in Florida and maintained multiple healthcare practice(s), including two practices in Miami, Florida.

275.     Upon information and belief, when Koffler was in Florida, Rauch was in full control of Koffler's businesses in New York and fabricated records to create the false impression that Koffler was present in New York (where the PC Defendants were allegedly rendering services).

276.   On at least one occasion, Koffler was listed as the treating provider at the PC Defendants when he was physically in Florida.

277.   Upon information and belief, once insurers became aware of this fact, the Defendants began listing an additional medical provider on the records from Motion Medical.

278.   Notably, this additional medical provider was a chiropractor who cannot be controlled by a medical doctor.

279.   And while Lewis may have been present in New York, a low bar for being paid under New York's No-Fault statute, she was still under Rauch's direction and control in violation of New York law.

280.   Ultimately, the Nominal Owners did not conduct any analysis, or generate any of the necessary written reports regarding the computerized testing allegedly performed by the PC Defendants.

281.   Instead, most if not all of the computerized testing appears to have been performed by technicians.

282.   As demonstrated below, the computerized testing at the center of the Defendants' scheme, was never truly interpreted by medical professionals, but instead generated by a machine without further analysis, scrutiny, or consideration for the Allstate Claimants' reported condition(s) and/or ongoing treatment with the Referring Providers.

**E.   UNIFORMITY OF LETTERS OF MEDICAL NECESSITY FROM SEEMINGLY DISTINCT REFERRING PROVIDERS**

283.   The uniform nature of the letters of medical necessity from seemingly distinct Referring Providers (designed to funnel patients to the PC Defendants) further demonstrates how a single influence, Rauch, engaged with additional medical providers to increase the amounts collected from insurers, like Allstate.

284.     Rauch himself also referred Allstate Claimants to Bi County Medical, Apollo Medical, and Island Medical for computerized ROM/MT using the same letters of medical necessity as the Referring Providers.

285.     In addition to containing the same boilerplate language, the letters of medical necessity submitted by the Referring Providers input the same cursory claim information, use the same font, format, and change only the referring providers name at the top.

286.     A true and accurate copy of such letters of medical necessity from the Referring Providers are attached hereto as Exhibit 10.

287.     These template referrals and letters of medical necessity are not the only commonalities shared by the PC Defendants.

288.     The shared practices of otherwise seemingly distinct entities (i.e. Nominal Owners, PC Defendants and Referring Providers) demonstrate how their common link, Rauch, controlled all aspects of the predetermined protocol, unnecessary treatment and unlawful referrals.

F.   <u>FURTHER EVIDENCE OF IMPROPER REFERRALS BETWEEN THE REFERRING PROVIDERS AND THE PC DEFENDANTS</u>

289.     As noted above, three of the PC Defendants (Apollo Medical, Island Medical, and Motion Medical) identified their principal place of business as 6800 Jericho Turnpike which is nothing more than a mailbox store/virtual office in Syosset, NY.

290.     Similarly, Bi County Medical identified its principal place of business at 338 Jericho Turnpike, which is a UPS store.

291.     In addition to these similarities and the common connection to the RPHA Address, referenced above, the PC Defendants also operated at a series of other medical clinics located at:

a.   2260 Hewlett Avenue, Merrick, NY 11566;

b.   1570 Old Country Road, Westbury, NY 11590;

     c.   56A Motor Avenue, Farmingdale, NY 11735;

     d.   64-33 98th Street, Rego Park, NY 11374;

     e.   6800 Jericho Turnpike, Ste 120W, Syosset, NY 11791;

     f.   474 Fulton Ave, Ste 102, Hempstead, NY 11550;

     g.   94-11 Jamaica Ave, Woodhaven, NY 11421; and

     h.   2799-5 Route 112, Medford, NY 11763.

292.    One way the Defendants all ensured they would make the most money was by obtaining referrals of patients for whom they could fraudulently bill.

293.    Indeed, Rauch and the PC Defendants entered into illegal financial arrangements with the Referring Providers, who operated out of the above-referenced addresses.

294.    These illegal financial arrangements included entering into illegal referral arrangements for payment, and/or permitting the impermissible splitting of professional fees, which resulted in increased medical bills for the Referring Providers.

295.    The payments for patient referrals paid by Rauch and/or the PC Defendants to the Referring Providers were disguised as fees to rent space or use personnel from the PC Defendants.

296.    These arrangements were designed to incentivize otherwise unnecessary referrals and treatment.

297.    These arrangements were designed so the Referring Providers would steer Allstate Claimants to the PC Defendants so they could be subjected to medically unnecessary services, culminating in fraudulent bills being submitted to Allstate.

298.    To the extent Rauch (directly and/or indirectly) and the PC Defendants entered into written lease or other agreements with the Referring Providers, the agreements were shams in that they did not mandate a fixed rental amount throughout the term of the agreement consistent with

arms-length commercial rental arrangements, but instead permitted the upward or downward adjustment of fees (i.e., disguised as "Additional Rent") that, despite boilerplate language to the contrary, reflected the volume of referrals from the Referring Providers to the PC Defendants.

299.    Furthermore, to the extent Rauch and the PC Defendants entered into written lease or other agreements with the Referring Providers the agreements were shams in that the agreements were not for space dedicated for use by the Defendants.

300.    These leases also provided for rental amounts that were not consistent with the fair market value of the space purportedly used by the Defendants, which typically consisted of use ***one or two days per month*** when Referring Providers would refer patients to the PC Defendants.

301.    In exchange for the illegal financial payments, when an Allstate Claimant visited one of the Referring Providers, the Allstate Claimant was, as a matter of course, referred for the medically unnecessary services with the PC Defendants, regardless of the individual's symptoms, presentment, or actual need for additional treatment or testing.

302.    Ultimately, the amounts paid by the PC Defendants to the owners and controllers of the various Referring Providers were based on the volume of patients that the Referring Providers generated for unnecessary treatment with the PC Defendants.

303.    These unlawful payments were essential to the success of the Defendants' fraudulent scheme. The Defendants derived significant financial benefit from the relationships because, without access to a steady stream of patients, the Defendants would not have the ability to execute the fraudulent treatment/testing and bill Allstate improperly for the same.

304.    The Defendants knew that these arrangements were illegal and by continuing to issue referrals and letters of medical necessity, were complicit in taking affirmative steps to conceal the existence of the fraudulent referral scheme.

305.     As noted, the Defendants use(d) lease agreements as a means by which to generate

patient volume and referrals for unecessary computerized ROM/MT testing.

306.     By way of example, a true and accurate depiction of relevant portions of the lease

agreement between Goldman PC and Motion Medical can be found below:



**LEASE AGREEMENT**

**by and between**

*Dr Todd Goldman Chiropractor PC* ("Landlord")
and
*Motion Medical Diagnostics PC* ("Tenant")

Respecting Professional Offices located at
2799 Route 112, Suite 5, Medford, NY 11763

**LEASE AGREEMENT**

Respecting Professional Offices located at
*2799 Route 112, Suite 5, Medford, NY 11763*

THIS LEASE AGREEMENT (the "Lease") is entered into as of October 1, 2020 by
and between *Dr. Todd Goldman Chiropractor PC* ("Landlord"), a New York Company, and
*Motion Medical Diagnostics PC*, a New York Professional Corporation ("Tenant").

Landlord and Tenant agree, as follows:

1.   SUMMARY OF LEASE PROVISIONS.

1.1. Leased Premises. The leased commercial office real estate (the "Premises") consists
of an agreed area of approximately 400 rentable square feet located within the
buildings known as *2799 Route 112, Suite 5, Medford, NY 11763*, together with the
non-exclusive right to use the Common Areas (as defined hereinbelow) appurtenant
to the Premises and the Building. The Premises contain, for the exclusive use of



Base Rent Rider annexed hereto.

Page 25 of 28

307.    While executed, the signature lines of this lease do not specifically identify the 'Landlord' and 'Tenant' by name.

308.    Upon information and belief, the signature for 'Landlord' should be that of Defendant Todd R. Goldman, D.C. (owner of Dr. Todd Goldman, Chiropractor, P.C.) while the signature for 'Tenant' should be that of Defendant, Richard C. Koffler, M.D. (listed owner of Motion Medical Diagnostics P.C.).

309.    However, the signature for the listed 'Tenant', Motion Medical, does not necessarily appear to match the signature placed on medical billing submitted to Allstate by Koffler.

310.    A true and accurate depiction of Koffler's signature from the medical records/bills submitted to Allstate by Island Medical can be found below:

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR COMMERCIAL INSURANCE OR A STATEMENT OF CLAIM FOR ANY COMMERCIAL OR PERSONAL INSURANCE BENEFITS CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, AND ANY PERSON WHO, IN CONNECTION WITH SUCH APPLICATION OR CLAIM, KNOWINGLY MAKES OR KNOWINGLY ASSISTS, ABETS, SOLICITS OR CONSPIRES WITH ANOTHER TO MAKE A FALSE REPORT OF THE THEFT, DESTRUCTION, DAMAGE OR CONVERSION OF ANY MOTOR VEHICLE TO A LAW ENFORCEMENT AGENCY, THE DEPARTMENT OF MOTOR VEHICLES OR AN INSURANCE COMPANY, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE VALUE OF THE SUBJECT MOTOR VEHICLE OR STATED CLAIM FOR EACH VIOLATION.

| DATE | PROVIDER'S SIGNATURE | IRS/TIN IDENTIFICATION NO. | WCB RATING CODE IF NONE, SPECIALTY |
|------|----------------------|----------------------------|-------------------------------------|
| 05/23/2018 | | | M.D. |

311.    On October 13, 2020, Goldman testified at an examination under oath (hereinafter, "EUO") with Allstate.

312. A true and accurate copy of relevant portions of Goldman's EUO is attached hereto as Exhibit 11.

313. As demonstrated below, during his EUO, Goldman testified that he signed a lease with Motion Medical because he "needed range of motion testing in [his] office."

314. A true and accurate portion of Goldman's EUO is depicted below:

```
 4        Q.    And how long have you been in
 5    agreement with this provider?
 6        A.    Less than a year.
 7        Q.    Other than range of motion and
 8    muscle testing, do they provide any other
 9    services?
10        A.    No.
11        Q.    Okay.
12              How did you come about with the
13    agreement with Motion Medical?
14        A.    What do you mean?
15        Q.    What made you want to lease to
16    Motion Medical?
17        A.    I needed range of motion
18    testing in my office.
19        Q.    Why did you need that?
20        A.    Because I like to see how the
21    patient progresses as I treat them.
```

315. Based upon Goldman's testimony, neither he, nor anyone from Goldman PC, vetted Motion Medical or its owner(s), whatsoever.

316.  Another true and accurate portion of Goldman's EUO is depicted below:

```
 5                Just to clarify, when we're
 6   saying deal with, I meant who is the
 7   agreement with that Todd Goldman PC has?
 8        A.    With Motion Medical.
 9        Q.    Okay.
10                Who is the owner of Motion
11   Medical?
12        A.    The specific owner I'm not
13   100 percent sure.
```

317.  Indeed, in spite of the fact that the purported lease agreement with Motion Medical was signed only twelve (12) days prior to the above-referenced EUO, Goldman's testimony suggests that he had not met the owner of Motion Medical.

318.  A true and accurate portion of Goldman's EUO is depicted below:

```
 4        Q.    Moving on.  You mentioned
 5   Motion Medical.
 6        A.    Yes.
 7        Q.    Is that the PC?  Motion Medical
 8   PC, is that the name?
 9        A.    I guess so.
10        Q.    Who is your agreement with,
11   with Motion Medical?
12        A.    What was that?
13            MR. MOROFF:  What is your
14       agreement with Motion Medical?
15            THE WITNESS:  Oh, my agreement
16       is a lease agreement.
17        Q.    With who?  Who is the person
18   that you're dealing with?
19        A.    I just deal with the techs that
20   are there.
21        Q.    Who is the tech?
22        A.    Cliff, Clifford.  I don't know
23   his last name.
```

319.    As depicted above, Goldman only "deal[s] with the techs that are there" from Motion Medical.

320.    Specifically, Goldman testified at his EUO with Allstate that he only deals with a technician from Motion Medical by the name of "Cliff" or "Clifford".

321.    More specifically, Goldman testified at his EUO with Allstate that he does not know Richard Koffler.

322.    A true and accurate portion of Goldman's EUO is depicted below:

```
 9        Q.    Who is Richard Koffler?
10        A.    Richard who?
11        Q.    Koffler.  I can spell it for
12   you, K-O-F-F-L-E-R?
13        A.    I have no idea.
14        Q.    That name is not familiar to
15   you at all?
16        A.    No.
```

323.    Goldman's EUO testimony demonstrates that the lease agreement between Goldman PC and Motion Medical came about as a result of a recommendation from Ronald Mazza.

324.    A true and accurate portion of Goldman's EUO is depicted below:

```
 7        Q.    How did you come about meeting
 8   Motion Medical?
 9        A.    One of the chiropractors I know
10   were using them.
11        Q.    Who was that?
12        A.    Ron Mazza.
```

325.    Dr. Ronald P. Mazza D.C., P.C. was also one of the largest Referring Providers to the PC Defendants during the Relevant Time Period.

326.    Notably, Dr. Ronald P. Mazza D.C., P.C. was a primary referral source for the first iterations of the PC Defendants, Bi County Medical and Apollo Medical.

327.    Much like Dr. Ronald P. Mazza D.C., P.C., Goldman and Goldman PC engaged in the same pattern of referrals with Motion Medical.

328.    A true and accurate portion of Goldman's EUO is depicted below:

```
20              So it says, "Computerized range
21   of motion muscle strength testing," right?
22        A.    Yes.
23        Q.    So is this a referral for
24   computerized range of motion?
25        A.    Yes.
 2        Q.    Okay.
 3              And it has your -- is this your
 4   template on top?
 5        A.    Apparently so, yeah.
 6        Q.    Apparently so?
 7              Do you have -- do you normally
 8   have this, a consultation referral for your
 9   patients?
10        A.    No, I don't use that.  I don't
11   use that company.  I don't use anything.
12        Q.    Okay.
13              Is this your signature at the
14   bottom?
15        A.    Yes, my stamp.
16        Q.    Your stamp?
17        A.    Yes.
18        Q.    Does anybody else have access
19   to your stamp?
20        A.    Yes.
21        Q.    Who else has access?
22        A.    My biller and my front desk,
23   person in the front desk.
```

49

```
18              Do you recognize this document?
19      A.      Yes.
20      Q.      What is this document?
21      A.      It's a referral for range of
22 motion.
23      Q.      Is this a -- who created this
24 document?
25      A.      Specifically, I don't know.  I
```

```
 1              GOLDMAN, DC
 2 don't remember.
 3      Q.      Is this a document that's
 4 created by your PC?
 5      A.      I would think so.
 6      Q.      This signature stamp -- I'm
 7 sorry.  This signature, is this your
 8 signature?
 9      A.      Yes.  I'm sorry to say.
10      Q.      Is this a stamp?
11      A.      I think that's a stamp.
12      Q.      Who has access -- who else has
13 access to your stamp?
14      A.      Front desk person and my
15 biller.
```

329.   Goldman's lack of knowledge regarding the form's origin/creation and his signature stamp on the same, provides further indicia of fraud, insofar as Goldman PC, like other Referring Providers, utilized the PC Defendants' same boilerplate referral documentation to generate referrals for bogus computerized ROM/MT testing.

330.   As noted below, computerized ROM/MT testing is only compensable when billed properly and when the tests are accompanied by a written interpretation/report.

331.    Goldman's EUO testimony also confirms that no medical professional interpreted any of the computerized reports.

332.    Instead, all of the computerized ROM/MT testing generated was a printout from a machine.

333.    A true and accurate portion of Goldman's EUO testimony is depicted below:

```
 2   Clifford.  Who does Clifford work for?
 3        A.    Motion Medical.
 4        Q.    And who creates the range of
 5   motion report?  Is it Clifford, or somebody
 6   else?
 7        A.    It's the machine Clifford uses.
 8        Q.    Does the report have any
 9   interpretation?
10        A.    Yes.
11        Q.    And who does that
12   interpretation?
13        A.    The machine.
14        Q.    So it's only the machine that
15   interprets the results?
16        A.    Yes.
```

334.    In spite of the fact that Goldman testified that he uses these tests/results to determine how Allstate Claimants progressed, these reports did nothing more than increase the billing submitted to Allstate.

335.    In fact, in most if not all of the claims related to the subject complaint, the computerized ROM/MT testing by the PC Defendants had no effect on the Referring Providers treatment plans.

### G. FRAUDULENT AND UNNECESSARY RANGE OF MOTION AND MANUAL MUSCLE TESTING

336. The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".

337. Essentially, range of motion measures the movement in a joint.

338. A traditional, or manual, range of motion test consists of a non-electronic measurement of the movement at the joint in comparison with an unimpaired joint.

339. In a traditional range of motion test, the limb actively or passively is moved around the joints. A physician then evaluates the patient's range of motion either by sight or through a device.

340. Similarly, a traditional manual muscle test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body or extremity in a given direction against resistance applied by the physician.

341. For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he or she could apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

342. Physical evaluations performed on patients with soft-tissue trauma include range of motion and manual muscle tests, insofar as these tests provide a point of reference for injury assessment and treatment planning.

343. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, the physician will be substantially limited in his or her ability to properly diagnose or treat the patient's injuries.

344. Evaluation of range of motion and muscle strength is an essential component of the hands on evaluation of a patient who has been in an automobile accident.

345. Since range of motion and manual muscle tests are conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and manual muscle tests are to be reimbursed as an element of the initial and follow-up examinations.

346. In essence, healthcare providers cannot conduct and bill for initial examinations and follow-up examinations, which include range of motion and muscle testing, then bill separately for duplicative range of motion and muscle strength tests.

347. Charges for the *manual* range of motion and *manual* muscle strength tests were part and parcel of the charges that the PC Defendants and Referring Providers routinely submitted or caused to be submitted after initial examinations, and follow-up examinations.

348. By way of example, certain referrals made to the PC Defendants by Goldman PC were issued after Goldman had supposedly calculated ROM/MMT of Allstate Claimants using a manual tool called a handheld dual inclinometer.

349. The use of a handheld dual inclinometer indicates that two inclinometers were used rather than a single inclinometer.

350. Manual dual inclinometers provide a more accurate ROM value in spinal measurements than a single inclinometer.

351. Despite the fact that the Defendants knew that the Allstate Claimants already underwent these types of manual range of motion and manual muscle testing during their initial examinations and follow-up examinations, the PC Defendants systemically billed for, and purported to provide, duplicative computerized ROM/MT testing to Allstate Claimants.

352. Computerized ROM testing allegedly provided by the PC Defendants was/is virtually identical to the manual range of motion testing that is described above and that was purportedly performed during the initial and follow-up examinations, except that a digital printout was obtained rather than the provider manually documenting the Allstate Claimant's results.

353. As with the computerized ROM testing, computerized MT tests were/are virtually identical to the manual muscle strength testing that is described above and that was purportedly performed during the initial examinations and follow-up examinations, except a digital printout was obtained.

354. To further demonstrate the lack of necessity and meaninglessness of these computerized ROM/MT tests, there is no evidence in the charts submitted by the PC Defendants and Referring Providers that these tests were never reviewed or interpreted by the Nominal Owners who placed their name on the same submissions to Allstate.

355. There is also no evidence that the results of these computerized tests ever affected the trajectory of treatment or outcome of any Allstate Claimant. In fact, in many instances the results of the manual tests by the Referring Providers conflicted with those results from the PC Defendants' computerized ROM/MT testing. A true and accurate example of these conflicting results are attached as Exhibit 12.

356. As further evidence these referrals should have been documented and/or changed the trajectory of Allstate Claimant's treatment, Rauch's own referral specifically stated: "After obtaining subjective reports and objective findings, the aforementioned patient has been referred for the following testing procedures(s): Range of Motion/Muscle Test. Based upon the results, I will modify my treatment plan as deemed necessary."

357.    A true and accurate example of his referral for computerized range of motion/muscle testing is attached hereto as Exhibit 13.

358.    The treatment allegedly administered by the PC Defendants (computerized ROM/MT testing) lacked clinical foundation, was unnecessary, and was unlawfully billed, and necessarily required the improper referrals from the Referring Providers.

359.    The uniform nature of the Defendants' referrals pales only in comparison to the lack of medical necessity and improper billing surrounding the computerized testing itself; which ultimately demonstrates the pervasive insurance fraud scheme put into motion by Rauch.

### H.  SPECIFIC METHOD BY WHICH ROM/MT TESTING WERE FRAUDULENTLY BILLED BY THE PC DEFENDANTS

360.    The PC Defendants' tests were not performed for the purpose of rendering aid to Allstate Claimants and/or reaching maximum medical improvement but, rather, to bill Allstate and collect excessive amounts of money.

361.    Moreover, the Referring Providers typically conducted frequent and repeated manual range of motion and manual muscle tests to the Allstate Claimants.

362.    Yet, the Referring Providers would still, throughout the course of long-lasting treatment periods, refer Allstate Claimants for computerized ROM/MT testing with the PC Defendants.

363.    Notably, documented results of the manual range of motion and manual muscle testing did not comport whatsoever with the computerized results generated by the PC Defendants.

364.    As such, these computerized ROM/MT tests were useless and never had any impact upon the Allstate Claimants' treatment plan. Instead, these referrals and tests were simply a means by which the Defendants could increase the value of their reimbursement from Allstate.

365.    Medical services in the State of New York are billed using Current Procedural Terminology ("CPT") codes, each of which has a fee attached to them in accordance with the New York Workers Compensation Fee Schedule ("Fee Schedule").

366.    MMT is intended to be billed under CPT code 95831 for muscle testing of an extremity (excluding the hand) or each trunk section (i.e., the spine) and must include a report ("CPT code 95831").

367.    ROM is intended to be billed under CPT code 95851 for measurements of each extremity (excluding the hand) or each trunk section (i.e., the spine) and must include a report ("CPT code 95851").

368.    A physical performance test or measurement—a test performed in a musculoskeletal and/or functional capacity—may be billed using CPT code 97750, but must include a written report and separate entries should be used for each 15 minutes of this test ("CPT code 97750").

369.    Both CPT code 95831 and CPT code 95851 are listed as "separate procedures" and therefore may not be billed together as they are considered part of the same physical performance test; if both procedures are performed, then only CPT code 97750 should be billed.

370.    Neither CPT code 95831 nor CPT code 95851 should be billed on the same day as CPT code 97750.

371.    The process of "unbundling" CPT codes refers to the practice of submitting multiple charges under certain CPT codes when a singular, more appropriate CPT code was readily available and was more appropriate.

372.    In nearly every bill submitted to Allstate, the PC Defendants billed for both CPT code 95831 and CPT code 95851 and otherwise unbundled bills that should have been coded as CPT code 97750 (physical performance test).

373.    CPT code 97750 is a time based code that - in the New York area where the Defendants practiced allows for a single charge of $45.71 for every 15 minutes of testing that is performed.

374.    In order to maximize their fraudulent billing for the computerized range of motion and muscle strength tests, the PC Defendants unbundled what should have been, at most, a single charge of $45.71 under CPT code 97750 for both computerized range of motion and muscle strength testing into: (i) multiple charges of $45.75 under CPT code 95851 (for the range of motion tests); and (ii) multiple charges of $43.60 under CPT code 95831(for the muscle strength tests).

375.    By unbundling CPT code 97750 into multiple charges under CPT codes 95851 and 95831, the PC Defendants typically inflated the fraudulent Range of Motion/Muscle Strength charges that they submitted to Allstate.

376.    On occasion, albeit rarely, PC Defendants billed Allstate using CPT code 97750 and other more appropriate codes that were not unbundled. Still use of this code requires a foundation for medical necessity, interpretation by the appropriate medical professional and a written report.

377.    The Defendants' infrequent use of CPT code 97750 demonstrates that the Defendants were/are aware of these "bundled codes", but chose more often than not to unbundle the CPT codes submitted to Allstate in order to artificially inflate the charges for already non-compensable bills and unnecessary treatment.

378.    Typically, on a single date of service the PC Defendants would submit a bill totaling $985.00 for each session of medically unnecessary *computerized* range of motion and muscle strength testing.

379.    The chart below illustrates the difference when a provider bills for both CPT code 95831 and CPT code 95851, instead of appropriately billing under CPT code 97750[2], when both services are provided during a single visit:

| Cost of CPT Code 95831 per unit under Fee Schedule | Cost of CPT Code 95851 per unit under Fee Schedule | Cost of CPT Code 97750 per 15-minute increment under Fee Schedule |
|---|---|---|
| $43.60 | $45.71 | $45.71 |
| Total: $89.31 | | Total: $45.71 |

380.    Pursuant to this practice, every time the PC Defendants submitted a bill to Allstate that included both CPT code 95831 and CPT code 95851, Allstate was unnecessarily charged an $43.60 for each entry of CPT 95831; as opposed to being billed $45.71 for CPT code 97750.

381.    A typical bill from the PC Defendants would include ten (10) separate charges for CPT code 95831 and twelve (12) separate charges for CPT code 95851.

382.    Given this practice, when the PC Defendants billed Allstate for these computerized ROM/MT tests, Allstate was typically charged an additional unnecessary $436.00 for testing.

383.    CPT code 97750, more appropriate for clinically necessary computerized ROM/MT testing, must be billed in 15-minute increments (i.e., if a visit lasts 40 minutes, then CPT code 97750 should be billed three times).

---

[2] The Region IV multiplier of the New York Workers Compensation Fee Schedule is used as the multiplier for all billing calculations given that all of the PC Defendants are located within this region for billing purposes.

384.     The PC Defendants actively chose manual codes to inflate their charges to Allstate, likely because billing under the timed code would drastically cut the amount the PC Defendants could actually bill.

385.     The PC Defendants use of manual range of motion/manual muscle testing codes was not only inappropriate because they require manual testing (which was already performed by the Referring Providers), but also excessive insofar as CPT codes 95831 or CPT code 95851 are to be billed for treatment to the extremities (excluding hands) or the trunk section.

386.     The human body is comprised of four extremities: the right and left upper extremities and the right and left lower extremities.

387.     The trunk section of the human body is comprised of the three sections of the spine: the cervical, lumbar, and thoracic sections.

388.     Based upon this information, if a patient requires and it is properly documented then CPT code 95831 or CPT code 95851 could possibly be billed for manual muscle testing/range of motion testing up to seven times per visit, once for each of the four extremities and once for each of the three spinal sections.

389.     As noted, despite such limitations, the PC Defendants, as part of their uniform treatment protocol, billed ten (10) units of computerized MT testing under CPT 95831 and twelve (12) units of computerized ROM testing under CPT 95851 for nearly every date of service to Allstate Claimants.

390.    Most if not every claim submitted by the PC Defendants documented twelve (12) units of CPT 95851 (ROM)  to the following parts of the body:

    a.  Cervical extension
    b.  Cervical flexion
    c.  Left cervical lateral flexion
    d.  Left cervical rotation
    e.  Right cervical lateral flexion
    f.  Right cervical rotation
    g.  Lumbar extension
    h.  Lumbar flexion
    i.  Left lumbar lateral flexion
    j.  Left lumbar rotation
    k.  Right lumbar lateral flexion
    l.  Right lumbar rotation

391.    Based upon the above-referenced body parts, testing would only be performed on the cervical and lumbar spine and therefore only two (2) units of Range of Motion testing under CPT code 95851 should be billed.

392.    Most if not every claim submitted by the PC Defendants documented ten (10) units of CPT 95831 (MMT) to the following parts of the body:

    a.  Left elbow flexion
    b.  Left hip flexion
    c.  Left hip lateral rotation
    d.  Left scapula elevation
    e.  Left wrist extension
    f.  Right elbow flexion
    g.  Right hip flexion
    h.  Right hip lateral rotation
    i.  Right scapula elevation
    j.  Right wrist extension

393.    The right and left upper extremities include the scapula, elbow and wrist.

394.    The right and left lower extremities include the hips.

395.    In practice, unless otherwise indicated, the wrists, elbows, scapula and hips are typically tested.

396.     The PC Defendants' documentation seems to indicate that only the extremities were tested. As such, only four (4) units would be appropriate to be billed under CPT 95831-- for manual muscle testing to the right and left upper extremities as well as the right and left lower extremities.

397.     In spite of the fact that the PC Defendants were aware they should not receive more than $125.74 per date of service for muscle testing, they continued to fraudulently submit these inflated charges.

398.     Since nearly every bill submitted by the PC Defendants listed ten (10) units of CPT 95831 and twelve (12) units of CPT 95851, even if the treatment were proper and actually rendered appropriately (it was not), the PC Defendants' bills still exceeded the amount that should have been billed.

399.     The frequency with which the PC Defendants would bill Allstate for ten (10) units of CPT code 95831 and twelve (12) units of CPT code 95851 can be found in Exhibit 14.

400.     Ignoring all other violations of New York Law which make the bills from the Defendants non compensable, the additional amounts billed for unbundled, and unnecessary computerized ROM/MT testing account for hundreds of thousands of dollars of Allstate's damages.

401.     Moreover, regardless of whether the PC Defendants were using the correct CPT codes when billing Allstate (they were not), their documentation (which was interpreted by a machine not a medical professional) did not meet CPT guidelines for reimbursement.

402.     Instead, as demonstrated above, the results of the PC Defendants' ROM and MMT studies were included with charts detailing these results that were generated by testing device software.

403.   At no time did the PC Defendants and/or the Nominal Owners ever submit a separate and identifiable written report, signed by the appropriate treating physician, which detailed how the results of the ROM/MMT studies impacted the Allstate Claimants' treatment or potential clinical outcome.

404.   In order to properly bill under CPT code 95831, CPT code 95851 (even though these CPT codes would be inappropriate for *computerized* ROM/MT testing) or CPT code 97750, a written report must be generated and included with the results.

405.   Any muscle testing that is not accompanied by a separate, distinctly identifiable written report signed by the treating physician should otherwise be considered as part of the evaluation and management service or part of the physical and occupational therapy evaluation and/or re-evaluation CPT codes.

## VI.   EXEMPLAR CLAIMS

406.   The standard of care following a motor vehicle accident for an ambulatory patient is to carefully and manually perform ROM/MMT as part of an initial evaluation and subsequent follow-up evaluations.

407.   However, the Referring Providers routinely performed range of motion and manual muscle testing, but then referred Allstate Claimants for computerized ROM/MT with the PC Defendants.

408.   This pre-determined referral practice exacerbated the amounts billed and otherwise caused more damage to Allstate.

409.   Below are specific examples of the Defendants' pattern of improper claim submissions involving fraudulent, inflated, and unnecessary computerized ROM/MT testing and excessive treatment in general.

**A.** **Claimant J.N. (Claim No. 0536109176)**
   **Date of Loss: February 23, 2019**

410.   Claimant J.N. (claim number 0536109176) received an initial evaluation on March 19, 2019, at Mazza PC, which included manual ROM/MT testing.

411.   The initial evaluation report for claimant J.N. documented ROM testing of the cervical and lumbar spine.

412.   Thereafter, Mazza PC referred claimant J.N. to Island Medical for computerized ROM/MT testing on April 1, 2019.

413.   Claimant J.N. underwent a follow-up evaluation which was performed at Mazza PC on April 30, 2019, which included manual ROM/MT testing.

414.   This pattern of treatment with Mazza PC would continue until August 27, 2019, when claimant J.N. would receive their final evaluation from Mazza PC after seventy-eight (78) visits.

415.   Thereafter, Mazza PC once again referred claimant J.N. to Island Medical for computerized ROM/MT testing which was performed on May 6, 2019.

416.   On June 3, 2019, claimant J.N. presented at Island Medical and received more computerized ROM/MT testing.

417.   Thereafter, Mazza PC referred claimant J.N. to Island Medical for computerized ROM/MT testing on September 9, 2019.

418.   Mazza PC referred claimant J.N. to Motion Medical for computerized ROM/MT testing which was performed on October 7, 2019.

419.   On November 11, 2019 claimant J.N. presented at Motion Medical and received more computerized ROM/MT testing.

420.    Thereafter, Mazza PC referred claimant J.N. to Motion Medical for computerized ROM/MT testing on June 8, 2020.

421.    Mazza PC referred claimant J.N. to Motion Medical for the final instance of computerized ROM/MT testing on July 13, 2020.

422.    In total, J.N. received treatment, related to their automobile claim, for 506 days after the date of loss.

423.    J.N. was in the Defendants' treatment protocol for 482 days after the date of loss.

424.    Despite referring claimant J.N. for computerized ROM/MT testing on at least eight (8) occasions, the results of these tests were/are not discussed in Mazza PC's re-evaluation reports and there was no change in the treatment plan for J.N. based on the computerized ROM/MT testing results from Island Medical and Motion Medical.

425.    While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

426.    Each instance of computerized ROM/MT testing allegedly rendered to claimant J.N. was not medically necessary.

427.    Ultimately, Island Medical and Motion Medical billed Allstate in excess of $7,880.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

**B.  Claimant J.O. (Claim No. 0557212487)
    Date of Loss: July 19, 2019**

428.    Claimant J.O. (claim number 0557212487) received an initial evaluation on August 20, 2019, at Mazza PC, which included manual ROM/MT testing.

64

429.     The initial evaluation report for claimant J.O. documented ROM testing of the cervical and lumbar spine.

430.     Thereafter, Mazza PC referred claimant J.O. to Island Medical for computerized ROM/MT testing on August 26, 2019.

431.     Thereafter, Mazza PC once again referred claimant J.O. to Island Medical for computerized ROM/MT testing which was performed on September 25, 2019.

432.     On October 1, 2019, claimant J.O. received additional manual ROM/MT testing from Mazza PC as part of a follow-up evaluation.

433.     This pattern of treatment with Mazza PC would continue until April 14, 2020, when claimant J.O. would receive their final evaluation from Mazza PC after sixty (60) visits.

434.     On October 23, 2019, claimant J.O. presented at Motion Medical and received more computerized ROM/MT testing.

435.     On December 11, 2019 claimant J.O. received more computerized ROM/MT testing at Motion Medical.

436.     On January 15, 2020, claimant J.O. presented at Motion Medical and received more computerized ROM/MT testing.

437.     On February 19, 2020 claimant J.O. received their final instance of computerized ROM/MT testing at Motion Medical.

438.     In total, J.O. received treatment, related to their automobile claim, for 215 days after the date of loss.

439.     J.O. was in the Defendants' treatment protocol for 183 days after the date of loss.

440.     Despite referring claimant J.O. for computerized ROM/MT testing on at least six (6) occasions, the results of these tests were/are not discussed in Mazza PC's re-evaluation reports

and there was no change in the treatment plan for J.O. based on the computerized ROM/MT testing results from Island Medical and Motion Medical.

441.    While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

442.    Each instance of computerized ROM/MT testing allegedly rendered to claimant J.O. was not medically necessary.

443.    Ultimately, Island Medical and Motion Medical billed Allstate in excess of $5,910.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

### C. Claimant J.L. (Claim No. 0435400478)
### Date of Loss: November 2, 2016

444.    Claimant J.L. (claim number 0435400478) received an initial evaluation on November 16, 2016, at Mazza PC, which included manual ROM/MT testing.

445.    The initial evaluation report for claimant J.L. documented ROM testing of the cervical and lumbar spine.

446.    Thereafter, Mazza PC referred claimant J.L. to Bi County Medical for computerized ROM/MT testing on November 28, 2016.

447.    Claimant J.L. underwent a follow-up evaluation which was performed at Mazza PC on January 12, 2017, which included manual ROM/MT testing.

448.    Thereafter, Mazza PC once again referred claimant J.L. to Bi County Medical for computerized ROM/MT testing which was performed on April 3, 2017.

449.     On April 24, 2017, claimant J.L. received additional manual ROM/MT testing from Mazza PC as part of a follow-up evaluation.

450.     On May 1, 2017, claimant J.L. presented at Apollo Medical and received more computerized ROM/MT testing.

451.     Mazza PC performed another follow-up evaluation on June 8, 2017, which included manual ROM/MT testing.

452.     On July 26, 2017, claimant J.L. received their final instance of computerized ROM/MT testing at Apollo Medical.

453.     Thereafter on July 27, 2017, Mazza PC conducted yet another follow-up evaluation, which included manual ROM/MT testing.

454.     On September 13, 2017, claimant J.L. received additional manual ROM/MT testing from Mazza PC as part of a follow-up examination.

455.     Mazza PC performed another follow-up evaluation on December 14, 2017, which included manual ROM/MT testing.

456.     This pattern of treatment with Mazza PC would continue until January 3, 2018 when claimant J.L. would receive their final evaluation from Mazza PC after one-hundred and six (106) visits.

457.     In total, J.L. received treatment, related to their automobile claim, for 427 days after the date of loss.

458.     J.L. was in the Defendants' treatment protocol for 413 days after the date of loss.

459.     Despite referring claimant J.L. for computerized ROM/MT testing on at least four (4) occasions, the results of these tests were/are not discussed in Mazza PC's re-evaluation reports

and there was no change in the treatment plan for J.L. based on the computerized ROM/MT testing results from Bi County Medical and Apollo Medical.

460.    While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

461.    Each instance of computerized ROM/MT testing allegedly rendered to claimant J.L. was not medically necessary.

462.    Ultimately, Apollo Medical and Island Medical billed Allstate in excess of $3,940.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

**D.   Claimant J.I. (Claim No. 0444560379)**
**Date of Loss: January 9, 2017**

463.    Claimant J.I. (claim number 0444560379) received an initial evaluation on January 11, 2017, at Mazza PC, which included manual ROM/MT testing.

464.    The initial evaluation report for claimant J.I. documented ROM testing of the cervical and lumbar spine.

465.    Thereafter, Mazza PC referred claimant J.I. to Bi County Medical for computerized ROM/MT testing on February 22, 2017.

466.    Claimant J.I. underwent a follow-up evaluation which was performed at Mazza PC on February 25, 2017, which included manual ROM/MT testing.

467.    Thereafter, Mazza PC once again referred claimant J.I. to Bi County Medical for computerized ROM/MT testing which was performed on April 19, 2017.

468.      On April 29, 2017, claimant J.I. received additional manual ROM/MT testing from Mazza PC as part of a follow-up evaluation.

469.      Claimant J.I. underwent a follow-up evaluation which was performed at Mazza PC on May 15, 2017, which included manual ROM/MT testing.

470.      On May 15, 2017, claimant J.I. also presented at Apollo Medical and received more computerized ROM/MT testing.

471.      On May 17, 2017, claimant J.I. received additional manual ROM/MT testing from Mazza PC as part of a follow-up evaluation.

472.      Claimant J.I. underwent a follow-up evaluation which was performed at Mazza PC on May 22, 2017, which included manual ROM/MT testing.

473.      On May 17, 2017, claimant J.I. received additional manual ROM/MT testing from Mazza PC as part of a follow-up evaluation.

474.      On May 22, 2017, claimant J.I. received additional manual ROM/MT testing from Mazza PC as part of a follow-up evaluation.

475.      Claimant J.I. underwent a follow-up evaluation which was performed at Mazza PC on May 24, 2017, which included manual ROM/MT testing.

476.      On May 26, 2017, claimant J.I. received additional manual ROM/MT testing from Mazza PC as part of a follow-up evaluation.

477.      Claimant J.I. underwent a follow-up evaluation which was performed at Mazza PC on May 31, 2017, which included manual ROM/MT testing.

478.      On June 5, 2017, claimant J.I. received additional manual ROM/MT testing from Mazza PC as part of a follow-up evaluation.

479.     Claimant J.I. underwent a follow-up evaluation which was performed at Mazza PC on June 7, 2017, which included manual ROM/MT testing.

480.     On June 10, 2017, claimant J.I. received additional manual ROM/MT testing from Mazza PC as part of a follow-up evaluation.

481.     On June 14, 2017 claimant J.I. received their final instance of computerized ROM/MT testing at Apollo Medical.

482.     Claimant J.I. underwent a follow-up evaluation which was performed at Mazza PC on June 16, 2017, which included manual ROM/MT testing.

483.     This pattern of treatment with Mazza PC would continue until July 7, 2017, when claimant J.I. would receive their final evaluation from Mazza PC after forty-five (45) visits.

484.     In total, J.I. received treatment, related to their automobile claim, for 179 days after the date of loss.

485.     J.I. was in the Defendants' treatment protocol for 177 days after the date of loss.

486.     Despite referring claimant J.I. for computerized ROM/MT testing on at least four (4) occasions, the results of these tests were/are not discussed in Mazza PC's re-evaluation reports and there was no change in the treatment plan for J.I. based on the computerized ROM/MT testing results from Bi County Medical and Apollo Medical.

487.     While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

488.     Each instance of computerized ROM/MT testing allegedly rendered to claimant J.I. was not medically necessary.

489.    Ultimately, Island Medical and Motion Medical billed Allstate in excess of $3,940.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

### E.    Claimant C.S. (Claim No. 0398376913)
### Date of Loss: January 11, 2016

490.    Claimant C.S. (claim number 0398376913) received an initial evaluation on January 13, 2016, at Mazza PC, which included manual ROM/MT testing.

491.    The initial evaluation report for claimant C.S. documented ROM testing of the cervical and lumbar spine.

492.    Claimant C.S. underwent a follow-up evaluation which was performed at Mazza PC on March 9, 2016 and included manual ROM/MT testing.

493.    Thereafter, Mazza PC referred claimant C.S. to Bi County Medical for computerized ROM/MT testing on March 21, 2016.

494.    Thereafter, Mazza PC once again referred claimant C.S. to Bi County Medical for computerized ROM/MT testing which was performed on April 18, 2016.

495.    On April 23, 2016, claimant C.S. received additional manual ROM/MT testing from Mazza PC as part of a follow-up evaluation.

496.    On May 15, 2016, claimant C.S. presented at Bi County Medical and received more computerized ROM/MT testing.

497.    On May 16, 2016, claimant C.S. presented at Bi County Medical and received more computerized ROM/MT testing.

498.    Mazza PC performed another follow-up evaluation on June 10, 2016, which included manual ROM/MT testing.

499.    On June 13, 2016, claimant C.S. received their final instance of computerized ROM/MT testing at Bi County Medical.

500.    Thereafter on July 30, 2016, Mazza PC conducted yet another follow-up evaluation which included manual ROM/MT testing.

501.    On September 16, 2016, claimant C.S. received additional manual ROM/MT testing from Mazza PC as part of a follow-up evaluation.

502.    Mazza PC performed another follow-up evaluation on October 28, 2016, which included manual ROM/MT testing.

503.    This pattern of treatment with Mazza PC would continue until August 28, 2017, when claimant C.S. would receive their final evaluation from Mazza PC after one-hundred and thirty-eight (138) visits.

504.    In total, C.S. received treatment, related to their automobile claim, for 595 days after the date of loss.

505.    C.S. was in the Defendants' treatment protocol for 593 days after the date of loss.

506.    Despite referring claimant C.S. for computerized ROM/MT testing on at least four (4) occasions, the results of these tests were/are not discussed in Mazza PC's re-evaluation reports and there was no change in the treatment plan for C.S. based on the computerized ROM/MT testing results from Bi County Medical.

507.    While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

508.   Each instance of computerized ROM/MT testing allegedly rendered to claimant C.S. was not medically necessary.

509.   Ultimately, Bi County Medical billed Allstate in excess of $3,940.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

**F.   Claimant J.G. (Claim No. 0462865833)
       Date of Loss: July 6, 2017**

510.   Claimant J.G. (claim number 0462865833) received an initial evaluation on July 18, 2017, at Mazza PC, which included manual ROM/MT testing.

511.   The initial evaluation report for claimant J.G. documented ROM testing of the cervical and lumbar spine.

512.   Thereafter, Mazza PC referred claimant J.G. to Apollo Medical for computerized ROM/MT testing on August 16, 2017.

513.   Claimant J.G. underwent a follow-up evaluation which was performed at Mazza PC on August 30, 2017, which included manual ROM/MT testing.

514.   On October 11, 2017, claimant J.G. received additional manual ROM/MT testing from Mazza PC as part of a follow-up evaluation.

515.   Mazza PC performed another follow-up evaluation on December 6, 2017, which included manual ROM/MT testing.

516.   On January 17, 2018, claimant J.G. received additional manual ROM/MT testing from Mazza PC as part of a follow-up examination.

517.   On February 19, 2018, claimant J.G. presented at Island Medical and received more computerized ROM/MT testing.

518.     Mazza PC performed another follow-up evaluation on February 28, 2018, which included manual ROM/MT testing.

519.     Claimant J.G. underwent a follow-up evaluation with Mazza PC on April 13, 2018 also included manual ROM/MT testing.

520.     Mazza PC performed another follow-up evaluation on April 16, 2018, which included manual ROM/MT testing.

521.     On April 18, 2018, claimant J.G. received additional manual ROM/MT testing from Mazza PC as part of a follow-up examination.

522.     Claimant J.G. underwent a follow-up evaluation with Mazza PC on April 25, 2018 also included manual ROM/MT testing.

523.     Mazza PC performed another follow-up evaluation on May 9, 2018, which included manual ROM/MT testing.

524.     On May 9, 2018 claimant J.G. also received their final instance of computerized ROM/MT testing at Island Medical.

525.     On May 14, 2018, claimant J.G. received additional manual ROM/MT testing from Mazza PC as part of a follow-up examination.

526.     This pattern of treatment with Mazza PC would continue until May 24, 2018, when claimant J.G. would receive their final evaluation from Mazza PC after sixty (60) visits.

527.     In total, J.G. received treatment, related to their automobile claim, for 322 days after the date of loss.

528.     J.G. was in the Defendants' treatment protocol for 310 days after the date of loss.

529.     Despite referring claimant J.G. for computerized ROM/MT testing on at least three (3) occasions, the results of these tests were/are not discussed in Mazza PC's re-evaluation reports

74

and there was no change in the treatment plan for J.G. based on the computerized ROM/MT testing results from Apollo Medical and Island Medical.

530.    While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

531.    Each instance of computerized ROM/MT testing allegedly rendered to claimant J.G. was not medically necessary.

532.    Ultimately, Apollo Medical and Island Medical billed Allstate in excess of $2,955.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

### G. Claimant G.M. (Claim No. 0449348101)
   ### Date of Loss: March 16, 2017

533.    Claimant G.M. (claim number 0449348101) received an initial evaluation on March 23, 2017, at Sunrise, which included manual ROM/MT testing.

534.    The initial evaluation report for claimant G.M. documented ROM testing of the cervical and lumbar spine.

535.    Claimant G.M. also began to receive treatment from Mazza PC on May 24, 2017, which included manual ROM/MT testing.

536.    Thereafter, Mazza PC referred claimant G.M. to Apollo Medical for computerized ROM/MT testing which was performed on July 7, 2017.

537.    On July 19, 2017, claimant G.M. received additional manual ROM/MT testing from Mazza PC as part of a follow-up evaluation.

538.    On September 13, 2017, Mazza PC performed another follow-up evaluation on claimant G.M. which involved additional manual ROM/MT testing.

539.    Claimant G.M. underwent a follow-up evaluation at Mazza PC on December 20, 2017, which also included manual ROM/MT testing.

540.    On December 20, 2017, the same day as claimant G.M.'s final evaluation with Mazza PC, claimant G.M. presented at Apollo Medical and received more computerized ROM/MT testing.

541.    On December 27, 2017, claimant G.M. received additional manual ROM/MT testing from Mazza PC as part of a follow-up evaluation.

542.    This pattern of treatment with Mazza PC would continue until January 22, 2018, when claimant G.M. would receive their final evaluation from Mazza PC after twenty-four (24) visits.

543.    On January 22, 2018, claimant G.M. also appeared at Island Medical and received their final instance of computerized ROM/MT testing.

544.    In total, G.M. received treatment, related to their automobile claim, for 312 days after the date of loss.

545.    G.M. was in the Defendants' treatment protocol for 305 days after the date of loss.

546.    Despite referring claimant G.M. for computerized ROM/MT testing on at least three (3) occasions, the results of these tests were/are not discussed in Sunrise or Mazza PC's re-evaluation reports and there was no change in the treatment plan for G.M. based on the computerized ROM/MT testing results from Apollo Medical and Island Medical.

547.    While computerized ROM/MT may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants

generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

548.    Each instance of computerized ROM/MT testing allegedly rendered to claimant G.M. was not medically necessary.

549.    Ultimately, Apollo Medical and Island Medical billed Allstate in excess of $2,955.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

  **H.  Claimant C.B. (Claim No. 0492570262)**
    **Date of Loss: February 20, 2018**

550.    Claimant C.B. (claim number 0492570262) received an initial evaluation on March 1, 2018 at Sunrise, which included manual ROM/MT testing.

551.    The initial evaluation report for claimant C.B. documented ROM testing of the cervical and lumbar spine.

552.    Sunrise referred claimant C.B. to Island Medical for computerized ROM/MT testing which was performed on March 7, 2018.

553.    Thereafter, Sunrise referred claimant C.B. for treatment with Rauch on March 21, 2018.

554.    Claimant C.B. underwent a follow-up evaluation which was performed at Sunrise on April 2, 2018, which included manual ROM/MT testing.

555.    Thereafter, Sunrise once again referred claimant D.B. for treatment with Rauch which was performed on April 25, 2018.

556.    On May 8, 2018, claimant C.B. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

557.    On May 16, 2018 claimant C.B. presented at Island Medical for computerized ROM/MT testing.

558.    On May 30, 2018, claimant C.B. presented for treatment with Rauch.

559.    Sunrise performed another follow-up evaluation on June 12, 2018, which included manual ROM/MT testing.

560.    On July 13, 2018, claimant C.B. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

561.    On July 17, 2018 claimant C.B. presented at Island Medical for computerized ROM/MT testing.

562.    Thereafter on August 14, 2018, Sunrise conducted yet another follow-up evaluation which included manual ROM/MT testing.

563.    On August 14, 2018 claimant C.B. presented at Island Medical for computerized ROM/MT testing.

564.    Thereafter on September 17, 2018, Sunrise conducted yet another follow-up evaluation which included manual ROM/MT testing.

565.    On October 9, 2018 claimant C.B. presented at Island Medical for computerized ROM/MT testing.

566.    Thereafter on October 22, 2018, Sunrise conducted yet another follow-up evaluation which included manual ROM/MT testing.

567.    On October 23, 2018 claimant C.B. again presented for treatment with Rauch.

568.    On November 6, 2018 claimant C.B. presented at Island Medical for computerized ROM/MT testing.

569.     Thereafter on November 23, 2018, Sunrise conducted yet another follow-up evaluation which included manual ROM/MT testing.

570.     On December 26, 2018, claimant C.B. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

571.     Claimant C.B. underwent a follow-up evaluation which was performed at Sunrise on January 28, 2019, which included manual ROM/MT testing.

572.     On February 26, 2019 claimant C.B. presented at Island Medical for computerized ROM/MT testing.

573.     Thereafter on March 5, 2019, Sunrise conducted yet another follow-up evaluation which included manual ROM/MT testing.

574.     On April 8, 2019, claimant C.B. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

575.     Claimant C.B. underwent a follow-up evaluation which was performed at Sunrise on May 10, 2019, which included manual ROM/MT testing.

576.     On May 21, 2019 claimant C.B. presented at Island Medical for computerized ROM/MT testing.

577.     Thereafter on June 11, 2019, Sunrise conducted yet another follow-up evaluation which included manual ROM/MT testing.

578.     On June 18, 2019 claimant C.B. presented at Island Medical for computerized ROM/MT testing.

579.     Thereafter on July 16, 2019, Sunrise conducted yet another follow-up evaluation which included manual ROM/MT testing.

580.     On August 20, 2019, claimant C.B. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

581.     Claimant C.B. underwent a follow-up evaluation which was performed at Sunrise on September 26, 2019 and included manual ROM/MT testing.

582.     On October 29, 2019, claimant C.B. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

583.     Sunrise referred claimant C.B. to Motion Medical for computerized ROM/MT testing which was performed on November 11, 2019.

584.     On November 19, 2019 claimant C.B. received their final instance of computerized ROM/MT testing at Motion Medical.

585.     On December 3, 2019, claimant C.B. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

586.     This pattern of treatment with Sunrise would continue until December 2, 2020, when claimant C.B. would receive their final evaluation from Sunrise after eighty-two (82) visits.

587.     In total, C.B. received treatment, related to their automobile claim, for 1,016 days after the date of loss.

588.     C.B. was in the Defendants' treatment protocol for 1,007 days after the date of loss.

589.     Despite referring claimant C.B. for computerized ROM/MT testing on at least eleven (11) occasions, the results of these tests were/are not discussed in Sunrise's re-evaluation reports and there was no change in the treatment plan for C.B. based on the computerized ROM/MT testing results from Island Medical and Motion Medical.

590.     While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the

Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

591.    Each instance of computerized ROM/MT testing allegedly rendered to claimant C.B. was not medically necessary.

592.    Ultimately, Island Medical and Motion Medical billed Allstate in excess of $10,835.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

**I.   Claimant T.G. (Claim No. 0377062807)**
**Date of Loss: July 19, 2015**

593.    Claimant T.G. (claim number 0377062807) received an initial evaluation on December 4, 2015 at Sunrise, which included manual ROM/MT testing.

594.    The initial evaluation report for claimant T.G. documented ROM testing of the cervical and lumbar spine.

595.    On January 4, 2016, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

596.    Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on February 6, 2016 and included manual ROM/MT testing.

597.    Sunrise performed another follow-up evaluation on March 7, 2016, which included manual ROM/MT testing.

598.    On April 7, 2016, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

599.    Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on May 7, 2016, which included manual ROM/MT testing.

600. Sunrise performed another follow-up evaluation on June 14, 2016, which included manual ROM/MT testing.

601. On July 13, 2016, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

602. Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on July 14, 2016 and included manual ROM/MT testing.

603. Sunrise performed another follow-up evaluation on August 15, 2016, which included manual ROM/MT testing.

604. On September 16, 2016, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

605. Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on October 18, 2016 and included manual ROM/MT testing.

606. Sunrise performed another follow-up evaluation on October 26, 2016, which included manual ROM/MT testing.

607. On November 21, 2016, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

608. Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on December 22, 2016 and included manual ROM/MT testing.

609. Sunrise performed another follow-up evaluation on January 23, 2017, which included manual ROM/MT testing.

610. On February 23, 2017, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

611. Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on March 24, 2017 and included manual ROM/MT testing.

612. Sunrise performed another follow-up evaluation on April 26, 2017, which included manual ROM/MT testing.

613. On May 31, 2017, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

614. Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on July 3, 2017 and included manual ROM/MT testing.

615. Sunrise performed another follow-up evaluation on August 8, 2017, which included manual ROM/MT testing.

616. On September 9, 2017, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

617. Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on October 12, 2017 and included manual ROM/MT testing.

618. Sunrise performed another follow-up evaluation on November 14, 2017, which included manual ROM/MT testing.

619. On December 15, 2017, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

620. Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on January 16, 2018 and included manual ROM/MT testing.

621. Sunrise performed another follow-up evaluation on February 17, 2018, which included manual ROM/MT testing.

622.    On March 21, 2018, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

623.    Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on April 24, 2018 and included manual ROM/MT testing.

624.    Sunrise performed another follow-up evaluation on May 26, 2018, which included manual ROM/MT testing.

625.    On June 28, 2018, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

626.    Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on July 30, 2018 and included manual ROM/MT testing.

627.    One day later, Sunrise referred claimant T.G. for treatment with Rauch on July 31, 2018.

628.    After years in a treatment protocol without any computerized ROM/MT testing, Sunrise referred claimant T.G. to Island Medical for computerized ROM/MT testing which was purportedly performed on August 14, 2018.

629.    Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on August 31, 2018, which included manual ROM/MT testing.

630.    Thereafter, Sunrise once again referred claimant T.G. for treatment with Rauch on September 25, 2018.

631.    On October 1, 2018, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

632.    Sunrise performed another follow-up evaluation on October 8, 2018, which included manual ROM/MT testing.

633.     On December 8, 2018, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

634.     Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on January 12, 2019 and included manual ROM/MT testing.

635.     On January 24, 2019, claimant T.G. presented for further treatment with Rauch.

636.     Sunrise performed another follow-up evaluation on February 13, 2019, which included manual ROM/MT testing.

637.     On February 26, 2019, claimant T.G. presented at Island Medical for additional computerized ROM/MT testing.

638.     On March 16, 2019, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

639.     Sunrise performed another follow-up evaluation on April 19, 2019, which included manual ROM/MT testing.

640.     On May 20, 2019, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

641.     Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on June 24, 2019 and included manual ROM/MT testing.

642.     On July 2, 2019, claimant T.G. presented at Island Medical for additional computerized ROM/MT testing.

643.     Thereafter on July 25, 2019, Sunrise conducted yet another follow-up evaluation which included manual ROM/MT testing.

644.     On August 26, 2019, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

645. Sunrise performed another follow-up evaluation on September 27, 2019, which included manual ROM/MT testing.

646. On October 29, 2019, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

647. Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on December 2, 2019 and included manual ROM/MT testing.

648. On January 6, 2020, claimant T.G. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

649. Sunrise performed another follow-up evaluation on July 21, 2020, which included manual ROM/MT testing.

650. On July 21, 2020, claimant T.G. also presented at Motion Medical for their final instance of computerized ROM/MT testing.

651. Claimant T.G. underwent a follow-up evaluation which was performed at Sunrise on July 22, 2020 and included manual ROM/MT testing.

652. This pattern of treatment with Sunrise would continue until February 10, 2021, when claimant T.G. would receive their final evaluation from Sunrise after eight hundred and seventy-four visits.

653. In total, T.G. received treatment, related to their automobile claim, for 2,033 days after the date of loss.

654. T.G. was in the Defendants' treatment protocol for 1,895 days after the date of loss.

655. Despite referring claimant T.G. for computerized ROM/MT testing on at least four (4) occasions, the results of these tests were/are not discussed in Sunrise's re-evaluation reports

and there was no change in the treatment plan for T.G. based on the computerized ROM/MT testing results from Island Medical and Motion Medical.

656.    While computerized ROM/MT may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

657.    Each instance of computerized ROM/MT testing allegedly rendered to claimant T.G. was not medically necessary.

658.    Ultimately, Island Medical and Motion Medical billed Allstate in excess of $3,355.62 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

**J.    Claimant D.Z. (Claim No. 0555929280)**
**Date of Loss: August 1, 2019**

659.    Claimant D.Z. (claim number 0555929280) received an initial evaluation on August 14, 2019 at Sunrise, which included manual ROM/MT testing.

660.    The initial evaluation report for claimant D.Z. documented ROM testing of the cervical and lumbar spine.

661.    Thereafter, Sunrise referred claimant D.Z. to Island Medical for computerized ROM/MT testing on August 27, 2019.

662.    Thereafter, Sunrise once again referred claimant D.Z. to Island Medical for further testing which was performed on September 10, 2019.

663.    On September 17, 2019, claimant D.Z. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

664. On September 24, 2019, claimant D.Z. presented at Island Medical and received more computerized ROM/MT testing.

665. Sunrise referred claimant D.Z. to Motion Medical for further testing which was performed on October 8, 2019.

666. Thereafter on October 24, 2019, Sunrise conducted yet another follow-up evaluation which included manual ROM/MT testing.

667. On November 25, 2019, claimant D.Z. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

668. This pattern of treatment with Sunrise would continue until February 12, 2020, when claimant D.Z. would receive their final evaluation from Sunrise after sixty-eight (68) visits.

669. In total, D.Z. received treatment, related to their automobile claim, for 195 days after the date of loss.

670. D.Z. was in the Defendants' treatment protocol for 182 days after the date of loss.

671. Despite referring claimant D.Z. for computerized ROM/MT testing on at least two (2) occasions, the results of these tests were/are not discussed in Sunrise's re-evaluation reports and there was no change in the treatment plan for D.Z. based on the computerized ROM/MT testing results from Island Medical and Motion Medical.

672. While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT testing had already been performed in or around the time of computerized test(s).

673. Each instance of computerized ROM/MT testing allegedly rendered to claimant D.Z. was not medically necessary.

88

674.    Ultimately, Island Medical and Motion Medical billed Allstate in excess of $1,970.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

**K.    Claimant S.M. (Claim No. 0416346567)**
**Date of Loss: June 7, 2016**

675.    Claimant S.M. (claim number 0416346567) received an initial evaluation on October 18, 2016, at Sunrise, which included manual ROM/MT testing.

676.    The initial evaluation report for claimant S.M. documented ROM testing of the cervical and lumbar spine.

677.    Claimant S.M. underwent a follow-up evaluation which was performed at Sunrise on December 6, 2016, which included manual ROM/MT testing.

678.    On January 9, 2017, claimant S.M. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

679.    Sunrise performed another follow-up evaluation on February 13, 2017, which included manual ROM/MT testing.

680.    Claimant S.M. underwent another follow-up evaluation which was performed at Sunrise on March 15, 2017, which included manual ROM/MT testing.

681.    On April 19, 2017, claimant S.M. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

682.    Sunrise performed a follow-up evaluation on May 24, 2017, which included manual ROM/MT testing.

683.    Claimant S.M. underwent another follow-up evaluation which was performed at Sunrise on June 26, 2017, which included manual ROM/MT testing.

684.     On July 28, 2017, claimant S.M. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

685.     Sunrise performed another follow-up evaluation on August 30, 2017, which included manual ROM/MT testing.

686.     Claimant S.M. underwent another follow-up evaluation which was performed at Sunrise on October 4, 2017, which included manual ROM/MT testing.

687.     On November 8, 2017, claimant S.M. received additional manual ROM/MT testing from Sunrise as part of another follow-up evaluation.

688.     Sunrise performed another follow-up evaluation on December 11, 2017, which included manual ROM/MT testing.

689.     Claimant S.M. underwent a follow-up evaluation which was performed at Sunrise on January 18, 2018, which included manual ROM/MT testing.

690.     On February 21, 2018, claimant S.M. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

691.     Sunrise performed a follow-up evaluation on March 23, 2018, which included manual ROM/MT testing.

692.     Claimant S.M. underwent another follow-up evaluation which was performed at Sunrise on April 24, 2018, which included manual ROM/MT testing.

693.     On May 25, 2018, claimant S.M. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

694.     Sunrise performed another follow-up evaluation on June 27, 2018, which included manual ROM/MT testing.

695.     Thereafter, Sunrise referred claimant S.M. for treatment with Rauch on June 27, 2018.

696.     Claimant S.M. underwent a follow-up evaluation which was performed at Sunrise on July 30, 2018, which included manual ROM/MT testing.

697.     On August 14, 2018, claimant S.M. presented at Island Medical and received computerized ROM/MT testing.

698.     Claimant S.M. underwent another follow-up evaluation which was performed at Sunrise on August 31, 2018, which included manual ROM/MT testing.

699.     On October 2, 2018, claimant S.M. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

700.     Sunrise performed a follow-up evaluation on December 6, 2018, which included manual ROM/MT testing.

701.     Claimant S.M. underwent a follow-up evaluation which was performed at Sunrise on January 9, 2019, which included manual ROM/MT testing.

702.     Thereafter, Sunrise once again referred claimant S.M. for further treatment with Rauch which was performed on January 24, 2019.

703.     Sunrise performed another follow-up evaluation on February 13, 2019, which included manual ROM/MT testing.

704.     Thereafter on March 14, 2019, Sunrise conducted yet another follow-up evaluation which included manual ROM/MT testing.

705.     Claimant S.M. underwent another follow-up evaluation which was performed at Sunrise on April 15, 2019, which included manual ROM/MT testing.

706.    On May 16, 2019, claimant S.M. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

707.    Sunrise performed another follow-up evaluation on June 17, 2019, which included manual ROM/MT testing.

708.    Claimant S.M. underwent another follow-up evaluation which was performed at Sunrise on July 19, 2019, which included manual ROM/MT testing.

709.    On August 20, 2019, claimant S.M. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

710.    Sunrise performed another follow-up evaluation on September 21, 2019, which included manual ROM/MT testing.

711.    Claimant S.M. underwent another follow-up evaluation which was performed at Sunrise on October 22, 2019, which included manual ROM/MT testing.

712.    On November 26, 2019, claimant S.M. received additional manual ROM/MT testing from Sunrise as part of a follow-up evaluation.

713.    Claimant S.M. underwent a follow-up evaluation with Sunrise on December 27, 2019, which included manual ROM/MT testing.

714.    This pattern of treatment with Sunrise would continue until February 15, 2021, when claimant S.M. would receive their final evaluation from Sunrise after six hundred and fifty (650) visits.

715.    In total, S.M. received treatment, related to their automobile claim, for 1,714 days after the date of loss.

716.    S.M. was in the Defendants' treatment protocol for 1,581 days after the date of loss.

717.     Despite referring claimant S.M. for computerized ROM/MT testing on at least one (1) occasion, the results of these tests were/are not discussed in Sunrise's re-evaluation reports and there was no change in the treatment plan for S.M. based on the computerized ROM/MT testing results from Island Medical.

718.     While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT testing had already been performed in or around the time of computerized test(s).

719.     Each instance of computerized ROM/MT testing allegedly rendered to claimant S.M. was not medically necessary.

720.     Ultimately, Island Medical billed Allstate in excess of $985.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

**L.   Claimant M.A. (Claim No. 0536663024)**
**Date of Loss: March 2, 2019**

721.     Claimant M.A. (claim number 0536663024) received an initial evaluation on March 12, 2019, at Yellowstone, which included manual ROM/MT testing.

722.     The initial evaluation report for claimant M.A. documented ROM testing of the cervical and lumbar spine.

723.     On June 6, 2019, claimant M.A. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

724.     Thereafter, Yellowstone referred claimant M.A. to Island Medical for computerized ROM/MT testing on June 6, 2019.

725.    Claimant M.A. underwent a follow-up evaluation which was performed at Yellowstone on June 19, 2019, which included manual ROM/MT testing.

726.    On July 29, 2019, claimant M.A. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

727.    Thereafter, Yellowstone once again referred claimant M.A. to Island Medical for computerized ROM/MT testing which was also performed on July 29, 2019.

728.    On August 27, 2019, claimant M.A. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

729.    Yellowstone performed another follow-up evaluation on September 12, 2019, which included manual ROM/MT testing.

730.    On September 12, 2019, claimant M.A. also presented at Island Medical and received more computerized ROM/MT testing.

731.    Yellowstone performed another follow-up evaluation on October 8, 2019, which included manual ROM/MT testing.

732.    Two days later, on October 10, 2019, claimant M.A. received computerized ROM/MT testing at Motion Medical.

733.    On October 10, 2019, claimant M.A. also received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

734.    Thereafter on November 27, 2019, Yellowstone conducted yet another follow-up evaluation which included manual ROM/MT testing.

735.    Yellowstone performed another follow-up evaluation on December 19, 2019, which included manual ROM/MT testing.

736.   On December 19, 2019, claimant M.A. also received their final instance of computerized ROM/MT testing at Motion Medical.

737.   Thereafter on January 28, 2020, Yellowstone conducted yet another follow-up evaluation which included manual ROM/MT testing.

738.   This pattern of treatment with Yellowstone would continue until February 3, 2020, when claimant M.A. would receive their final evaluation from Yellowstone after fifty-seven (57) visits.

739.   In total, M.A. received treatment, related to their automobile claim, for 338 days after the date of loss.

740.   M.A. was in the Defendants' treatment protocol for 328 days after the date of loss.

741.   Despite referring claimant M.A. for computerized ROM/MT testing on at least five (5) occasions, the results of these tests were/are not discussed in Yellowstone's re-evaluation reports and there was no change in the treatment plan for M.A. based on the computerized ROM/MT testing results from Island Medical or Motion Medical.

742.   While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

743.   Each instance of computerized ROM/MT testing allegedly rendered to claimant M.A. was not medically necessary.

744.   Ultimately, Island Medical and Motion Medical billed Allstate in excess of $4,925.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

M. **Claimant J.D. (Claim No. 0517596101)**
   **Date of Loss: August 22, 2018**

745.     Claimant J.D. (claim number 0517596101) received an initial evaluation on September 5, 2018, at Yellowstone, which included manual ROM/MT testing.

746.     The initial evaluation report for claimant J.D. documented ROM testing of the cervical and lumbar spine.

747.     Claimant J.D. underwent a follow-up examination at Yellowstone on October 9, 2018, which included manual ROM/MT testing.

748.     On November 13, 2018, claimant J.D. received additional manual ROM/MT testing from Yellowstone as part of a follow-up examination.

749.     Thereafter, Yellowstone referred claimant J.D. to Island Medical for computerized ROM/MT testing which was performed on December 6, 2018.

750.     On December 11, 2018, claimant J.D. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

751.     On January 9, 2019, claimant J.D. received additional manual ROM/MT testing from Yellowstone as part of a follow-up examination.

752.     Yellowstone performed another follow-up examination on February 6, 2019 which included manual ROM/MT testing.

753.     On March 6, 2019, claimant J.D. received additional manual ROM/MT testing from Yellowstone as part of a follow-up examination.

754.     On March 7, 2019, claimant J.D. presented at Island Medical and received more computerized ROM/MMT testing.

755.     Yellowstone performed another follow-up evaluation on April 3, 2019 which included manual ROM/MT testing.

756.    On May 8, 2019, claimant J.D. received additional manual ROM/MT testing from Yellowstone as part of a follow-up examination.

757.    Yellowstone performed another follow-up examination on June 5, 2019 which included manual ROM/MT testing.

758.    On July 3, 2019, claimant J.D. received additional manual ROM/MT testing from Yellowstone as part of a follow-up examination.

759.    On July 31, 2019, claimant J.D. underwent a follow-up examination at Yellowstone which included manual ROM/MT testing.

760.    On August 19, 2019, claimant J.D. received computerized ROM/MT testing at Island Medical.

761.    Thereafter, on August 28, 2019, Yellowstone conducted yet another follow-up evaluation which included manual ROM/MT testing.

762.    On September 23, 2019, claimant J.D. received their final instance of computerized ROM/MT testing at Island Medical.

763.    On September 25, 2019, claimant J.D. received additional manual ROM/MT testing from Yellowstone as part of a follow-up examination.

764.    On October 23, 2019, claimant J.D. underwent a follow-up examination at Yellowstone which included manual ROM/MT testing.

765.    This pattern of treatment with Yellowstone would continue until May 12, 2020, when claimant J.D. would receive their final evaluation from Yellowstone after one hundred and forty-one (141) visits.

766.    In total, J.D. received treatment, related to their automobile claim, for 629 days after the date of loss.

767.    J.D. was in the Defendants' treatment protocol for 615 days after the date of loss.

768.    Despite referring claimant J.D. for computerized ROM/MT testing on at least four (4) occasions, the results of these tests were/are not discussed in Yellowstone's re-evaluation reports and there was no change in the treatment plan for J.D. based on the computerized ROM/MT testing results from Island Medical.

769.    While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

770.    Each instance of computerized ROM/MT testing allegedly rendered to claimant J.D. was not medically necessary.

771.    Ultimately, Island Medical billed Allstate in excess of $3,940.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

### N.    Claimant V.N. (Claim No. 0524967593)
### Date of Loss: November 18, 2018

772.    Claimant V.N. (claim number 0524967593) received an initial evaluation on November 28, 2018, at Yellowstone, which included manual ROM/MT testing.

773.    The initial evaluation report for claimant V.N. documented ROM testing of the cervical and lumbar spine.

774.    Claimant V.N. underwent a follow-up evaluation which was performed at Yellowstone on December 26, 2018, which included manual ROM/MT testing.

775.    Thereafter, Yellowstone referred claimant V.N. to Island Medical for computerized ROM/MT testing on January 10, 2019.

776.    Claimant V.N. underwent a follow-up evaluation which was performed at Yellowstone on January 23, 2019, which included manual ROM/MT testing.

777.    Thereafter, Yellowstone once again referred claimant V.N. to Island Medical for computerized ROM/MT testing which was performed on February 21, 2019.

778.    On February 27 2019, claimant V.N. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

779.    Claimant V.N. underwent a follow-up evaluation which was performed at Yellowstone on March 26, 2019, which included manual ROM/MT testing.

780.    On May 1, 2019, claimant V.N. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

781.    Yellowstone performed a follow-up evaluation on June 12, 2019, which included manual ROM/MT testing.

782.    On July 10, 2019, claimant V.N. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

783.    Claimant V.N. underwent a follow-up evaluation which was performed at Yellowstone on August 14, 2019, which included manual ROM/MT testing.

784.    On September 11, 2019, claimant V.N. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

785.    On September 12, 2019, claimant V.N. presented at Island Medical and received more computerized ROM/MT testing.

786.    Claimant V.N. underwent a follow-up evaluation with Yellowstone on October 16, 2019 which also included manual ROM/MT testing.

787.     Claimant V.N. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation on October 17, 2019.

788.     On October 21, 2019, claimant V.N. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

789.     Claimant V.N. underwent a follow-up evaluation with Yellowstone on October 31, 2019 which also included manual ROM/MT testing.

790.     Yellowstone referred claimant V.N. to Motion Medical for their final instance of computerized ROM/MT testing, which was also performed on October 31, 2019.

791.     On November 4, 2019, claimant V.N. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

792.     This pattern of treatment with Yellowstone would continue until November 18, 2019, when claimant V.N. would receive their final evaluation from Yellowstone after eighty-seven (87) visits.

793.     In total, V.N. received treatment, related to their automobile claim, for 365 days after the date of loss.

794.     V.N. was in the Defendants' treatment protocol for 355 days after the date of loss.

795.     Despite referring claimant V.N. for computerized ROM/MT testing on at least four (4) occasions, the results of these tests were/are not discussed in Yellowstone's re-evaluation reports and there was no change in the treatment plan for V.N. based on the computerized ROM/MT testing results from Island Medical and Motion Medical.

796.     While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the

Defendants generated no report and/or manual ROM/MT testing had already been performed in or around the time of computerized test(s).

797.    Each instance of computerized ROM/MT testing allegedly rendered to claimant V.N. was not medically necessary.

798.    Ultimately, Island Medical and Motion Medical billed Allstate in excess of $3,940.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

### O.  **Claimant N.R. (Claim No. 0484082771)**
   **Date of Loss: December 4, 2017**

799.    Claimant N.R. (claim number 0484082771) received an initial evaluation on December 14, 2017 at Yellowstone, which included manual ROM/MT testing.

800.    The initial evaluation report for claimant N.R. documented ROM testing of the cervical and lumbar spine.

801.    Claimant N.R. underwent a follow-up evaluation which was performed at Yellowstone on January 15, 2018, which included manual ROM/MT testing.

802.    On February 21, 2018, claimant N.R. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

803.    Yellowstone performed a follow-up evaluation on April 4, 2018, which included manual ROM/MT testing.

804.    Claimant N.R. underwent a follow-up evaluation which was performed at Yellowstone on May 16, 2018, which included manual ROM/MT testing.

805.    On June 6, 2018, claimant N.R. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

806.    Yellowstone performed another follow-up evaluation on July 11, 2018, which included manual ROM/MT testing.

807.    Claimant N.R. underwent another follow-up evaluation which was performed at Yellowstone on August 27, 2018, which included manual ROM/MT testing.

808.    On October 1, 2018, claimant N.R. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

809.    Yellowstone performed another follow-up evaluation on November 12, 2018, which included manual ROM/MT testing.

810.    Claimant N.R. underwent another follow-up evaluation which was performed at Yellowstone on December 19, 2018, which included manual ROM/MT testing.

811.    Thereafter, Yellowstone referred claimant N.R. to Island Medical for computerized ROM/MT testing on December 27, 2018.

812.    Claimant N.R. underwent a follow-up evaluation which was performed at Yellowstone on January 21, 2019, which included manual ROM/MT testing.

813.    Thereafter, Yellowstone once again referred claimant N.R. to Island Medical for computerized ROM/MT testing which was performed on February 5, 2019.

814.    On March 4, 2019, claimant N.R. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

815.    Yellowstone performed another follow-up evaluation on April 15, 2019, which included manual ROM/MT testing.

816.    Thereafter on June 3, 2019, Yellowstone conducted yet another follow-up evaluation which included manual ROM/MT testing.

817.    Claimant N.R. underwent a follow-up evaluation which was performed at Yellowstone on July 10, 2019, which included manual ROM/MT testing.

818.    On August 26, 2019, claimant N.R. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

819.    Yellowstone performed a follow-up evaluation on September 25, 2019, which included manual ROM/MT testing.

820.    On October 25, 2019, claimant N.R. received additional manual ROM/MT testing from Yellowstone as part of a follow-up evaluation.

821.    Yellowstone performed a follow-up evaluation on November 4, 2019, which included manual ROM/MT testing.

822.    This pattern of treatment with Yellowstone would continue until December 11, 2019, when claimant N.R. would receive their final evaluation from Yellowstone after one-hundred and thirty-six (136) visits.

823.    In total, N.R. received treatment, related to their automobile claim, for 737 days after the date of loss.

824.    N.R. was in the Defendants' treatment protocol for 727 days after the date of loss.

825.    Despite referring claimant N.R. for computerized ROM/MT testing on at least two (2) occasions, the results of these tests were/are not discussed in Yellowstone's re-evaluation reports and there was no change in the treatment plan for N.R. based on the computerized ROM/MT testing results from Island Medical.

826.    While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the

Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

827. Each instance of computerized ROM/MT testing allegedly rendered to claimant N.R. was not medically necessary.

828. Ultimately, Island Medical billed Allstate in excess of $1,970.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

**P. Claimant A.L. (Claim No. 0569496689)**
**Date of Loss: November 7, 2019**

829. Claimant A.L. (claim number 0569496689) received an initial evaluation on November 19, 2019 at Goldman PC, which, based upon the Defendants' pattern, included manual ROM/MT testing.

830. As is common practice, Goldman PC generated an initial evaluation report for claimant A.L. and documented ROM testing of the cervical and lumbar spine.

831. This pattern of treatment with Goldman PC would continue until March 22, 2021, when claimant A.L. would receive their final evaluation from Goldman PC after one hundred and seventy (170) visits.

832. On May 15, 2020, Goldman PC referred claimant A.L. to Motion Medical for computerized ROM/MT testing.

833. On June 12, 2020, Goldman PC once again referred claimant A.L. to Motion Medical for computerized ROM/MT testing, which was performed.

834. On July 10, 2020, claimant A.L. presented at Motion Medical and received more computerized ROM/MT testing.

835.    On August 7, 2020, Goldman PC once again referred claimant A.L. to Motion Medical for computerized ROM/MT testing.

836.    On September 25, 2020, claimant A.L. received their final instance of computerized ROM/MT testing at Motion Medical.

837.    On February 5, 2021, claimant A.L. would return to Motion Medical when claimant A.L. received a disability impairment assessment.

838.    Upon information and belief, the Defendants endeavored to update their pre-determined treatment protocol and scheme in further efforts to avoid detection.

839.    By way of example, upon information and belief, the Defendants' appear to have installed an individual who is located in New York State at Motion Medical whereas the owner of Motion Medical (Koffler) may not physically be present in New York State.

840.    Upon information and belief, after denials for improper billing and scrutiny from various insurers, Motion Medical expanded the Defendants' protocol to incorporate disability impairment assessment testing in order to maximize unnecessary treatment and the value of claims overall.

841.    While this updated protocol still includes medically unnecessary computerized ROM/MT testing, Motion Medical also billed for disability impairment testing under the CPT code 99456 ("CPT Code 99456").

842.    CPT Code 99456 is for work-related or medical disability examination by one other than the treating physician that includes: completion of a medical history commensurate with the patient's condition; performance of an examination commensurate with the patient's condition; formulation of a diagnosis, assessment of capabilities and stability, as well as calculation of

impairment; development of future medical treatment plan; and completion of necessary documentation/certificates and report.

843.   Despite this new protocol by Motion Medical, the disability impairment testing was also improperly billed under CPT Code 99456 due to the lack of any assessment of the capabilities and stability of the patient, no calculation of the patient's impairment, and Motion Medical's failure to offer any treatment plan other than returning the claimant to their treating provider for additional medically unnecessary and excessive treatment.

844.   This shift in billing by Motion Medical represents not just a new approach to concealing the medically unnecessary treatment being billed, but is also indicative of an awareness by Motion Medical that it had to change its approach to fraudulently billing for medically unnecessary testing.

845.   In total, A.L. received treatment related to their automobile claim for 501 days after the date of loss.

846.   A.L. was in the Defendants' treatment protocol for 489 days after the date of loss.

847.   Despite referring claimant A.L. for computerized ROM/MT testing on at least five (5) occasions, the results of these tests were/are not discussed in Goldman PC's re-evaluation reports and there was no change in the treatment plan for A.L. based on the computerized ROM/MT testing results from Motion Medical.

848.   While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

849.     Each instance of computerized ROM/MT testing allegedly rendered to claimant A.L. was not medically necessary.

850.     Ultimately, Motion Medical billed Allstate in excess of $4,925.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

**Q.  Claimant X.C. (Claim No. 0573811767)**
**Date of Loss: January 3, 2020**

851.     Claimant X.C. (claim number 0573811767) received an initial evaluation on January 10, 2020 at Goldman PC, which included manual ROM/MT testing using a handheld dual inclinometer.

852.     The initial evaluation report for claimant X.C. documented ROM testing of the cervical and lumbar spine.

853.     On July 8, 2020, claimant X.C. received additional manual ROM/MT testing from Goldman PC as part of a follow-up evaluation.

854.     Goldman PC performed a follow-up evaluation on July 10, 2020, which included manual ROM/MT testing.

855.     On July 10, 2020, Goldman PC also referred claimant X.C. to Motion Medical for computerized ROM/MT testing.

856.     On July 13, 2020, claimant X.C. received additional manual ROM/MT testing from Goldman PC as part of a follow-up evaluation.

857.     This pattern of treatment with Goldman PC would continue until August 7, 2020, when claimant X.C. would receive their final evaluation from Goldman PC after forty-seven (47) visits.

858.    In total, X.C. received treatment related to their automobile claim for 217 days after the date of loss.

859.    X.C. was in the Defendants' treatment protocol for 210 days after the date of loss.

860.    Despite referring claimant X.C. for computerized ROM/MT testing on at least one (1) occasion, the results of these tests were/are not discussed in Goldman PC's re-evaluation reports and there was no change in the treatment plan for X.C. based on the computerized ROM/MT testing results from Motion Medical.

861.    While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

862.    Each instance of computerized ROM/MT testing allegedly rendered to claimant X.C. was not medically necessary.

863.    Ultimately, Motion Medical billed Allstate in excess of $985.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

### R.   Claimant C.P. (Claim No. 0475333225)
Date of Loss: September 17, 2017

864.    Claimant C.P. (claim number 0475333225) received an initial evaluation on September 18, 2017, at RPHA, which included manual ROM/MT testing.

865.    The initial evaluation report for claimant C.P. documented ROM testing of the cervical and lumbar spine.

866.    Notably, the initial evaluation was purportedly conducted at RHPA, but the referring provider was a different entity owned by Rauch.

867.    Rauch ultimately referred C.P. to Apollo Medical for computerized ROM/MT testing on October 11, 2017.

868.    Thereafter, Rauch once again referred claimant C.P. to Apollo Medical for computerized ROM/MT testing which was performed on November 8, 2017.

869.    On December 6, 2017 claimant C.P. received additional computerized ROM/MT testing from Apollo Medical upon referral from Rauch.

870.    On January 3, 2018 claimant C.P. presented at Island Medical and received more computerized ROM/MT testing upon referral from Rauch.

871.    On April 9, 2018 claimant C.P. presented for treatment with Rauch.

872.    Notably, the referral for C.P.'s treatment with Rauch on April 9 2018 was issued from the same Rauch entity purporting to offer treatment on this date.

873.    It should also be noted that this demonstrates how Rauch uses businesses in his own name interchangeably and both co-mingles and endeavors to refer business within his own tightly controlled circle; essentially, there is no distinguishable difference between Rauch, his businesses on paper, and the PC Defendants. They operate as one to achieve a goal of excessively billing insurance companies such as Allstate.

874.    This pattern of treatment with Rauch would continue until April 23, 2018, when claimant C.P. would receive their final evaluation from Rauch after twelve (12) visits.

875.    On May 23, 2018 claimant C.P. received their final instance of computerized ROM/MT testing at Island Medical.

876.    In total, C.P. received treatment, related to their automobile claim, for 248 days after the date of loss.

877.    C.P. was in the Defendants' treatment protocol for 247 days after the date of loss.

878.   Despite referring claimant C.P. for computerized ROM/MT testing on at least five (5) occasions, the results of these tests were/are not discussed in RPHA re-evaluation reports and there was no change in the treatment plan for C.P. based on the computerized ROM/MT testing results from Apollo Medical and Island Medical.

879.   While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

880.   Each instance of computerized ROM/MT testing allegedly rendered to claimant C.P. was not medically necessary.

881.   Ultimately, Apollo Medical and Island Medical billed Allstate in excess of $4,925.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

**S.   Claimant I.K. (Claim No. 0475333225)**
     **Date of Loss: September 17, 2017**

882.   Claimant I.K. (claim number 047533225) received an initial evaluation on September 18, 2017, at RPHA, which included manual ROM/MT testing.

883.   The initial evaluation report for claimant I.K. documented ROM testing of the cervical and lumbar spine.

884.   Notably, RPHA performed the initial evaluation, but the referring provider was a different entity owned by Rauch, which referred I.K. to Apollo Medical for computerized ROM/MT testing on October 11, 2017.

885.   Thereafter, Rauch once again referred claimant I.K. to Apollo Medical for computerized ROM/MT testing which was performed on November 8, 2017.

886.     On December 6, 2017 claimant I.K. received additional computerized ROM/MT testing from Apollo Medical upon referral from Rauch.

887.     On January 3, 2018 claimant I.K. presented at Island Medical and received more computerized ROM/MT testing upon referral from Rauch.

888.     Claimant I.K.'s final evaluation with Rauch on April 9, 2018 also included manual ROM/MT testing.

889.     Notably, the referral for I.K.'s treatment with Rauch on April 9, 2018 was issued from the same Rauch entity purporting to offer treatment on this date.

890.     This demonstrates how Rauch uses businesses in his own name interchangeably and both co-mingles and endeavors to refer business within his own tightly controlled circle; essentially, there is no distinguishable difference between Rauch, his businesses on paper, and the PC Defendants. They operate as one to achieve a goal of excessively billing insurance companies such as Allstate.

891.     On May 23, 2018 claimant I.K. received their final instance of computerized ROM/MT testing at Island Medical.

892.     In total, I.K. received treatment, related to their automobile claim, for 248 days after the date of loss.

893.     I.K. was in the Defendants' treatment protocol for 247 days after the date of loss.

894.     Despite referring claimant I.K. for computerized ROM/MT testing on at least five (5) occasions, the results of these tests were/are not discussed in RPHA re-evaluation reports and there was no change in the treatment plan for I.K. based on the computerized ROM/MT testing results from Apollo Medical and Island Medical.

111

895.    While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

896.    Each instance of computerized ROM/MT testing allegedly rendered to claimant I.K. was not medically necessary.

897.    Ultimately, Apollo Medical and Island Medical billed Allstate in excess of $4,925.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

**T.    Claimant D.F. (Claim No. 0396253296)
        Date of Loss: December 26, 2015**

898.    Claimant D.F. (claim number 0396253296) received an initial evaluation on January 15, 2016 at RPHA, which included manual ROM/MT testing.

899.    Soon thereafter, claimant D.F. received a pain management evaluation at RPHA which included manual ROM/MT testing of the cervical spine.

900.    Notably, the initial evaluation was purportedly performed by RPHA, but the medical records also reference another entity owned by Rauch, which was the facility that referred D.F. to Bi County Medical for computerized ROM/MT testing on January 27, 2016.

901.    A true and accurate copy of the D.F.'s initial evaluation is attached hereto as Exhibit 15.

902.    The medical billing for D.F.'s initial evaluation was submitted in Rauch's individual name.

903.    A true and accurate copy of the billing for D.F.'s initial evaluation is attached hereto as Exhibit 16.

904.   The intermingling of Rauch's businesses and the disparity between the medical documentation and medical billing further demonstrates how Rauch utilizes businesses within his control for self-referrals and maximum profit.

905.   Rauch performed a follow-up evaluation on February 22, 2016, which included manual ROM/MT testing.

906.   On February 24, 2016, claimant D.F. received additional manual ROM/MT testing from Rauch as part of a follow-up evaluation.

907.   RPHA once again referred claimant D.F. to Bi County Medical for computerized ROM/MT testing which was purportedly performed on February 24, 2016.

908.   Rauch performed a follow-up evaluation on March 23, 2016, which included manual ROM/MT testing.

909.   On March 23, 2016, claimant D.F. was once again referred for computerized ROM/MT testing from Bi County Medical.

910.   On April 27, 2016, claimant D.F. received additional manual ROM/MT testing from Rauch as part of a follow-up evaluation.

911.   On April 27, 2016, claimant D.F. purportedly received their final instance of computerized ROM/MT testing from Bi County Medical based upon a referral from Rauch.

912.   Rauch performed a follow-up evaluation on May 2, 2016, which included manual ROM/MT testing.

913.   This pattern of treatment with Rauch would continue until May 8, 2017, when claimant D.F. would receive their final evaluation from Rauch after seventy (70) visits.

914.   In total, D.F. received treatment, related to their automobile claim, for 499 days after the date of loss.

915.     D.F. was in the Defendants' treatment protocol for 479 days after the date of loss.

916.     Despite referring claimant D.F. for computerized ROM/MT testing on at least four (4) occasions, the results of these tests were/are not discussed in Rauch/RPHA's re-evaluation reports and there was no change in the treatment plan for D.F. based on the computerized ROM/MT testing results from Bi County Medical.

917.     While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

918.     Each instance of computerized ROM/MT testing allegedly rendered to claimant D.F. was not medically necessary.

919.     Ultimately, Bi County Medical billed Allstate in excess of $3,940.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

### U.   **Claimant B.P. (Claim No. 0422259895)**
####    **Date of Loss: July 24, 2016**

920.     Claimant B.P. (claim number 0422259895) received an initial evaluation on August 10, 2016, at RPHA, which included manual ROM/MT testing.

921.     The initial evaluation report for claimant B.P. documented ROM testing of the cervical and lumbar spine.

922.     Notably, RPHA performed the initial evaluation but the referring provider was a different entity owned by Rauch, which referred B.P. to Bi County Medical for computerized ROM/MT testing on September 28, 2016.

923.    It should also be noted that this demonstrates how Rauch uses businesses in his own name interchangeably and both co-mingles and endeavors to refer business within his own tightly controlled circle; essentially, there is no distinguishable difference between Rauch, his businesses on paper, and the PC Defendants. They operate as one to achieve a goal of excessively billing insurance companies such as Allstate.

924.    Rauch performed a follow-up evaluation on November 30, 2016, which included manual ROM/MT testing.

925.    Thereafter, Rauch once again referred claimant B.P. to Bi County Medical for computerized ROM/MT testing which was also performed on November 30, 2016.

926.    On December 28, 2016, claimant B.P. received additional manual ROM/MT testing from Rauch as part of a follow-up evaluation.

927.    On December 28, 2016 claimant B.P. was once again referred by Rauch for computerized ROM/MT testing from Bi County Medical.

928.    Rauch performed a follow-up evaluation on January 25, 2017, which included manual ROM/MT testing.

929.    On January 25, 2017 claimant B.P. also received their final instance of computerized ROM/MT testing from Bi County Medical upon a referral from Rauch.

930.    On March 1, 2017, claimant B.P. received additional manual ROM/MT testing from Rauch as part of a follow-up evaluation.

931.    This pattern of treatment with Rauch would continue until August 23, 2017, when claimant B.P. would receive their final evaluation from Rauch after twenty-five (25) visits.

932.    In total, B.P. received treatment, related to their automobile claim, for 395 days after the date of loss.

933.    B.P. was in the Defendants' treatment protocol for 378 days after the date of loss.

934.    Despite referring claimant B.P. for computerized ROM/MT testing on at least four (4) occasions, the results of these tests were/are not discussed in RPHA's re-evaluation reports and there was no change in the treatment plan for B.P. based on the computerized ROM/MT testing results from Bi County Medical.

935.    While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

936.    Each instance of computerized ROM/MT testing allegedly rendered to claimant B.P. was not medically necessary.

937.    Ultimately, Bi County Medical billed Allstate in excess of $3,940.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

**V.    Claimant J.A. (Claim No. 0429208184)**
**Date of Loss: September 19, 2016**

938.    Claimant J.A. (claim number 0429208184) received an initial evaluation on October 3, 2016, at RPHA, which included manual ROM/MT testing.

939.    The initial evaluation report for claimant J.A. documented ROM testing of the cervical and lumbar spine.

940.    Claimant J.A. underwent a follow-up evaluation which was performed with Rauch on October 21, 2016, which included manual ROM/MT testing.

941.    On October 24, 2016, claimant J.A. received additional manual ROM/MT testing from Rauch as part of a follow-up evaluation.

116

942. Claimant J.A. underwent a follow-up evaluation which was performed with Rauch on October 28, 2016, which included manual ROM/MT testing.

943. On October 31, 2016, claimant J.A. received additional manual ROM/MT testing from Rauch as part of a follow-up evaluation.

944. Claimant J.A. underwent a follow-up evaluation which was performed with Rauch on November 2, 2016, which included manual ROM/MT testing.

945. On November 14, 2016, claimant J.A. received additional manual ROM/MT testing from Rauch as part of a follow-up evaluation.

946. Claimant J.A.'s final evaluation with Rauch on December 23, 2016 also included manual ROM/MT testing.

947. Notably, RPHA performed the initial evaluation but the referring provider was a different entity owned by Rauch, which referred J.A. to Bi County Medical for computerized ROM/MT testing on January 25, 2017.

948. It should also be noted that this demonstrates how Rauch uses businesses in his own name interchangeably and both co-mingles and endeavors to refer business within his own tightly controlled circle; essentially, there is no distinguishable difference between Rauch, his businesses on paper, and the PC Defendants. They operate as one to achieve a goal of excessively billing insurance companies such as Allstate.

949. On September 13, 2017 claimant J.A. received their final instance of computerized ROM/MT testing from Apollo Medical upon a referral from Rauch.

950. In total, J.A. received treatment, related to their automobile claim, for 359 days after the date of loss.

951. J.A. was in the Defendants' treatment protocol for 345 days after the date of loss.

952.     Despite referring claimant J.A. for computerized ROM/MT testing on at least two (2) occasions, the results of these tests were/are not discussed in RPHA's re-evaluation reports and there was no change in the treatment plan for J.A. based on the computerized ROM/MT testing results from Bi County Medical and Apollo Medical.

953.     While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

954.     Each instance of computerized ROM/MT testing allegedly rendered to claimant J.A. was not medically necessary.

955.     Ultimately, Bi County Medical and Apollo billed Allstate in excess of $1,970.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

### W. Claimant R.M. (Claim No. 0439425448)
### Date of Loss: December 15, 2016

956.     Claimant R.M. was referred to Bi County Medical for computerized ROM/MT testing on February 6, 2017.

957.     On March 28, 2017, claimant R.M. was once again referred to Bi County Medical for computerized ROM/MT testing.

958.     On June 5, 2017 claimant R.M. presented at Apollo Medical and received more computerized ROM/MT testing.

959.     On May 21, 2018 claimant R.M. received their final instance of computerized ROM/MT testing at Island Medical.

960.    In total, R.M. received treatment, related to their automobile claim, for 522 days after the date of loss.

961.    R.M. was in the Defendants' treatment protocol for 469 days after the date of loss.

962.    Despite being referred for computerized ROM/MT testing on at least four (4) occasions, claimant R.M.'s treatment plan never changed based upon the computerized ROM/MT testing results from Bi County Medical, Apollo Medical, and Island Medical.

963.    While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

964.    Each instance of computerized ROM/MT testing allegedly rendered to claimant R.M. was not medically necessary.

965.    Ultimately, Bi County Medical, Apollo Medical and Island Medical billed Allstate in excess of $3,940.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

### X. Claimant S.M. (Claim No. 0439425448)
   Date of Loss: December 15, 2016

966.    Claimant S.M. was referred to Bi County Medical for computerized ROM/MT testing on February 6, 2017.

967.    On March 28, 2017, claimant S.M. was once again referred to Bi County Medical for computerized ROM/MT testing.

968.    On June 5, 2017 claimant S.M. presented at Apollo Medical and received more computerized ROM/MT testing.

969.    On May 21, 2018 claimant S.M. received their final instance of computerized ROM/MT testing at Island Medical.

970.    In total, S.M. received treatment, related to their automobile claim, for 522 days after the date of loss.

971.    S.M. was in the Defendants' treatment protocol for 469 days after the date of loss.

972.    Despite being referred for computerized ROM/MT testing on at least four (4) occasions, claimant S.M.'s treatment plan never changed based upon the computerized ROM/MT testing results from Bi County Medical, Apollo Medical, and Island Medical.

973.    While computerized ROM/MT testing may be useful for research purposes, it serves no role in clinical or practical diagnoses; particularly, as in this instance where the Defendants generated no report and/or manual ROM/MT had already been performed in or around the time of computerized test(s).

974.    Each instance of computerized ROM/MT testing allegedly rendered to claimant S.M. was not medically necessary.

975.    Ultimately, Bi County Medical, Apollo Medical and Island Medical billed Allstate in excess of $3,940.00 for these bogus computerized ROM/MT tests. This system of referrals demonstrates the unnecessary nature of these tests by the Referring Providers and the PC Defendants.

976.    Indeed, the lack of individual patient care is best exemplified by these final two (2) exemplar claims. Whereby, two (2) separate individuals were put into a nearly identical treatment protocol, including referrals for computerized ROM/MT testing from all of the PC Defendants that existed at the time of their treatment.

977.    Ultimately, the totality of the evidence compiled by Allstate demonstrates that the use of computerized ROM/MT testing in the treatment of Allstate insureds by the PC Defendants was an exercise in billing and profit rather than an examination as to what was necessary to care for these patients.

## VII.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

978.    Throughout the course of this scheme, Rauch, Lewis, Koffler, Sari Rauch, Jones, McGee, and/or Goldman created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation and intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing (or causing to be placed) in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Services, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

979.    Most if not all of the documents, treatment notes, testing reports, health insurance claim forms, NF-3 claim forms, narrative reports, referrals, prescriptions, letters, and requests for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

980.    Every automobile insurance claim detailed herein involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks, and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of settlement draft duplicates to the insurance carrier's home office for filing.

A.   **Bi County Medical Diagnostics P.C. ("Bi County Medical") Enterprise**

981.   Rauch, Lewis, and/or Sari Rauch personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Bi County Medical to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

982.   Rauch, Lewis, and/or Sari Rauch caused Bi County Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Bi County Medical mailed a demand for payment (i.e., invoice) to Allstate.

983.   Lewis' (and/or her agents) provision of excessive and medically unnecessary services to Allstate Claimants rendered Bi County Medical completely ineligible for No-Fault reimbursement under New York law.

984.   Rauch's control over Bi County Medical—including the receipt and distribution of fees and proceeds derived from professional services that he was not lawfully authorized to administer, control, or profit from—also rendered Bi County Medical completely ineligible for No-Fault reimbursement under New York law.

985.   Rauch, Lewis, and/or Sari Rauch caused medical records and bills from Bi County Medical to be submitted to Allstate through the U.S. Mails which epitomize the Defendants' fraudulent effort to obtain payment for inflated, unnecessary and otherwise non-compensable bills.

986.   At all relevant times, Rauch, Lewis, and/or Sari Rauch knew that Bi County Medical (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mails in connection with each of the fraudulent claims.

987.   Allstate estimates that the unlawful operation of the Bi County Medical enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 17 and incorporated by reference as if set forth in its entirety.

### B.   APOLLO MEDICAL DIAGNOSTICS PLLC ("APOLLO MEDICAL") ENTERPRISE

988.   Rauch, Lewis, Koffler, and/or Sari Rauch personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Apollo Medical to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

989.   Rauch, Lewis, Koffler, and/or Sari Rauch caused Apollo Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Apollo Medical mailed a demand for payment (i.e., invoice) to Allstate.

990.   Lewis and/or Koffler's (and/or their agents) provision of excessive and medically unnecessary services to Allstate Claimants rendered Apollo Medical completely ineligible for No-Fault reimbursement under New York law.

991.   Rauch's control over Apollo Medical—including the receipt and distribution of fees/proceeds derived from professional services that he was not lawfully authorized to administer, control, or profit from—also rendered Apollo Medical completely ineligible for No-Fault reimbursement under New York law.

992.   Rauch, Lewis, Koffler, and/or Sari Rauch caused medical records and bills from Apollo Medical to be submitted to Allstate through the U.S. Mails which epitomize the Defendants' fraudulent effort to obtain payment for inflated, unnecessary and otherwise non-compensable bills.

993.     At all relevant times, Rauch, Lewis, Koffler, and/or Sari Rauch knew that Apollo Medical (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mails in connection with each of these fraudulent claims.

994.     Allstate estimates that the unlawful operation of the Apollo Medical enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 18 and incorporated by reference as if set forth in its entirety.

### C.     ISLAND MEDICAL DIAGNOSTICS PLLC ("ISLAND MEDICAL") ENTERPRISE

995.     Rauch, Koffler, Sari Rauch, Jones, and/or McGee personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Island Medical to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

996.     Rauch, Koffler, Sari Rauch, Jones, and/or McGee caused Island Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Island Medical mailed a demand for payment (i.e., invoice) to Allstate.

997.     Koffler's (and/or his agents) provision of excessive and medically unnecessary services to patients of Island Medical rendered Island Medical completely ineligible for No-Fault reimbursement under New York law.

998.     Rauch's control over Island Medical—including the receipt and distribution of fees and proceeds derived from professional services that he was not lawfully authorized to administer, control, or profit from—also rendered Island Medical completely ineligible for No-Fault reimbursement under New York law.

999.   At all relevant times, Rauch, Koffler, Sari Rauch, Jones, and/or McGee knew that Island Medical (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mails in connection with each of these fraudulent claims

1000.   At all relevant times, Rauch, Koffler, Sari Rauch, Jones, and/or McGee knew that Island Medical (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mails in connection with each of the fraudulent claims.

1001.   Allstate estimates that the unlawful operation of the Island Medical enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 19 and incorporated by reference as if set forth in its entirety.

### D.   MOTION MEDICAL DIAGNOSTICS P.C. ("MOTION MEDICAL") ENTERPRISE

1002.   Rauch, Koffler, Sari Rauch, Jones, McGee, and/or Goldman personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Motion Medical to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1003.   Rauch, Koffler, Sari Rauch, Jones, McGee, and/or Goldman caused Motion Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Motion Medical mailed a demand for payment (i.e., invoice) to Allstate.

1004.  Koffler's (and/or his agents) provision of excessive and medically unnecessary services to Allstate Claimants rendered Motion Medical completely ineligible for No-Fault reimbursement under New York law.

1005.  Rauch's control over Motion Medical—including the receipt and distribution of fees and proceeds derived from professional services that these Defendants were not lawfully authorized to administer, control, or profit from—also rendered Motion Medical completely ineligible for No-Fault reimbursement under New York law.

1006.  At all relevant times, Rauch, Koffler, Sari Rauch, Jones, McGee, and/or Goldman knew that Motion Medical (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mails in connection with each of these fraudulent claims.

1007.  At all relevant times, Rauch, Koffler, Sari Rauch, Jones, McGee, and/or Goldman knew that Motion Medical (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mails in connection with each of the fraudulent claims.

1008.  Allstate estimates that the unlawful operation of the Motion Medical enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 20 and incorporated by reference as if set forth in its entirety.

E.    RONALD P. MAZZA, D.C. P.C. ( "MAZZA PC") ENTERPRISE

1009.  Rauch, Lewis, and/or Koffler personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from

Mazza PC to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1010.   Rauch, Lewis, and/or Koffler's actions caused Mazza PC to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Mazza PC mailed a demand for payment (i.e., invoice) to Allstate.

1011.   The provision of excessive and medically unnecessary services to Allstate Claimants at Mazza PC rendered Mazza PC completely ineligible for No-Fault reimbursement under New York law.

1012.   At all relevant times, Rauch, Lewis, and/or Koffler knew that Mazza PC (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mails in connection with each of these fraudulent claims.

1013.   At all relevant times, Rauch, Lewis, and/or Koffler knew that Mazza PC (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mails in connection with each of the fraudulent claims.

1014.   Allstate estimates that the unlawful operation of the Mazza PC Enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 21 and incorporated by reference as if set forth in its entirety.

F.   **FRED J. JONES CHIROPRACTOR P.C. D/B/A SUNRISE CHIROPRACTIC ( "SUNRISE) ENTERPRISE**

1015.   Rauch, Koffler, and/or Jones personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Sunrise

to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1016. Rauch, Koffler, and/or Jones caused Sunrise to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Sunrise mailed a demand for payment (i.e., invoice) to Allstate.

1017. Jones' (and/or his agents) provision of excessive and medically unnecessary services to Allstate Claimants rendered Sunrise completely ineligible for No-Fault reimbursement under New York law.

1018. At all relevant times, Rauch, Koffler, and/or Jones knew that Sunrise (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mails in connection with each of these fraudulent claims.

1019. At all relevant times, Rauch, Koffler, and/or Jones knew that Sunrise (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mails in connection with each of the fraudulent claims.

1020. Allstate estimates that the unlawful operation of the Sunrise enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 22 and incorporated by reference as if set forth in its entirety.

### G. YELLOWSTONE MEDICAL REHABILITATION P.C. ("YELLOWSTONE") ENTERPRISE

1021. Rauch, Koffler, and/or McGee personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from

Yellowstone to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1022.   Rauch, Koffler, and/or McGee caused Yellowstone to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Yellowstone mailed a demand for payment (i.e., invoice) to Allstate.

1023.   McGee's (and/or his agents) provision of excessive and medically unnecessary services to Allstate Claimants rendered Yellowstone completely ineligible for No-Fault reimbursement under New York law.

1024.   At all relevant times, Rauch, Koffler, and/or McGee knew that Yellowstone (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mails in connection with each of these fraudulent claims.

1025.   At all relevant times, Rauch, Koffler, and/or McGee knew that Yellowstone (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mails in connection with each of the fraudulent claims.

1026.  Allstate estimates that the unlawful operation of the Yellowstone enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 23 and incorporated by reference as if set forth in its entirety.

### H.   DR. TODD GOLDMAN, CHIROPRACTOR, P.C. ("GOLDMAN PC") ENTERPRISE

1027.   Rauch, Koffler, and/or Goldman personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from

Goldman PC to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1028.   Rauch, Koffler, and/or Goldman caused Goldman PC to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Goldman PC mailed a demand for payment (i.e., invoice) to Allstate.

1029.   Goldman's (and/or his agents) provision of excessive and medically unnecessary services to Allstate Claimants rendered Goldman PC completely ineligible for No-Fault reimbursement under New York law.

1030.   At all relevant times, Rauch, Koffler, and/or Goldman knew that Goldman PC (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mails in connection with each of these fraudulent claims.

1031.   At all relevant times, Rauch, Koffler, and/or Goldman knew that Goldman PC (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mails in connection with each of the fraudulent claims.

1032.   Allstate estimates that the unlawful operation of the Goldman PC enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 24 and incorporated by reference as if set forth in its entirety.

**VIII**. **SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE**

### A. FRAUDULENT CONCEALMENT OF RAUCH'S INVOLVEMENT AND UNLAWFUL PARTICIPATION IN THE OPERATION AND MANAGEMENT OF BI COUNTY MEDICAL

1033.   In furtherance of this scheme, Lewis was induced to register herself with the State of New York as Bi County Medical's sole officer, director, and shareholder by Rauch, who recruited Lewis to make it appear as if she were the sole officer, director, and shareholder of Bi County Medical.

1034.   The documents created and filed with the State of New York related to Bi County Medical deliberately omitted any reference to Rauch's involvement with or control over Bi County Medical.

1035.   The documents created and filed with the State of New York related to Bi County Medical gave no indication to Allstate or the general public that Rauch had in any way maintained a controlling interest in Bi County Medical, or in any way participated in the operation, management, and control of Bi County Medical.

1036.   Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Bi County Medical, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Rauch's domination and control over Lewis and Bi County Medical.

1037.   Rauch's purposeful concealment of his controlling interest in Bi County Medical—including Rauch's participation in the operation, management, and control of Bi County Medical as well as Rauch exercising control over Bi County Medical's professional fees, profits, and company finances—allowed Rauch to unlawfully control Bi County Medical undetected.

1038.   At all relevant times during the operation of the Bi County Medical enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Bi County Medical, Rauch and Lewis caused Bi County Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1039.   Further, Lewis attested (or caused the attestation) to the medical necessity of the services that they (or persons under their direction and control) allegedly performed in connection with the treatment and testing of Bi County Medical patients, as well as the validity of the charges submitted to Allstate for such services.

1040.   At all relevant times, Lewis, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with any other aspect of her oaths as a licensed medical professional.

1041.   At all relevant times, Rauch and Lewis actively concealed from Allstate facts regarding Bi County Medical's true ownership and control to prevent Allstate from discovering that Bi County Medical was unlawfully incorporated, operated and controlled by a non-physician, and therefore ineligible to seek or collect No-Fault benefit payments.

1042.   Many of these facts—particularly (a) Rauch's involvement in the direction and control of the treatment and testing of Bi County Medical's patients, and (b) Bi County Medical's unlawful splitting of professional fees and profits with Rauch—are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1043.   Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

1044.   Thus, every time that Rauch and Lewis (along with those individuals working under their control) caused Bi County Medical to submit No-Fault reimbursement demands to Allstate, Rauch and Lewis (and those individuals working under their control) necessarily certified that Bi County Medical was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1045.   The full extent of Rauch and Lewis' fraudulent and unlawful acts relative to their control over the Bi County Medical enterprise—including (a) Rauch's involvement in the direction and control of the treatment and testing of Bi County Medical's patients, (b) Rauch's participation in the operation and control of Bi County Medical, and (c) the unlawful channeling of Bi County Medical's professional fees and profits to Rauch through arrangements Rauch and/or one or more Rauch-owned medical facilities such as RPHA maintained with Lewis and Bi County Medical— was not, and could not have been, known to Allstate until shortly before it commenced this action.

## B. FRAUDULENT CONCEALMENT OF RAUCH'S INVOLVEMENT AND UNLAWFUL PARTICIPATION IN THE OPERATION AND MANAGEMENT OF APOLLO MEDICAL

1046.   In furtherance of this scheme, Lewis registered herself with the State of New York as Apollo Medical's sole member/manager.

1047.   This was done to create the appearance that Lewis was/is the sole member/manager of Apollo Medical, and in order to help conceal Rauch's true control of this facility.

1048.   In or about April 2017, Lewis purportedly sold her membership in Apollo Medical to Koffler.

1049.   Similar to Lewis, Koffler was also induced to register himself with the State of New York as Apollo Medical's sole member/manager by Rauch, who recruited Koffler to make it appear as if he were the sole member/manager of Apollo Medical.

1050.   The documents created and filed with the State of New York related to Apollo Medical deliberately omitted any reference to Rauch's involvement with or control over Apollo Medical.

1051.   The documents created and filed with the State of New York related to Apollo Medical gave no indication to Allstate or the general public that Rauch had in any way maintained a controlling interest in Apollo Medical, or in any way participated in the operation, management, and control of Apollo Medical.

1052.   Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Apollo Medical, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Rauch's domination and control over Lewis, Koffler, and Apollo Medical.

1053.   Rauch's purposeful concealment of his controlling interest in Apollo Medical—including Rauch's participation in the operation, management, and control of Apollo Medical as well as Rauch exercising control over Apollo Medical's professional fees, profits, and company finances—allowed Rauch to unlawfully control Apollo Medical undetected.

1054.   At all relevant times during the operation of the Apollo Medical enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Apollo Medical, Rauch, Lewis and Koffler caused Apollo Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1055.   Further, Lewis and Koffler attested (or caused the attestation) to the medical necessity of the services that they (or persons under their direction and control) allegedly performed in connection with the treatment and testing of Apollo Medical patients, as well as the validity of the charges submitted to Allstate for such services.

1056.   At all relevant times, Lewis and Koffler, as duly licensed physicians, were legally and ethically obligated to act honestly and with integrity, and also were legally and ethically obligated to act in accordance with any other aspect of their oaths as licensed medical professionals.

1057.   At all relevant times, Rauch, Lewis, and/or Koffler actively concealed from Allstate facts regarding Apollo Medical's true ownership and control to prevent Allstate from discovering that Apollo Medical was unlawfully incorporated, operated and controlled by a non-physician, and therefore ineligible to seek or collect No-Fault benefit payments.

1058.   Many of these facts—particularly (a) Rauch's involvement in the direction and control of the treatment and testing of Apollo Medical's patients, and (b) Apollo Medical's unlawful splitting of professional fees and profits with Rauch—are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1059.   Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

1060.   Thus, every time that Rauch, Lewis, and/or Koffler (along with those individuals working under their control) caused Apollo Medical to submit No-Fault reimbursement demands

to Allstate, Rauch, Lewis, and/or Koffler (and those individuals working under their control) necessarily certified that Apollo Medical was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1061.   The full extent of Rauch, Lewis, and/or Koffler's fraudulent and unlawful acts relative to their control over the Apollo Medical enterprise—including (a) Rauch's involvement in the direction and control of the treatment and testing of Apollo Medical's patients, (b) Rauch's participation in the operation and control of Apollo Medical, and (c) the unlawful channeling of Apollo Medical's professional fees and profits to Rauch through arrangements Rauch and/or one or more Rauch-owned medical facilities such as RPHA maintained with Lewis, Koffler and Apollo Medical—was not, and could not have been, known to Allstate until shortly before it commenced this action**.**

## C. Fraudulent Concealment of Rauch's Involvement and Unlawful Participation in the Operation and Management of Island Medical

1062.   In furtherance of this scheme, Koffler was induced to register himself with the State of New York as Island Medical's sole member/manager by Rauch, who recruited Koffler to make it appear as if he were the sole member/manager of Island Medical.

1063.   The documents created and filed with the State of New York related to Island Medical deliberately omitted any reference to Rauch's involvement with or control over Island Medical.

1064.   The documents created and filed with the State of New York related to Island Medical gave no indication to Allstate or the general public that Rauch had in any way maintained a controlling interest in Island Medical, or in any way participated in the operation, management, and control of Island Medical.

136

1065.   Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Island Medical, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Rauch's domination and control over Koffler and Island Medical.

1066.   Rauch's purposeful concealment of his controlling interest in Island Medical—including Rauch's participation in the operation, management, and control of Island Medical as well as Rauch exercising control over Island Medical's professional fees, profits, and company finances—allowed Rauch to unlawfully control Island Medical undetected.

1067.   At all relevant times during the operation of the Island Medical enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Island Medical, Rauch and Koffler caused Island Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1068.   Further, Koffler attested (or caused the attestation) to the medical necessity of the services that they (or persons under their direction and control) allegedly performed in connection with the treatment and testing of Island Medical patients, as well as the validity of the charges submitted to Allstate for such services.

1069.   At all relevant times, Koffler, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with any other aspect of his oaths as a licensed medical professional.

1070.   At all relevant times, Rauch and Koffler actively concealed from Allstate facts regarding Island Medical's true ownership and control to prevent Allstate from discovering that Island Medical was unlawfully incorporated, operated and controlled by a non-physician, and therefore ineligible to seek or collect No-Fault benefit payments.

1071.   Many of these facts—particularly (a) Rauch's involvement in the direction and control of the treatment and testing of Island Medical's patients, and (b) Island Medical's unlawful splitting of professional fees and profits with Rauch—are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1072.   Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

1073.   Thus, every time that Rauch and Koffler (along with those individuals working under their control) caused Island Medical to submit No-Fault reimbursement demands to Allstate, Rauch and Koffler (and those individuals working under their control) necessarily certified that Island Medical was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1074.   The full extent of Rauch and Koffler's fraudulent and unlawful acts relative to their control over the Island Medical enterprise—including (a) Rauch's involvement in the direction and control of the treatment and testing of Island Medical's patients, (b) Rauch's participation in the operation and control of Island Medical, and (c) the unlawful channeling of Island Medical's professional fees and profits to Rauch through arrangements Rauch and/or one or more Rauch-owned medical facilities such as RPHA maintained with Koffler and Island Medical—was not, and could not have been, known to Allstate until shortly before it commenced this action.

### D. Fraudulent Concealment of Rauch's Involvement and Unlawful Participation in the Operation and Management of the Motion Medical Enterprise

1075. In furtherance of this scheme, Koffler was induced to register himself with the State of New York as Motion Medical's sole officer, director and shareholder by Rauch, who recruited Koffler to make it appear as if he were the sole officer, director, and shareholder of Motion Medical.

1076. The documents created and filed with the State of New York related to Motion Medical deliberately omitted any reference to Rauch's involvement with or control over Motion Medical.

1077. The documents created and filed with the State of New York related to Motion Medical gave no indication to Allstate or the general public that Rauch had in any way maintained a controlling interest in Motion Medical, or in any way participated in the operation, management, and control of Motion Medical.

1078. Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Motion Medical, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Rauch's domination and control over Koffler and Motion Medical.

1079. Rauch's purposeful concealment of his controlling interest in Motion Medical—including Rauch's participation in the operation, management, and control of Motion Medical as well as Rauch exercising control over Motion Medical's professional fees, profits, and company finances—allowed Rauch to unlawfully control Motion Medical undetected.

1080. At all relevant times during the operation of the Motion Medical enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients

who received treatment through Motion Medical, Rauch and Koffler caused Motion Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1081.   Further, Koffler attested (or caused the attestation) to the medical necessity of the services that they (or persons under their direction and control) allegedly performed in connection with the treatment and testing of Motion Medical patients, as well as the validity of the charges submitted to Allstate for such services.

1082.   At all relevant times, Koffler, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

1083.   At all relevant times, Rauch and Koffler actively concealed from Allstate facts regarding Motion Medical's true ownership and control to prevent Allstate from discovering that Motion Medical was unlawfully incorporated, operated and controlled by a non-physician, and therefore ineligible to seek or collect No-Fault benefit payments.

1084.   Many of these facts—particularly (a) Rauch's involvement in the direction and control of the treatment and testing of Motion Medical's patients, and (b) Motion Medical's unlawful splitting of professional fees and profits with Rauch—are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1085.   Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

1086. Thus, every time that Rauch and Koffler (along with those individuals working under their control) caused Motion Medical to submit No-Fault reimbursement demands to Allstate, Rauch and Koffler (and those individuals working under their control) necessarily certified that Motion Medical was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1087. The full extent of Rauch and Koffler's fraudulent and unlawful acts relative to their control over the Motion Medical enterprise—including (a) Rauch's involvement in the direction and control of the treatment and testing of Motion Medical's patients, (b) Rauch's participation in the operation and control of Motion Medical, and (c) the unlawful channeling of Motion Medical's professional fees and profits to Rauch through arrangements Rauch and/or one or more Rauch-owned medical facilities such as RPHA maintained with Koffler and Motion Medical—was not, and could not have been, known to Allstate until shortly before it commenced this action.

## IX.  ALLSTATE'S JUSTIFIABLE RELIANCE

1088. Each claim is submitted to Allstate by (or on behalf of) Bi County Medical, Apollo Medical, Island Medical, Motion Medical, Mazza PC, Sunrise, Yellowstone, and Goldman PC was verified pursuant to Insurance Law § 403.

1089. At all relevant times, Rauch, Lewis, Koffler, Mazza, Jones, McGee, and Goldman, as licensed healthcare providers, were legally and ethically obligated to act with honesty and integrity in connection with their provisions of, and billing for, healthcare services.

1090. To induce Allstate to promptly pay Bi County Medical, Apollo Medical, Island Medical, Motion Medical, Mazza PC, Sunrise, Yellowstone, and Goldman PC's invoices, the Defendants submitted (or caused to be submitted) to Allstate NF-3 forms or CMS-1500 forms certifying that Bi County Medical, Apollo Medical, Island Medical, Motion Medical, Mazza PC,

Sunrise, Yellowstone, and Goldman PC were eligible to be reimbursed under New York's No-Fault laws.

1091.   Further, to induce Allstate to promptly pay the non-compensable charges for the professional healthcare services purportedly provided to patients of Bi County Medical, Apollo Medical, Island Medical, Motion Medical, Mazza PC, Sunrise, Yellowstone, and Goldman PC, the Defendants hired attorneys and law firms to pursue collection of the fraudulent and/or otherwise non-compensable charges from Allstate. These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that Bi County Medical, Apollo Medical, Island Medical, Motion Medical, Mazza PC, Sunrise, Yellowstone, and Goldman PC's invoices are not promptly paid in full.

1092.   Allstate is under a statutory and contractual obligation to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

1093.   At all relevant times, as alleged above, the Defendants concealed from Allstate the truth regarding Bi County Medical, Apollo Medical, Island Medical, Motion Medical, Mazza PC, Sunrise, Yellowstone, and Goldman PC's reimbursement eligibility under New York law.

1094.   Acting in reasonable reliance on these misrepresentations, Allstate paid money to Bi County Medical, Apollo Medical, Island Medical, Motion Medical, Mazza PC, Sunrise, Yellowstone, and Goldman PC to its detriment.

1095.   Allstate would not have made any of these payments to these entities had the Defendants provided true and accurate information about Bi County Medical, Apollo Medical, Island Medical, Motion Medical, Mazza PC, Sunrise, Yellowstone, and Goldman PC's

reimbursement eligibility under New York law, including the operation of these entities and the fact and necessity of the services provided.

1096.   As a result of the Defendants' conduct, Allstate has been forced to make substantial payments in reasonable reliance on the Defendants' false healthcare documentation and false representations regarding the Defendants' eligibility for reimbursement under New York's No-Fault laws.

1097.   Because the Defendants actively concealed their fraudulent conduct from Allstate, Allstate did not discover, and could not have reasonably discovered, that it had been damaged by the Defendants' fraudulent conduct until shortly before it filed this Complaint.

## X.   **DAMAGES**

1098.   The Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate its damages with specificity at this stage of the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments wrongfully made to Bi County Medical, Apollo Medical, Island Medical, Motion Medical, Goldman PC, Sunrise, and Yellowstone in connection with claims made under New York's No-Fault Laws, the exact amount to be determined at trial, including:

(a)      Payments made to Bi County Medical Diagnostics P.C. totaling at least $71,339.55, the exact amount to be determined at trial. The chart at Exhibit 25 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Bi County Medical Diagnostics P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(b)      Payments made to Apollo Medical Diagnostics PLLC totaling at least $37,052.14, the exact amount to be determined at trial. The chart at Exhibit 26 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Apollo Medical Diagnostics PLLC in

connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(c)     Payments made to Island Medical Diagnostics PLLC totaling at least $213,406.49, the exact amount to be determined at trial. The chart at Exhibit 27 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Island Medical Diagnostics PLLC in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(d)     Payments made to Motion Medical Diagnostics P.C. totaling at least $89,240.92, the exact amount to be determined at trial. The chart at Exhibit 28 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Motion Medical Diagnostics P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(e)     Payments made to Dr. Todd Goldman, Chiropractor, P.C. totaling at least $14,984.01, the exact amount to be determined at trial. The chart at Exhibit 29 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Dr. Todd Goldman, Chiropractor, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(f)     Payments made to Fred Jones Chiropractor, P.C. d/b/a Sunrise Chiropractic totaling at least $233,340.52, the exact amount to be determined at trial. The chart at Exhibit 30 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Fred Jones Chiropractor, P.C. d/b/a Sunrise Chiropractic in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(g)     Payments made to Yellowstone Medical Rehabilitation P.C. totaling at least $134,982.63, the exact amount to be determined at trial. The chart at Exhibit 31 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Yellowstone Medical Rehabilitation P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

## XI.     CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### BI COUNTY MEDICAL DIAGNOSTICS P.C. ENTERPRISE
### (Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., and Sari R. Rauch)

1099.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully therein.

1100. Bi County Medical Diagnostics P.C. ("Bi County Medical") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1101. In connection with the operation and management of the Bi County Medical enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., and Sari R. Rauch, (collectively, "Count I Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Bi County Medical's business, or should have reasonably foreseen that the mailing of such false medical documentation by Bi County Medical would occur, in furtherance of their scheme to defraud.

1102. The Count I Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 17.

1103. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1104. Policies of insurance were also delivered to insureds through the U.S. Mail.

1105. Payments made by Allstate to Bi County Medical traveled through the U.S. Mail.

1106. As documented above, the Count I Defendants repeatedly and intentionally submitted NF-3 forms, CMS-500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Bi County Medical—payments that the Count I Defendants intended to be funded using the No-Fault

insurance benefits that were provided under the applicable automobile insurance policy pursuant to New York law.

1107.  As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Bi County Medical for the benefit of the Count I Defendants that would not otherwise have been made.

1108.  The Count I Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I Defendants to continue their unlawful scheme without being detected.

1109.  The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1110.  By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1111.  The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Bi County Medical for the benefit of the Count I Defendants.

1112.  The Count I Defendants participated in the conduct of the Bi County Medical enterprise through a pattern of racketeering activities.

1113.  Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

1114.  The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1115.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1116.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1117.   By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## BI COUNTY MEDICAL DIAGNOSTICS P.C. ENTERPRISE
### (Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., and Sari R. Rauch)

1118.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1119.   Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., and Sari R. Rauch, (collectively, "Count II Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Bi County Medical Diagnostics PLLC ("Bi County Medical").

1120.   The Count II Defendants each agreed to further, facilitate, support, and operate the Bi County Medical enterprise.

1121.   As such, the Count II Defendants conspired to violate 18 U.S.C. § 1962(c).

1122.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Bi County Medical

even though Bi County Medical was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count II Defendants.

1123.   The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Bi County Medical, the provision of false, fraudulent, and grossly unnecessary healthcare services to Bi County Medical patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3's), bills, invoices, and other claim-related documents that materially misrepresented Bi County Medical's No-Fault reimbursement eligibility.

1124.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Bi County Medical as a result of the Count II Defendants' unlawful conduct described herein.

1125.   By virtue of the Count II Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**APOLLO MEDICAL DIAGNOSTICS PLLC ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., Richard C. Koffler, M.D., Sari R. Rauch, and Bi County Medical Diagnostics P.C.)**

1126.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1127.   Apollo Medical Diagnostics PLLC ("Apollo Medical") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1128. In connection with the operation and management of the Apollo Medical enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., Richard C. Koffler, M.D., Sari R. Rauch, and Bi County Medical Diagnostics P.C., (collectively, "Count III Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Apollo Medical's business, or should have reasonably foreseen that the mailing of such false medical documentation by Apollo Medical would occur, in furtherance of their scheme to defraud.

1129. The Count III Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 18.

1130. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1131. Policies of insurance were also delivered to insureds through the U.S. Mail.

1132. Payments made by Allstate to Apollo Medical traveled through the U.S. Mail.

1133. As documented above, the Count III Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Apollo Medical— payments that the Count III Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1134.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Apollo Medical for the benefit of the Count III Defendants that would not otherwise have been made.

1135.   The Count III Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III Defendants to continue their unlawful scheme without being detected.

1136.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1137.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1138.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Apollo Medical for the benefit of the Count III Defendants.

1139.   The Count III Defendants participated in the conduct of the Apollo Medical enterprise through a pattern of racketeering activities.

1140.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

1141.   The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1142.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1143.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1144.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**APOLLO MEDICAL DIAGNOSTICS PLLC ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., Richard C. Koffler, M.D., Sari R. Rauch, and Bi County Medical Diagnostics P.C.)**

1145.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1146.    Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., Richard C. Koffler, M.D., Sari R. Rauch, and Bi County Medical Diagnostics P.C. (collectively, "Count IV Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Apollo Medical Diagnostics PLLC ("Apollo Medical").

1147.    The Count IV Defendants each agreed to further, facilitate, support, and operate the Apollo Medical enterprise.

1148.    As such, the Count IV Defendants conspired to violate 18 U.S.C. § 1962(c).

1149.    The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Apollo Medical even though Apollo Medical was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count IV Defendants.

1150. The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Apollo Medical, the provision of false, fraudulent, and grossly unnecessary healthcare services to Apollo Medical patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3's), bills, invoices, and other claim-related documents that materially misrepresented Apollo Medical's No-Fault reimbursement eligibility.

1151. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Apollo Medical as a result of the Count IV Defendants' unlawful conduct described herein.

1152. By virtue of the Count IV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## ISLAND MEDICAL DIAGNOSTICS PLLC ENTERPRISE
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Apollo Medical Diagnostics PLLC, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., and John J. McGee, M.D.)**

1153. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1154. Island Medical Diagnostics PLLC ("Island Medical") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1155.   In connection with the operation and management of the Island Medical enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Apollo Medical Diagnostics PLLC, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., and John J. McGee, M.D. (collectively, "Count V Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Island Medical's business, or should have reasonably foreseen that the mailing of such false medical documentation by Island Medical would occur, in furtherance of their scheme to defraud.

1156.   The Count V Defendants employed, knew or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 19.

1157.   Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1158.   Policies of insurance were also delivered to insureds through the U.S. Mail.

1159.   Payments made by Allstate to Island Medical traveled through the U.S. Mail.

1160.   As documented above, the Count V Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Island Medical—payments that the Count V Defendants intended to be funded using the No-Fault insurance benefits

that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1161.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Island Medical for the benefit of the Count V Defendants that would not otherwise have been made.

1162.   The Count V Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V Defendants to continue their unlawful scheme without being detected.

1163.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1164.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1165.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Island Medical for the benefit of the Count V Defendants.

1166.   The Count V Defendants participated in the conduct of the Island Medical enterprise through a pattern of racketeering activities.

1167.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

1168.   The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1169.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1170.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1171.   By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ISLAND MEDICAL DIAGNOSTICS PLLC ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Apollo Medical Diagnostics PLLC, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., and John J. McGee, M.D.)**

1172.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1173.   Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Apollo Medical Diagnostics PLLC, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., and John J. McGee, M.D. (collectively, "Count VI Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Island Medical Diagnostics PLLC ("Island Medical").

1174.   The Count VI Defendants each agreed to further, facilitate, support, and operate the Island Medical enterprise.

1175.   As such, the Count VI Defendants conspired to violate 18 U.S.C. § 1962(c).

1176.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for the healthcare services provided to patients through Island Medical even though island Medical was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count VI Defendants.

1177.   The Count VI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Island Medical, the provision of false, fraudulent, and grossly unnecessary healthcare services to  Island Medical patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3's), bills, invoices, and other claim-related documents that materially misrepresented Island Medical's No-Fault reimbursement eligibility.

1178.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Island Medical as a result of the Count VI Defendants' unlawful conduct described herein.

1179.   By virtue of the Count VI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**MOTION MEDICAL DIAGNOSTICS P.C. ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Island Medical Diagnostics PLLC, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Dr. Todd Goldman, Chiropractor, P.C., Fred J. Jones, Jr., D.C., John J. McGee, M.D., and Todd R. Goldman, D.C.)**

1180.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1181.   Motion Medical Diagnostics P.C. ("Motion Medical") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1182.   In connection with the operation and management of the Motion Medical enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Island Medical Diagnostics PLLC, Fred J. Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Dr. Todd Goldman, Chiropractor, P.C., Fred J. Jones, Jr., D.C., John J. McGee, M.D., and Todd R. Goldman, D.C. (collectively, "Count VII Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Motion Medical's business, or should have reasonably foreseen that the mailing of such false medical documentation by Motion Medical would occur, in furtherance of their scheme to defraud.

1183.   The Count VII Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 20.

1184.   Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1185.   Policies of insurance were also delivered to insureds through the U.S. Mail.

1186.   Payments made by Allstate to Motion Medical traveled through the U.S. Mail.

1187.   As documented above, the Count VII Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Motion Medical—payments that the Count VII Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1188.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Motion Medical for the benefit of the Count VII Defendants that would not otherwise have been made.

1189.   The Count VII Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII Defendants to continue their unlawful scheme without being detected.

1190.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1191.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1192.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Motion Medical for the benefit of the Count VII Defendants.

1193.   The Count VII Defendants participated in the conduct of the Motion Medical enterprise through a pattern of racketeering activities.

1194.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' conduct.

1195.   The Count VII Defendants' conduct in violation of 18 U.S.C. 1962(c) was the direct and proximate cause of Allstate's injury.

1196.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1197.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1198.   By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT VIII</u>
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**MOTION MEDICAL DIAGNOSTICS P.C. ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Island Medical Diagnostics PLLC, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Dr. Todd Goldman, Chiropractor, P.C., Fred J. Jones, Jr., D.C., John J. McGee, M.D., and Todd R. Goldman, D.C.)**

1199.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1200.   Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Island Medical Diagnostics PLLC, Dr. Todd Goldman, Chiropractor, P.C., Fred J. Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., John J. McGee, M.D., and Todd R. Goldman, D.C. (collectively, "Count VIII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Motion Medical Diagnostics P.C. ("Motion Medical").

1201.   The Count VIII Defendants each agreed to further, facilitate, support, and operate the Motion Medical enterprise.

1202.   As such, the Count VIII Defendants conspired to violate 18 U.S.C. § 1962(c).

1203.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Motion Medical even though Motion Medical was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count VIII Defendants.

1204.   The Count VIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Motion Medical, the provision of false, fraudulent, and grossly unnecessary healthcare services to Motion Medical patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3's), bills, invoices, and other claim-related documents that materially misrepresented Motion Medical's No-Fault reimbursement eligibility.

1205.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the

benefit of) Motion Medical as a result of the Count VIII Defendants' unlawful conduct described herein.

1206.   By virtue of the Count VIII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DR. RONALD P. MAZZA, D.C., P.C. ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Jacqueline M. Lewis, M.D., Bi County Medical Diagnostics P.C., Apollo Medical Diagnostics PLLC, Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C.)**

1207.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1208.   Dr. Ronald. P. Mazza, D.C., P.C. ("Mazza PC") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1209.   In connection with the operation and management of the Mazza PC enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Jacqueline M. Lewis, M.D., Bi County Medical Diagnostics P.C., Apollo Medical Diagnostics PLLC, Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C. (collectively, "Count IX Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Mazza PC's business, or should have reasonably foreseen that the mailing of such false medical documentation by Mazza PC would occur, in furtherance of their scheme to defraud.

1210.   The Count IX Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 21.

1211.   Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1212.   Policies of insurance were also delivered to insureds through the U.S. Mail.

1213.   Payments made by Allstate to Mazza PC traveled through the U.S. Mail.

1214.   As documented above, the Count IX Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Mazza PC—payments that the Count IX Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1215.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Mazza PC for the benefit of the Count IX Defendants that would not otherwise have been made.

1216.   The Count IX Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX Defendants to continue their unlawful scheme without being detected.

1217.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1218.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count IX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1219.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Mazza PC for the benefit of the Count IX Defendants.

1220.   The Count IX Defendants participated in the conduct of the Mazza PC Medical enterprise through a pattern of racketeering activities.

1221.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX Defendants' conduct.

1222.   The Count IX Defendants' conduct in violation of 18 U.S.C. 1962(c) was the direct and proximate cause of Allstate's injury.

1223.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1224.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1225.   By virtue of the Count IX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT X**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**DR. RONALD P. MAZZA, D.C., P.C. ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Jacqueline M. Lewis, M.D., Bi County Medical Diagnostics P.C., Apollo Medical Diagnostics PLLC, Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C.)**

1226.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1227.   Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Jacqueline M. Lewis, M.D., Bi County Medical Diagnostics P.C., Apollo Medical Diagnostics PLLC, Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C. (collectively, "Count X Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Dr. Ronald P. Mazza, D.C., P.C. ("Mazza PC").

1228.   The Count X Defendants each agreed to further, facilitate, support, and operate the Mazza PC enterprise.

1229.   As such, the Count X Defendants conspired to violate 18 U.S.C. § 1962(c).

1230.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Mazza PC even though Mazza PC was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count X Defendants.

1231.   The Count X Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Mazza PC, the provision of false, fraudulent, and grossly unnecessary healthcare services to Mazza PC patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3's), bills, invoices,

and other claim-related documents that materially misrepresented Mazza PC's No-Fault reimbursement eligibility.

1232. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Mazza PC as a result of the Count X Defendants' unlawful conduct described herein.

1233. By virtue of the Count X Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**FRED JONES CHIROPRACTOR P.C. d/b/a SUNRISE CHIROPRACTIC ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Fred J. Jones, Jr., D.C., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C.)**

1234. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1235. Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic ("Sunrise") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1236. In connection with the operation and management of the Sunrise enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Fred J. Jones, Jr., D.C., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C. (collectively, "Count XI Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would

be mailed in the ordinary course of Sunrise's business, or should have reasonably foreseen that the mailing of such false medical documentation by Sunrise would occur, in furtherance of their scheme to defraud.

1237.   The Count XI Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 22.

1238.   Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1239.   Policies of insurance were also delivered to insureds through the U.S. Mail.

1240.   Payments made by Allstate to Sunrise traveled through the U.S. Mail.

1241.   As documented above, the Count XI Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Sunrise—payments that the Count XI Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1242.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Sunrise for the benefit of the Count XI Defendants that would not otherwise have been made.

1243.   The Count XI Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long

period of time, thus enabling the Count XI Defendants to continue their unlawful scheme without being detected.

1244.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1245.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1246.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Sunrise for the benefit of the Count XI Defendants.

1247.   The Count XI Defendants participated in the conduct of the Sunrise enterprise through a pattern of racketeering activities.

1248.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI Defendants' conduct.

1249.   The Count XI Defendants' conduct in violation of 18 U.S.C. 1962(c) was the direct and proximate cause of Allstate's injury.

1250.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1251.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1252.   By virtue of the Count XI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**FRED JONES CHIROPRACTOR P.C. d/b/a SUNRISE CHIROPRACTIC ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler,**
**M.D., Fred J. Jones, Jr., D.C., Island Medical Diagnostics PLLC, and Motion Medical**
**Diagnostics P.C.)**

1253.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1254.   Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Fred J. Jones, Jr. D.C., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C. (collectively, "Count XII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic ("Sunrise").

1255.   The Count XII Defendants each agreed to further, facilitate, support, and operate the Sunrise enterprise.

1256.   As such, the Count XII Defendants conspired to violate 18 U.S.C. § 1962(c).

1257.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Sunrise even though Sunrise was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XII Defendants.

1258.   The Count XII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Sunrise, the provision of false, fraudulent, and grossly unnecessary healthcare services to Sunrise patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3's), bills, invoices, and

168

other claim-related documents that materially misrepresented Sunrise's No-Fault reimbursement eligibility.

1259.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Sunrise as a result of the Count XII Defendants' unlawful conduct described herein.

1260.   By virtue of the Count XII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**YELLOWSTONE MEDICAL REHABILITATION P.C. ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., John J. McGee, M.D., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C.)**

1261.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1262.   Yellowstone Medical Rehabilitation P.C.   ("Yellowstone") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1263.   In connection with the operation and management of the Yellowstone enterprise and with each of the claims identified  in the plaintiffs' Complaint, Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., John J. McGee, M.D., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C. (collectively, "Count XIII Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would

169

be mailed in the ordinary course of Yellowstone's business, or should have reasonably foreseen that the mailing of such false medical documentation by Yellowstone would occur, in furtherance of their scheme to defraud.

1264.   The Count XIII Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 23.

1265.   Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1266.   Policies of insurance were also delivered to insureds through the U.S. Mail.

1267.   Payments made by Allstate to Yellowstone traveled through the U.S. Mail.

1268.   As documented above, the Count XIII Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Yellowstone— payments that the Count XIII Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1269.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Yellowstone for the benefit of the Count XIII Defendants that would not otherwise have been made.

1270.   The Count XIII Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long

period of time, thus enabling the Count XIII Defendants to continue their unlawful scheme without being detected.

1271.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1272.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XIII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1273.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Yellowstone for the benefit of the Count XIII Defendants.

1274.   The Count XIII Defendants participated in the conduct of the Yellowstone enterprise through a pattern of racketeering activities.

1275.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII Defendants' conduct.

1276.   The Count XIII Defendants' conduct in violation of 18 U.S.C. 1962(c) was the direct and proximate cause of Allstate's injury.

1277.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1278.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1279.   By virtue of the Count XIII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**YELLOWSTONE MEDICAL REHABILITATION P.C. ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler,**
**M.D., John J. McGee, M.D., Island Medical Diagnostics PLLC, and Motion Medical**
**Diagnostics P.C.)**

1280.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1281.   Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., John J. McGee, M.D., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C. (collectively, "Count XIV Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Yellowstone Medical Rehabilitation, P.C. ("Yellowstone").

1282.   The Count XIV Defendants each agreed to further, facilitate, support, and operate the Yellowstone enterprise.

1283.   As such, the Count XIV Defendants conspired to violate 18 U.S.C. § 1962(c).

1284.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Yellowstone even though Yellowstone was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XIV Defendants.

1285.   The Count XIV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Yellowstone, the provision of false, fraudulent, and grossly unnecessary healthcare services to Yellowstone patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3's), bills, invoices,

172

and other claim-related documents that materially misrepresented Yellowstone's No-Fault reimbursement eligibility.

1286. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Yellowstone as a result of the Count XIV Defendants' unlawful conduct described herein.

1287. By virtue of the Count XIV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DR. TODD GOLDMAN, CHIROPRACTOR, P.C. ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Todd R. Goldman, D.C., and Motion Medical Diagnostics P.C.)**

1288. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1289. Dr. Todd Goldman, Chiropractor, P.C. ("Goldman PC") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1290. In connection with the operation and management of the Goldman PC enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Todd R. Goldman, D.C., and Motion Medical Diagnostics P.C. (collectively, "Count XV Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims,

or knew that such false medical documentation would be mailed in the ordinary course of Goldman PC's business, or should have reasonably foreseen that the mailing of such false medical documentation by Goldman PC would occur, in furtherance of their scheme to defraud.

1291.   The Count XV Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 24.

1292.   Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1293.   Policies of insurance were also delivered to insureds through the U.S. Mail.

1294.   Payments made by Allstate to Goldman PC traveled through the U.S. Mail.

1295.   As documented above, the Count XV Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Goldman PC— payments that the Count XV Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1296.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Goldman PC for the benefit of the Count XV Defendants that would not otherwise have been made.

1297.   The Count XV Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long

period of time, thus enabling the Count XV Defendants to continue their unlawful scheme without being detected.

1298.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1299.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XV Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1300.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Goldman PC for the benefit of the Count XV Defendants.

1301.   The Count XV Defendants participated in the conduct of the Goldman PC enterprise through a pattern of racketeering activities.

1302.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV Defendants' conduct.

1303.   The Count XV Defendants' conduct in violation of 18 U.S.C. 1962(c) was the direct and proximate cause of Allstate's injury.

1304.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1305.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1306.   By virtue of the Count XV Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**DR. TODD GOLDMAN, CHIROPRACTOR, P.C. ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler,**
**M.D., Todd R. Goldman, D.C.,  and Motion Medical Diagnostics P.C.)**

1307.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1308.   Defendants Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Todd R. Goldman, D.C., and Motion Medical Diagnostics P.C. (collectively, "Count XVI Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Dr. Todd R. Goldman, Chiropractor, P.C. ("Goldman PC").

1309.   The Count XVI Defendants each agreed to further, facilitate, support, and operate the Goldman PC enterprise.

1310.   As such, the Count XVI Defendants conspired to violate 18 U.S.C. § 1962(c).

1311.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Goldman PC even though Goldman PC was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XVI Defendants.

1312.   The Count XVI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Goldman PC, the provision of false, fraudulent, and grossly unnecessary healthcare services to Goldman PC patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3's), bills,

176

invoices, and other claim-related documents that materially misrepresented Goldman PC's No-Fault reimbursement eligibility.

1313.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Goldman PC as a result of the Count XVI Defendants' unlawful conduct described herein.

1314.   By virtue of the Count XVI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVII
## COMMON LAW FRAUD
**(Against Bi County Medical Diagnostics P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., and Sari R. Rauch)**

1315.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1316.   Defendants Bi County Medical Diagnostics P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., and Sari R. Rauch (collectively, "Count XVII Defendants") conspired to defraud Allstate through their unlawful management and control of Bi County Medical Diagnostics P.C.

1317.   The Count XVII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Bi County Medical Diagnostics P.C. was entitled to receive No-Fault reimbursement under New York law.

1318.   The misrepresentations of fact by the Count XVII Defendants included, but were not limited to, the material misrepresentations of fact made in Bi County Medical Diagnostics

177

P.C.'s NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy of the healthcare services purportedly provided to patients and the actual ownership and control of Bi County Medical Diagnostics P.C.

1319.  The Count XVII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1320.  The misrepresentations were intentionally made by the Count XVII Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Bi County Medical Diagnostics P.C.—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

1321.  The Count XVII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1322.  Allstate reasonably relied, to its detriment, upon the Count XVII Defendants' material misrepresentations concerning Bi County Medical Diagnostics P.C.'s eligibility to receive No-Fault reimbursement when making payments for healthcare services purportedly provided to patients through Bi County Medical Diagnostics P.C.

1323.  Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Bi County Medical Diagnostics P.C.—in excess of $71,339.55—for healthcare services purportedly provided to patients through Bi County Medical Diagnostics P.C. even though Bi County Medical Diagnostics P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XVIII**
**COMMON LAW FRAUD**
**(Against Apollo Medical Diagnostics PLLC, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., Richard C. Koffler, M.D., and Sari R. Rauch)**

1324.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1325.   Defendants Apollo Medical Diagnostics PLLC, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., Richard C. Koffler, M.D., and Sari R. Rauch (collectively, "Count XVIII Defendants") conspired to defraud Allstate through their unlawful management and control of Apollo Medical Diagnostics PLLC.

1326.   The Count XVIII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Apollo Medical Diagnostics PLLC was entitled to receive No-Fault reimbursement under New York law.

1327.   The misrepresentations of fact by the Count XVIII Defendants included, but were not limited to, the material misrepresentations of fact made in Apollo Medical Diagnostics PLLC's NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy of the healthcare services purportedly  provided to patients and the actual ownership and control of Apollo Medical Diagnostics PLLC.

1328.   The Count XVIII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1329.   The misrepresentations were intentionally made by the Count XVIII Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Apollo Medical Diagnostics PLLC—an unlawfully operated and controlled professional service limited liability company—for payment of No-Fault insurance benefits.

179

1330.   The Count XVIII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate. Allstate reasonably relied, to its detriment, upon the Count XVIII Defendants' material misrepresentations concerning Apollo Medical Diagnostics PLLC's eligibility to receive No-Fault reimbursement when making payments for healthcare services purportedly provided to patients through Apollo Medical Diagnostics PLLC.

1331.   Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Apollo Medical Diagnostics PLLC—in excess of $37,052.14—for healthcare services purportedly provided to patients through Apollo Medical Diagnostics PLLC, even though Apollo Medical Diagnostics PLLC was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

### COUNT XIX
### COMMON LAW FRAUD
**(Against Island Medical Diagnostics PLLC, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., and John J. McGee, M.D.)**

1332.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1333.   Defendants Island Medical Diagnostics PLLC, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., and John J. McGee, M.D. (collectively, "Count XIX Defendants") conspired to defraud Allstate through their unlawful management and control of Island Medical Diagnostics PLLC.

1334.   The Count XIX Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Island Medical Diagnostics PLLC was entitled to receive No-Fault reimbursement under New York law.

1335.   The misrepresentations of fact by the count XIX Defendants included, but were not limited to, the material misrepresentations of fact made in Island Medical Diagnostics PLLC's NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy of the healthcare services purportedly provided to patients and the actual ownership and control of Island Medical Diagnostics PLLC.

1336.   The Count XIX Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1337.   The misrepresentations were intentionally made by the Count XIX Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Island Medical Diagnostics PLLC—an unlawfully operated and controlled professional service limited liability company—for payment of No-Fault insurance benefits.

1338.   The Count XIX Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1339.   Allstate reasonably relied, to its detriment, upon the Count XIX Defendants' material misrepresentations concerning Island Medical Diagnostics PLLC eligibility to receive No-Fault reimbursement when making payments for healthcare services purportedly provided to patients through Island Medical Diagnostics PLLC.

1340.   Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Island Medical Diagnostics PLLC—in excess of $213,406.49—for healthcare services purportedly provided to patients through Island Medical Diagnostics PLLC

even though Island Medical Diagnostics PLLC was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XX**
**COMMON LAW FRAUD**
**(Against Motion Medical Diagnostics P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Dr. Todd Goldman, Chiropractor, P.C., Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., John J. McGee, M.D., and Todd R. Goldman, D.C.)**

1341. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1342. Defendants Motion Medical Diagnostics P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Dr. Todd Goldman, Chiropractor, P.C., Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., John J. McGee, M.D., and Todd R. Goldman, D.C. (collectively, "Count XX Defendants") conspired to defraud Allstate through their unlawful management and control of Motion Medical Diagnostics P.C.

1343. The Count XX Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Motion Medical Diagnostics P.C. was entitled to receive No-Fault reimbursement under New York law.

1344. The misrepresentations of fact by the Count XX Defendants included, but were not limited to, the material misrepresentations of fact made in Motion Medical Diagnostics P.C.'s NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy of the healthcare services purportedly provided to patients and the actual ownership and control of Motion Medical Diagnostics P.C.

182

1345.   The Count XX Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1346.   The misrepresentations were intentionally made by the Count XX Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Motion Medical Diagnostics P.C.—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

1347.   The Count XX Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1348.   Allstate reasonably relied, to its detriment, upon the Count XX Defendants' material misrepresentations concerning Motion Medical Diagnostics P.C.'s eligibility to receive No-Fault reimbursement when making payments for healthcare services purportedly provided to patients through Motion Medical Diagnostics P.C.

1349.   Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Motion Medical Diagnostics P.C.—in excess of $89,240.92—for healthcare services purportedly provided to patients through Motion Medical Diagnostics P.C., even though Motion Medical Diagnostics P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

### COUNT XXI
### COMMON LAW FRAUD
**(Against Dr. Todd Goldman, Chiropractor, P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Todd R. Goldman, D.C., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C.)**

1350.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1351.   Defendants Dr. Todd Goldman, Chiropractor, P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Todd R. Goldman, D.C., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C. (collectively, "Count XXI Defendants") conspired to defraud Allstate through their unlawful referral arrangement with Island Medical Diagnostics PLLC.

1352.   The Count XXI Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Dr. Todd Goldman, Chiropractor, P.C. was entitled to receive No-Fault reimbursement under New York law.

1353.   The misrepresentations of fact by the Count XXI Defendants included, but were not limited to, the material misrepresentations of fact made in Dr. Todd Goldman, Chiropractor, P.C.'s NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy and necessity of the healthcare services purportedly provided to patients at Dr. Todd Goldman, Chiropractor, P.C.

1354.   The Count XXI Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1355.   The misrepresentations were intentionally made by the Count XXI Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Dr. Todd Goldman, Chiropractor, P.C.—an unlawfully operated professional service corporation—for payment of No-Fault insurance benefits.

1356.   The Count XXI Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1357.   Allstate reasonably relied, to its detriment, upon the Count XXI Defendants' material misrepresentations concerning Dr. Todd Goldman, Chiropractor, P.C.'s eligibility to

receive No-Fault reimbursement when making payments for healthcare services purportedly provided to patients through Dr. Todd Goldman, Chiropractor, P.C.

1358.   Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Dr. Todd Goldman, Chiropractor, P.C.—in excess of $14,984.01— for healthcare services purportedly provided to patients through Dr. Todd Goldman, Chiropractor, P.C., even though Dr. Todd Goldman, Chiropractor, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XXII
## COMMON LAW FRAUD
**(Against Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Fred J. Jones, Jr., D.C., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C.)**

1359.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1360.   Defendants Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Fred J. Jones, Jr., D.C., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C. (collectively, "Count XXII Defendants") conspired to defraud Allstate through their unlawful referral arrangement with Island Medical Diagnostics PLLC and Motion Medical Diagnostics P.C.

1361.   The Count XXII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic was entitled to receive No-Fault reimbursement under New York law.

1362.   The misrepresentations of fact by the Count XXII Defendants included, but were not limited to, the material misrepresentations of fact made in Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic's NF-3 claim forms, reports, invoices, and other claim-related documentation

185

concerning the legitimacy and necessity of the healthcare services purportedly provided to patients at Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic.

1363. The Count XXII Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1364. The misrepresentations were intentionally made by the Count XXII Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic—an unlawfully operated professional service corporation—for payment of No-Fault insurance benefits.

1365. The Count XXII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1366. Allstate reasonably relied, to its detriment, upon the Count XXII Defendants' material misrepresentations concerning Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic's eligibility to receive No-Fault reimbursement when making payments for healthcare services purportedly provided to patients through Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic.

1367. Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic—in excess of $233,340.52—for healthcare services purportedly provided to patients through Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, even though Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XXIII**
**COMMON LAW FRAUD**

**(Against Yellowstone Medical Rehabilitation P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., John J. McGee, M.D., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C)**

1368.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1369.   Defendants Yellowstone Medical Rehabilitation P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., John J. McGee, M.D.,  Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C. (collectively, "Count XXIII Defendants") conspired to defraud Allstate through their unlawful referral arrangement with Island Medical Diagnostics PLLC and Motion Medical Diagnostics P.C.

1370.   The Count XXIII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Yellowstone Medical Rehabilitation P.C. was entitled to receive No-Fault reimbursement under New York law.

1371.   The misrepresentations of fact by the Count XXIII Defendants included, but were not limited to, the material misrepresentations of fact made in Yellowstone Medical Rehabilitation P.C.'s NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy and necessity of the healthcare services purportedly provided to patients at Yellowstone Medical Rehabilitation P.C.

1372.   The Count XXIII Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1373.   The misrepresentations were intentionally made by the Count XXIII Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Yellowstone Medical

Rehabilitation P.C.—an unlawfully operated professional service corporation—for payment of No-Fault insurance benefits.

1374.   The Count XXIII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1375.   Allstate reasonably relied, to its detriment, upon the Count XXIII Defendants' material misrepresentations concerning Yellowstone Medical Rehabilitation P.C.'s eligibility to receive No-Fault reimbursement when making payments for healthcare services purportedly provided to patients through Yellowstone Medical Rehabilitation P.C.

1376.   Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Yellowstone Medical Rehabilitation P.C.—in excess of $134,982.63—for healthcare services purportedly provided to patients through Yellowstone Medical Rehabilitation P.C., even though Yellowstone Medical Rehabilitation P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

### COUNT XXIV
### UNJUST ENRICHMENT
**(Against Bi County Medical Diagnostics P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., and Sari R. Rauch)**

1377.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1378.   As alleged herein, Defendants Bi County Medical Diagnostics P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., and Sari R. Rauch (collectively, "Count XXIV Defendants") conspired to induce Allstate to make numerous and substantial payments to Bi County Medical Diagnostics P.C. pursuant to New York's No-Fault Laws.

1379.   As alleged herein, Bi County Medical Diagnostics P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, (a) Bi County Medical Diagnostics P.C. was unlawfully operated and controlled by non-physician Jeffrey S. Rauch, D.C. and (b) Jeffrey S. Rauch, D.C. a non-physician, unlawfully participated in the operation and management of Bi County Medical Diagnostics P.C.

1380.   When Allstate made No-Fault benefit payments to Bi County Medical Diagnostics P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXIV Defendants, or those persons working under their control, made concerning Bi County Medical Diagnostics P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1381.   Each and every No-Fault benefit payment that Allstate was caused to make to Bi County Medical Diagnostics P.C. during the course of this scheme constitutes a benefit that the Count XXIV Defendants aggressively caused Bi County Medical Diagnostics P.C. to seek and voluntarily accept.

1382.   Throughout the course of their scheme, the Count XXIV Defendants caused Bi County Medical Diagnostics P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling over $71,339.55 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1383. Under New York Law, Jeffrey S. Rauch, D.C., at all times, lacked legal authorization to (a) provide professional physician services, (b) control the provision of professional physician services, and (c) receive any fees or profits derived from the provision of professional physician services, and thus never had any legal right to control Bi County Medical Diagnostics P.C., including its account receivables and/or the receipt and disbursement of any

professional physician fees and profits obtained by Bi County Medical Diagnostics P.C., or to participate in the operation and management of Bi County Medical Diagnostics P.C.

1384.  As a direct and proximate result of Jeffrey S. Rauch, D.C.'s unlawful control over Bi County Medical Diagnostics P.C. (and/or their participation in the operation and management of Bi County Medical Diagnostics P.C.), Bi County Medical Diagnostics P.C. was never eligible for reimbursement under New York's No-Fault Laws at any time during the course of this scheme.

1385.  Throughout the duration of this scheme, the Count XXIV Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Bi County Medical Diagnostics P.C.

1386.  Retention of those benefits by the Count XXIV Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXV
## UNJUST ENRICHMENT
**(Against Apollo Medical Diagnostics PLLC, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., Richard C. Koffler, M.D., and Sari R. Rauch)**

1387.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1388.  As alleged herein, Defendants Apollo Medical Diagnostics PLLC, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., Richard C. Koffler, M.D., and Sari R. Rauch (collectively, "Count XXV Defendants") conspired to induce Allstate to make numerous and substantial payments to Apollo Medical Diagnostics PLLC pursuant to New York's No-Fault Laws.

1389.  As alleged herein, Apollo Medical Diagnostics PLLC was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, (a) Apollo Medical Diagnostics PLLC was unlawfully operated and controlled by non-physician Jeffrey S. Rauch, D.C. and (b) Jeffrey S. Rauch, D.C., a non-physician, unlawfully participated in the operation and management of Apollo Medical Diagnostics PLLC.

1390.  When Allstate made No-Fault benefit payments to Apollo Medical Diagnostics PLLC, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXV Defendants, or those persons working under their control, made concerning Apollo Medical Diagnostics PLLC's reimbursement eligibility under New York's No-Fault Laws.

1391.  Each and every No-Fault benefit payment that Allstate was caused to make to Apollo Medical Diagnostics PLLC during the course of this scheme constitutes a benefit that the Count XXV Defendants aggressively caused Apollo Medical Diagnostics PLLC to seek and voluntarily accept.

1392.  Throughout the course of their scheme, the Count XXV Defendants caused Apollo Medical Diagnostics PLLC to wrongfully obtain from Allstate No-Fault benefit payments totaling over $37,052.14 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1393.  Under New York law, Jeffrey S. Rauch, D.C., at all times, lacked legal authorization to (a) provide professional physician services, (b) control the provision of professional physician services, and (c) receive any fees or profits derived from the provision of professional physician services, and thus never had any legal right to control Apollo Medical Diagnostics PLLC, including its account receivables and/or the receipt and disbursement of any

professional physician fees and profits obtained by Apollo Medical Diagnostics PLLC, or to participate in the operation and management of Apollo Medical Diagnostics PLLC.

1394.   As a direct and proximate result of Jeffrey S. Rauch, D.C.'s unlawful control over Apollo Medical Diagnostics PLLC (and/or their participation in the operation and management of Apollo Medical Diagnostics PLLC), Apollo Medical Diagnostics PLLC was never eligible for reimbursement under New York's No-Fault Laws at any time during the course of this scheme.

1395.   Throughout the duration of this scheme, the Count XXV Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Apollo Medical Diagnostics PLLC.

1396.   Retention of those benefits by the Count XXV Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT XXVI**
**UNJUST ENRICHMENT**
**(Against Island Medical Diagnostics PLLC, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., and John J. McGee, M.D.)**

1397.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1398.   As alleged herein, Defendants Island Medical Diagnostics PLLC, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., and John J. McGee, M.D. (collectively, "Count XXVI Defendants") conspired to induce Allstate to make numerous and substantial payments to Island Medical Diagnostics PLLC pursuant to New York's No-Fault Laws.

1399.   As alleged herein, Island Medical Diagnostics PLLC was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, (a) Island Medical Diagnostics PLLC was unlawfully operated and controlled by non-physician Jeffrey S. Rauch, D.C. and (b) Jeffrey S. Rauch, D.C., a non-physician, unlawfully participated in the operation and management of Island Medical Diagnostics PLLC.

1400.   When Allstate made no-Fault benefit payments to Island Medical Diagnostics PLLC, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXVI Defendants, or those persons working under their control, made concerning Island Medical Diagnostics PLLC's reimbursement eligibility under New York's No-Fault Laws.

1401.   Each and every No-Fault benefit payment that Allstate was caused to make to Island Medical Diagnostics PLLC during the course of this scheme constitutes a benefit that the Count XXVI Defendants aggressively caused Island Medical Diagnostics PLLC to seek and voluntarily accept.

1402.   Throughout the course of their scheme, the Count XXVI Defendants caused Island Medical Diagnostics PLLC to wrongfully obtain from Allstate No-Fault benefit payments totaling over $213,406.49 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1403.  Under New York law, Jeffrey S. Rauch, D.C., at all times, lacked legal authorization to (a) provide professional physician services, (b) control the provision of professional physician services, and (c) receive any fees or profits derived from the provision of professional physician services, and thus never had any legal right to control Island Medical Diagnostics PLLC, including its account receivables and/or the receipt and disbursement of any

professional physician fees and profits obtained by Island Medical Diagnostics PLLC or to participate in the operation and management of Island Medical Diagnostics PLLC.

1404.   As a direct and proximate result of Jeffrey S. Rauch, D.C.'s unlawful control over Island Medical Diagnostics PLLC (and/or their participation in the operation and management of Island Medical Diagnostics PLLC), Island Medical Diagnostics PLLC was never eligible for reimbursement under New York's No-Fault Laws at any time during the course of this scheme.

1405.   Throughout the duration of this scheme, the Count XXVI Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Island Medical Diagnostics PLLC.

1406.   Retention of those benefits by the Count XXVI Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT XXVII**
**UNJUST ENRICHMENT**
**(Against Motion Medical Diagnostics P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Dr. Todd Goldman, Chiropractor, P.C., Fred J. Jones, Jr., D.C., John J. McGee, M.D., and Todd R. Goldman, D.C.)**

1407.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1408.   As alleged herein, Defendants Motion Medical Diagnostics P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Dr. Todd Goldman, Chiropractor, P.C., Fred J. Jones, Jr., D.C., John J. McGee, M.D., and Todd R. Goldman, D.C. (collectively, "Count XXVII Defendants") conspired to induce Allstate to make numerous

and substantial payments to Motion Medical Diagnostics P.C. pursuant to New York's No-Fault Laws.

1409.   As alleged herein, Motion Medical Diagnostics P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, (a) Motion Medical Diagnostics P.C. was unlawfully operated and controlled by non-physician Jeffrey S. Rauch, D.C. and (b) Jeffrey S. Rauch, D.C., a non-physician, unlawfully participated in the operation and management of Motion Medical Diagnostics P.C.

1410.   When Allstate made No-Fault benefit payments to Motion Medical Diagnostics P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXVII Defendants, or those persons working under their control, made concerning Motion Medical Diagnostics P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1411.   Each and every No-Fault benefit payment that Allstate was caused to make to Motion Medical Diagnostics P.C. during the course of this scheme constitutes a benefit that the Count XXVII Defendants aggressively caused Motion Medical Diagnostics P.C. to seek and voluntarily accept.

1412.   Throughout the course of their scheme, the Count XXVII Defendants caused Motion Medical Diagnostics P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling over $89,240.92 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1413.   Under New York law, Jeffrey S. Rauch, D.C., at all times, lacked authorization to (a) provide professional physician services, (b) control the provision of professional physician services, and (c) receive any fees or profits derived from the provision of professional physician

services, and thus never had any legal right to control Motion Medical Diagnostics P.C., including its account receivables and/or the receipt and disbursement of any professional physician fees and profits obtained by Motion Medical Diagnostics P.C. or to participate in the operation and management of Motion Medical Diagnostics P.C.

1414.   As a direct and proximate result of Jeffrey S. Rauch, D.C.'s unlawful control over Motion Medical Diagnostics P.C. (and/or their participation in the operation and management of Motion Medical Diagnostics P.C.), Motion Medical Diagnostics P.C. was never eligible for reimbursement under New York's No-Fault Laws at any time during the course of this scheme.

1415.   Throughout the duration of scheme, the Count XXVII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Motion Medical Diagnostics P.C.

1416.   Retention of those benefits by the Count XXVII Defendants would violate fundamental principles of justice, equity, and good conscience.

### COUNT XXVIII
### UNJUST ENRICHMENT
**(Against Fred Jones Chiropractor P.C. d/b/a/ Sunrise Chiropractic, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Fred J. Jones, Jr., D.C., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C.)**

1417.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1418.   As alleged herein, Defendants Fred Jones Chiropractor P.C. d/b/a/ Sunrise Chiropractic, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Fred J. Jones, Jr., D.C., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C. (collectively, "Count XXVIII Defendants") conspired to induce Allstate to make numerous

and substantial payments to Fred Jones Chiropractor P.C. d/b/a/ Sunrise Chiropractic pursuant to New York's No-Fault Laws.

1419.  As alleged herein, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Fred Jones Chiropractor P.C. d/b/a/ Sunrise Chiropractic received payments from Jeffrey S. Rauch, D.C., Richard C. Koffler, M.D., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C. in exchange for patient referrals for otherwise unnecessary treatment.

1420.  When Allstate made No-Fault benefit payments to Fred Jones Chiropractor P.C. d/b/a/ Sunrise Chiropractic, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXVIII Defendants, or those persons working under their control, made concerning Fred Jones Chiropractor P.C. d/b/a/ Sunrise Chiropractic's reimbursement eligibility under New York's No-Fault Laws.

1421.  Each and every No-Fault benefit payment that Allstate was caused to make to Fred Jones Chiropractor P.C. d/b/a/ Sunrise Chiropractic during the course of this scheme constitutes a benefit that the Count XXVIII Defendants aggressively caused Fred Jones Chiropractor P.C. d/b/a/ Sunrise Chiropractic to seek and voluntarily accept.

1422.  Throughout the course of their scheme, the Count XXVIII Defendants caused Fred Jones Chiropractor P.C. d/b/a/ Sunrise Chiropractic to wrongfully obtain from Allstate No-Fault benefit payments totaling over $233,340.52 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1423.  As a direct and proximate result of Count XXVIII Defendants' unlawful payments, Fred Jones Chiropractor P.C. d/b/a/ Sunrise Chiropractic was never eligible for reimbursement under New York's No-Fault Laws at any time during the course of this scheme.

1424.    Throughout the duration of scheme, the Count XXVIII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic.

1425.    Retention of those benefits by the Count XXVIII Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT XXIX**
**UNJUST ENRICHMENT**
**(Against Yellowstone Medical Rehabilitation P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., John J. McGee, M.D., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C.)**

1426.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1427.    As alleged herein, Defendants Yellowstone Medical Rehabilitation P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., John J. McGee, M.D., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C. (collectively, "Count XXIX Defendants") conspired to induce Allstate to make numerous and substantial payments to Yellowstone Medical Rehabilitation P.C. pursuant to New York's No-Fault Laws.

1428.    As alleged herein, Yellowstone Medical Rehabilitation P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Yellowstone Medical Rehabilitation P.C. received payments from Jeffrey S. Rauch, D.C., Richard C. Koffler, M.D., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C. in exchange for patient referrals for otherwise unnecessary treatment.

1429.    When Allstate made No-Fault benefit payments to Yellowstone Medical Rehabilitation P.C., Allstate reasonably believed that it was legally obligated to make such

payments based upon the misrepresentations and omissions that the Count XXIX Defendants, or those persons working under their control, made concerning Yellowstone Medical Rehabilitation P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1430.   Each and every No-Fault benefit payment that Allstate was caused to make to Yellowstone Medical Rehabilitation P.C. during the course of this scheme constitutes a benefit that the Count XXIX Defendants aggressively caused Yellowstone Medical Rehabilitation P.C. to seek and voluntarily accept.

1431.   Throughout the course of their scheme, the Count XXIX Defendants caused Yellowstone Medical Rehabilitation P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling over $134,982.63 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1432.   As a direct and proximate result of Count XXIX Defendants' unlawful payments, Yellowstone Medical Rehabilitation P.C. was never eligible for reimbursement under New York's No-Fault Laws at any time during the course of this scheme.

1433.   Throughout the duration of scheme, the Count XXIX Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Yellowstone Medical Rehabilitation P.C.

1434.   Retention of those benefits by the Count XXIX Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT XXX**
**UNJUST ENRICHMENT**
**(Against Dr. Todd Goldman, Chiropractor, P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Todd R. Goldman, D.C., and Motion Medical Diagnostics P.C.)**

1435.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1436.   As alleged herein, Defendants Dr. Todd Goldman, Chiropractor, P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Todd R. Goldman, D.C., and Motion Medical Diagnostics P.C. (collectively, "Count XXX Defendants") conspired to induce Allstate to make numerous and substantial payments to Dr. Todd Goldman, Chiropractor, P.C. pursuant to New York's No-Fault Laws.

1437.   As alleged herein, Dr. Todd Goldman, Chiropractor, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Dr. Todd Goldman, Chiropractor, P.C. received payments from Jeffrey S. Rauch, D.C., Richard C. Koffler, M.D., and Motion Medical Diagnostics P.C. in exchange for patient referrals for otherwise unnecessary treatment.

1438.   When Allstate made No-Fault benefit payments to Dr. Todd Goldman, Chiropractor, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXX Defendants, or those persons working under their control, made concerning Dr. Todd Goldman, Chiropractor, P.C.'s eligibility under New York's No-Fault Laws.

1439.   Each and every No-Fault benefit payment that Allstate was caused to make to Dr. Todd Goldman, Chiropractor, P.C. during the course of this scheme constitutes a benefit that the

Count XXX Defendants aggressively caused Dr. Todd Goldman, Chiropractor, P.C. to seek and voluntarily accept.

1440.   Throughout the course of their scheme, the Count XXX Defendants caused Dr. Todd Goldman, Chiropractor, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling over $14,984.01 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1441.   As a direct and proximate result of Count XXX Defendants' unlawful payments, Dr. Todd Goldman, Chiropractor, P.C. was never eligible for reimbursement under New York's No-Fault Laws at any time during the course of this scheme.

1442.   Throughout the duration of scheme, the Count XXX Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Dr. Todd Goldman, Chiropractor, P.C.

1443.   Retention of those benefits by the Count XXX Defendants would violate fundamental principles of justice, equity, and good conscience.

### COUNT XXXI
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
**(Against Bi County Medical Diagnostics P.C.)**

1444.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1445.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1446.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Jeffrey S. Rauch, D.C.), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Jeffrey S. Rauch, D.C.), (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) billing for excessive and medically unnecessary healthcare services, Bi County Medical Diagnostics P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to Bi County Medical Diagnostics P.C. by its patients.

1447.   Bi County Medical Diagnostics P.C. continues to submit assigned No-Fault claims to Allstate demanding payment and other assigned No-Fault claims remain pending with Allstate.

1448.   Bi County Medical Diagnostics P.C. continues to challenge Allstate's prior claim denials.

1449.   Bi County Medical Diagnostics P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1450.   A justifiable controversy exists between Allstate and Bi County Medical Diagnostics P.C. because Bi County Medical Diagnostics P.C. rejects Allstate's ability to deny such claims.

1451.   Allstate has no adequate remedy at law.

1452.   Bi County Medical Diagnostics P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that

Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Bi County Medical Diagnostics P.C.

1453.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Bi County Medical Diagnostics P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by one or more non-physician, (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services, (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT XXXII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Apollo Medical Diagnostics PLLC)

1454.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1455.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1456.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Jeffrey S. Rauch, D.C.), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Jeffrey S. Rauch, D.C.), (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) billing for excessive and medically unnecessary healthcare services, Apollo Medical Diagnostics PLLC has, at all relevant times, been operating in violation of one or more New York

State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Limited Liability Company Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to Apollo Medical Diagnostics PLLC by its patients.

1457.   Apollo Medical Diagnostics PLLC continues to submit assigned No-Fault claims to Allstate demanding payment and other assigned No-Fault claims remain pending with Allstate.

1458.   Apollo Medical Diagnostics PLLC continues to challenge Allstate's prior claim denials.

1459.   Apollo Medical Diagnostics PLLC continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1460.   A justifiable controversy exists between Allstate and Apollo Medical Diagnostics PLLC because Apollo Medical Diagnostics PLLC rejects Allstate's ability to deny such claims.

1461.   Allstate has no adequate remedy at law.

1462.   Apollo Medical Diagnostics PLLC will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or the future No-Fault claims submitted by Apollo Medical Diagnostics PLLC.

1463.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Apollo Medical Diagnostics PLLC, at all relevant times, was (a) fraudulently organized, (b) unlawfully owned, operated, managed, and/or controlled by one or more non-physician, (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services, (d) billing for healthcare services that were not

actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT XXXIII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Island Medical Diagnostics PLLC)

1464.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1465.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1466.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Jeffrey S. Rauch, D.C.), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Jeffrey S. Rauch, D.C.), (d) billing for healthcare services that were not actually rendered, (e) billing for service rendered pursuant to an unlawful referral, and (f) billing for excessive and medically unnecessary healthcare services, Island Medical Diagnostics PLLC has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education law, and New York Limited Liability Company Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefit payments that were assigned to Island Medical Diagnostics PLLC by its patients.

1467.   Island Medical Diagnostics PLLC continues to submit assigned No-Fault claims to Allstate demanding payment and other assigned No-Fault claims remain pending with Allstate.

1468.   Island Medical Diagnostics PLLC continues to challenge Allstate's prior claim denials.

1469.   Island Medical Diagnostics PLLC continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1470.   A justifiable controversy exists between Allstate and Island Medical Diagnostics PLLC because Island Medical Diagnostics PLLC rejects Allstate's ability to deny such claims.

1471.   Allstate has no adequate remedy at law.

1472.   Island Medical Diagnostics PLLC will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Island Medical Diagnostics PLLC.

1473.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Island Medical Diagnostics PLLC, at all relevant times, was (a) fraudulently organized, (b) unlawfully owned, operated, managed, and/or controlled by one or more non-physician, (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services, (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT XXXIV**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Motion Medical Diagnostics P.C.)**

1474.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1475.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1476.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Jeffrey S. Rauch, D.C.), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Jeffrey S. Rauch, D.C.), (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) billing for excessive and medically unnecessary healthcare services, Motion Medical Diagnostics P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to Motion Medical Diagnostics P.C. by its patients.

1477.   Motion Medical Diagnostics P.C. continues to submit assigned No-Fault claims to Allstate demanding payment and other assigned No-Fault claims pending with Allstate.

1478.   Motion Medical Diagnostics P.C. continues to challenge Allstate's prior claim denials.

1479.   Motion Medical Diagnostics P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1480.   A justifiable controversy exists between Allstate and Motion Medical Diagnostics P.C. because Motion Medical Diagnostics P.C. rejects Allstate's ability to deny such claims.

1481.   Allstate has no adequate remedy at law.

1482.  Motion Medical Diagnostics P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligations to pay the pending, previously denied, and/or any future No-Fault claims submitted by Motion Medical Diagnostics P.C.

1483.  Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Motion Medical Diagnostics P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by one or more non-physician, (c) engaged in the unlawful sharing of fees derived from the provisions of professional physician services, (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT XXXV
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
**(Against Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic)**

1484.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1485.  To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1486.  In view of its (a) billing for healthcare services that were not actually rendered, (b) billing for services rendered pursuant to an unlawful referral, and (c) billing for excessive and medically unnecessary healthcare services, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic has, at all relevant times, been operating in violation of one or more New York State

requirements necessary to be paid for  professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic by its patients.

1487.   Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic continues to submit assigned No-Fault claims to Allstate demanding payment and other assigned No-Fault claims pending with Allstate.

1488.   Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic continues to challenge Allstate's prior claim denials.

1489.   Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1490.   A justifiable controversy exists between Allstate and Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic because Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic rejects Allstate's ability to deny such claims.

1491.   Allstate has no adequate remedy at law.

1492.   Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligations to pay the pending, previously denied, and/or any future No-Fault claims submitted by Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic.

1493.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Fred Jones Chiropractor P.C. d/b/a Sunrise

Chiropractic, at all relevant times, was (a) engaged in the unlawful sharing of fees derived from the provisions of professional physician services, (b) billing for healthcare services that were not actually rendered, (c) billing for services rendered pursuant to an unlawful referral, and (d) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT XXXVI**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Yellowstone Medical Rehabilitation P.C.)**

1494.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1495.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1496.   In view of its (a) billing for healthcare services that were not actually rendered, (b) billing for services rendered pursuant to an unlawful referral, and (c) billing for excessive and medically unnecessary healthcare services, Yellowstone Medical Rehabilitation P.C. has, at all relevant times, been operating in violation of one or more New York State requirements necessary to be paid for professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to Yellowstone Medical Rehabilitation P.C. by its patients.

1497.   Yellowstone Medical Rehabilitation P.C. continues to submit assigned No-Fault claims to Allstate demanding payment and other assigned No-Fault claims pending with Allstate.

210

1498.   Yellowstone Medical Rehabilitation P.C. continues to challenge Allstate's prior claim denials.

1499.   Yellowstone Medical Rehabilitation P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1500.   A justifiable controversy exists between Allstate and Yellowstone Medical Rehabilitation P.C. because Yellowstone Medical Rehabilitation P.C. rejects Allstate's ability to deny such claims.

1501.   Allstate has no adequate remedy at law.

1502.   Yellowstone Medical Rehabilitation P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligations to pay the pending, previously denied, and/or any future No-Fault claims submitted by Yellowstone Medical Rehabilitation P.C.

1503.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Yellowstone Medical Rehabilitation P.C., at all relevant times, was (a) engaged in the unlawful sharing of fees derived from the provisions of professional physician services, (b) billing for healthcare services that were not actually rendered, (c) billing for services rendered pursuant to an unlawful referral, and (d) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT XXXVII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
**(Against Dr. Todd Goldman, Chiropractor, P.C.)**

1504.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1098 as if set forth fully herein.

1505.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1506.   In view of its (a) billing for healthcare services that were not actually rendered, (b) billing for services rendered pursuant to an unlawful referral, and (c) billing for excessive and medically unnecessary healthcare services, Dr. Todd Goldman, Chiropractor, P.C. has, at all relevant times, been operating in violation of one or more New York State requirements necessary to be paid for  professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to Dr. Todd Goldman, Chiropractor, P.C. by its patients.

1507.   Dr. Todd Goldman, Chiropractor, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment and other assigned No-Fault claims pending with Allstate.

1508.   Dr. Todd Goldman, Chiropractor, P.C. continues to challenge Allstate's prior claim denials.

1509.   Dr. Todd Goldman, Chiropractor, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1510.   A justifiable controversy exists between Allstate and Dr. Todd Goldman, Chiropractor, P.C. because Dr. Todd Goldman, Chiropractor, P.C. rejects Allstate's ability to deny such claims.

1511.   Allstate has no adequate remedy at law.

1512.  Dr. Todd Goldman, Chiropractor, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligations to pay the pending, previously denied, and/or any future No-Fault claims submitted by Dr. Todd Goldman, Chiropractor, P.C.

1513.  Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Dr. Todd Goldman, Chiropractor, P.C., at all relevant times, was (a) engaged in the unlawful sharing of fees derived from the provisions of professional physician services, (b) billing for healthcare services that were not actually rendered, (c) billing for services rendered pursuant to an unlawful referral, and (d) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## XII.  **DEMAND FOR RELIEF**

1514.  WHEREFORE, Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BI COUNTY MEDICAL DIAGNOSTICS P.C. ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., and Sari R. Rauch)**

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorneys' fees;

(c)  GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### BI COUNTY MEDICAL DIAGNOSTICS P.C. ENTERPRISE
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M.
Lewis, M.D., and Sari R. Rauch)**

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c)  GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(C)
### APOLLO MEDICAL DIAGNOSTICS PLLC ENTERPRISE
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M.
Lewis, M.D., Richard C. Koffler, M.D., Sari R. Rauch, and Bi County Medical
Diagnostics P.C.)**

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c)  GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### APOLLO MEDICAL DIAGNOSTICS PLLC ENTERPRISE
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., Richard C. Koffler, M.D., Sari R. Rauch, and Bi County Medical Diagnostics P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ISLAND MEDICAL DIAGNOSTICS PLLC ENTERPRISE
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Apollo Medical Diagnostics PLLC, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., and John J. McGee, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### ISLAND MEDICAL DIAGNOSTICS PLLC ENTERPRISE
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Apollo Medical Diagnostics PLLC, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., and John J. McGee, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### MOTION MEDICAL DIAGNOSTICS P.C. ENTERPRISE
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Island Medical Diagnostics PLLC, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Dr. Todd Goldman, Chiropractor, P.C., Fred J. Jones, Jr., D.C., John J. McGee, M.D., and Todd R. Goldman, D.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### MOTION MEDICAL DIAGNOSTICS P.C. ENTERPRISE
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Island Medical Diagnostics PLLC, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Dr. Todd Goldman, Chiropractor, P.C., Fred J. Jones, Jr., D.C., John J. McGee, M.D., and Todd R. Goldman, D.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### DR. RONALD P. MAZZA, D.C., P.C. ENTERPRISE
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Jacqueline M. Lewis, M.D., Bi County Medical Diagnostics P.C., Apollo Medical Diagnostics PLLC, Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

217

**COUNT X**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**DR. RONALD P. MAZZA, D.C., P.C. ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler,**
**M.D., Jacqueline M. Lewis, M.D., Bi County Medical Diagnostics P.C., Apollo Medical**
**Diagnostics PLLC, Island Medical Diagnostics PLLC, and Motion Medical**
**Diagnostics P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**FRED JONES CHIROPRACTIC P.C. d/b/a SUNRISE CHIROPRACTIC ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler,**
**M.D., Fred J. Jones, Jr., D.C., Island Medical Diagnostics PLLC, and Motion Medical**
**Diagnostics P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**FRED JONES CHIROPRACTOR P.C. d/b/a SUNRISE CHIROPRACTIC ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler,**
**M.D., Fred J. Jones, Jr., D.C., Island Medical Diagnostics PLLC, and Motion Medical**
**Diagnostics P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XIII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**YELLOWSTONE MEDICAL REHABILITATION P.C. ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler,**
**M.D., John J. McGee, M.D., Island Medical Diagnostics PLLC, and Motion Medical**
**Diagnostics P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XIV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**YELLOWSTONE MEDICAL REHABILITATION P.C. ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., John J. McGee, M.D., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DR. TODD GOLDMAN, CHIROPRACTOR, P.C. ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Todd R. Goldman, D.C., and Motion Medical Diagnostics P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XVI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**DR. TODD GOLDMAN, CHIROPRACTOR, P.C. ENTERPRISE**
**(Against Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler,**
**M.D., Todd R. Goldman, D.C., and Motion Medical Diagnostics P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XVII**
**COMMON LAW FRAUD**
**(Against Bi County Medical Diagnostics P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park**
**Healthcare Alliance, Jacqueline M. Lewis, M.D., and Sari R. Rauch)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

the detection of Defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by Defendants

seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT XVIII**
**COMMON LAW FRAUD**
**(Against Apollo Medical Diagnostics PLLC, Jeffrey S. Rauch, D.C. d/b/a Rego Park**
**Healthcare Alliance, Jacqueline M. Lewis, M.D., Richard C. Koffler, M.D., and Sari R.**
**Rauch)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

the detection of Defendants' illegal conduct;

221

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by Defendants

seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XIX
## COMMON LAW FRAUD
**(Against Island Medical Diagnostics PLLC, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., and John J. McGee, M.D.)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

the detection of Defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by Defendants

seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XX
## COMMON LAW FRAUD
**(Against Motion Medical Diagnostics P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Dr. Todd Goldman, Chiropractor, P.C., Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., John J. McGee, M.D., and Todd R. Goldman, D.C.)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

the detection of Defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by Defendants

seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XXI
## COMMON LAW FRAUD

**(Against Dr. Todd Goldman, Chiropractor, P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Todd R. Goldman, D.C., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C.)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of Defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by Defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XXII
## COMMON LAW FRAUD

**(Against Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Fred J. Jones, Jr., D.C., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C.)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of Defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by Defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XXIII
## COMMON LAW FRAUD

**(Against Yellowstone Medical Rehabilitation P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., John J. McGee, M.D., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of Defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by Defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XXIV
## UNJUST ENRICHMENT
**(Against Bi County Medical Diagnostics P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., and Sari R. Rauch)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT XXV
## UNJUST ENRICHMENT
**(Against Apollo Medical Diagnostics PLLC, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Jacqueline M. Lewis, M.D., Richard C. Koffler, M.D., and Sari R. Rauch)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT XXVI
## UNJUST ENRICHMENT
**(Against Island Medical Diagnostics PLLC, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Dr. Richard C. Koffler, M.D., Sari R. Rauch, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Fred J. Jones, Jr., D.C., and John J. McGee, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

### COUNT XXVII
### UNJUST ENRICHMENT

**(Against Motion Medical Diagnostics P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Sari R. Rauch, Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, Yellowstone Medical Rehabilitation P.C., Dr. Todd Goldman, Chiropractor, P.C., Fred J. Jones, Jr., D.C., John J. McGee, M.D., and Todd R. Goldman, D.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

### COUNT XXVIII
### UNJUST ENRICHMENT

**(Against Fred Jones Chiropractor P.C. d/b/a/ Sunrise Chiropractic, Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Fred J. Jones, Jr., D.C., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

### COUNT XXIX
### UNJUST ENRICHMENT

**(Against Yellowstone Medical Rehabilitation P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., John J. McGee, M.D., Island Medical Diagnostics PLLC, and Motion Medical Diagnostics P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

### COUNT XXX
### UNJUST ENRICHMENT

**(Against Dr. Todd Goldman, Chiropractor, P.C., Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance, Richard C. Koffler, M.D., Todd R. Goldman, D.C., and Motion Medical Diagnostics P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT XXXI**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Bi County Medical Diagnostics P.C.)**

(a)  DECLARE that Bi County Medical Diagnostics P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b)  DECLARE that Bi County Medical Diagnostics P.C.'s activities are unlawful;

(c)  DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Bi County Medical Diagnostics P.C., and

(d)  GRANT all other relief this Court deems just.

**COUNT XXXII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Apollo Medical Diagnostics PLLC)**

(a)  DECLARE that Apollo Medical Diagnostics PLLC., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b)  DECLARE that Apollo Medical Diagnostics PLLC's activities are unlawful;

(c)  DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Apollo Medical Diagnostics PLLC; and

(d)  GRANT all other relief this Court deems just.

**COUNT XXXIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Island Medical Diagnostics PLLC)**

(a)  DECLARE that Island Medical Diagnostics PLLC, at all relevant times, has been

unlawfully organized, controlled, and/or operated by at least one non-physician, and

otherwise operated in violation of at least one New York state and/or local licensing

requirement necessary to provide professional physician services in New York;

(b)  DECLARE that Island Medical Diagnostics PLLC's activities are unlawful;

(c)  DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or

future No-Fault insurance claims submitted by Island Medical Diagnostics PLLC, and

(d)  GRANT all other relief this Court deems just.

**COUNT XXXIV**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Motion Medical Diagnostics P.C.)**

(a)  DECLARE that Motion Medical Diagnostics P.C., at all relevant times, has been

unlawfully organized, controlled, and/or operated by at least one non-physician, and

otherwise operated in violation of at least one New York state and/or local licensing

requirement necessary to provide professional physician services in New York;

(b)  DECLARE that Motion Medical Diagnostics P.C.'s activities are unlawful;

(c)  DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or

future No-Fault insurance claims submitted by Motion Medical Diagnostics P.C., and

(d)  GRANT all other relief this Court deems just.

## COUNT XXXV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic)

(a) DECLARE that Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic, at all relevant times, has operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Fred Jones Chiropractor P.C. d/b/a Sunrise Chiropractic; and,

(d) GRANT all other relief this Court deems just.

## COUNT XXXVI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Yellowstone Medical Rehabilitation P.C.)

(a) DECLARE that Yellowstone Medical Rehabilitation P.C. at all relevant times, has operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that Yellowstone Medical Rehabilitation P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Yellowstone Medical Rehabilitation P.C., and,

(d) GRANT all other relief this Court deems just.

**COUNT XXXVII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Dr. Todd Goldman, Chiropractor, P.C.)**

(a)  DECLARE that Dr. Todd Goldman, Chiropractor, P.C. at all relevant times, has operated

in violation of at least one New York state and/or local licensing requirement necessary

to provide professional physician services in New York;

(b)  DECLARE that Dr. Todd Goldman, Chiropractor, P.C.'s activities are unlawful;

(c)  DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or

future No-Fault insurance claims submitted by Dr. Todd Goldman, Chiropractor, P.C.,

and,

(d)  GRANT all other relief this Court deems just.

## JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all counts.

KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____

Richard D. King, Jr. (RK8381)
rking@ktmpc.com
Nathan A. Tilden (NT0571)
ntilden@ ktmpc.com
Shauna L. Sullivan (SS5624)
ssullivan@ ktmpc.com
Hugh C. M. Brady (HB4724)
hbrady@ ktmpc.com
350 Granite St., Ste 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Indemnity Company,*
*Allstate Fire and Casualty Insurance Company, and*
*Allstate Property and Casualty Insurance Company*

Dated: April 28, 2022